UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC )<br><br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant, )<br>)<br>) | Court No. 24-00263<br><br>**PUBLIC VERSION** |

## <u>COMPLAINT</u>

Plaintiff Bridgestone Americas Tire Operations, LLC ("Plaintiff," "Bridgestone," or BATO), by and through its attorneys, alleges and states:

## <u>ADMINISTRATIVE DETERMINATION CONTESTED</u>

1.       This action is an appeal from the final determination issued by the United States Department of Commerce (the "Department" or "Commerce") in the Antidumping Investigation of Truck and Bus Tires from Thailand (the "Investigation").

2.       Commerce published its contested final determination in the Federal Register on October 17, 2024.  *See Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 89 Fed. Reg. 83,636 (October 17, 2024) ("Final Determination").

3.       Based on the Final Determination, Commerce issued the Antidumping Duty Order on Truck and Bus Tires from Thailand.  *See Truck and Bus Tires From Thailand: Antidumping Duty Order,* 89 Fed. Reg. 102,111 (December 17, 2024) (the "AD Order").

4.      Commerce's final determinations, findings, and conclusions are set out primarily in the issues and decision memorandum for the Final Determination.  *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand* (October 9, 2024) ("Final IDM").

## JURISDICTION

5.      Plaintiff Bridgestone brings this action pursuant to Section 516A(a)(2) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. § 1516a(a)(2).  Bridgestone contests the Final Determination generally and specifically as applied to Bridgestone in connection with the Investigation.  This Court has jurisdiction under 28 U.S.C. § 1581(c).

## STANDING

6.      Plaintiff Bridgestone is a U.S. importer of truck and bus tires from Thailand and therefore an interested party under Sections 516A(f)(3) and 771(9) of the Act, codified at 19 U.S.C. §§ 1516a(f)(3) and 1677(9) respectively.  Bridgestone was also a party to the administrative proceeding from which this matter arises.  Bridgestone thus has standing to bring this action under 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

7.      Plaintiff filed a Summons with this Court on December 23, 2024, within 30 days from the date of publication of the AD Order.  Plaintiff filed a Complaint on December 23, 2024, pursuant to 19 U.S.C. § 1516a(a)(2)(A) and Rule 3 of the Rules of this Court, which requires that the Complaint be filed within 30 days of the Summons.

**STANDARD OF REVIEW**

8.    The Court must hold unlawful any administrative determination by Commerce that is "unsupported by substantial evidence on the record as a whole, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

**STATEMENT OF FACTS**

9.    Paragraphs 1 through 8 are realleged and incorporated herein.

10.    On November 6, 2023, Commerce initiated the Investigation. *See Truck and Bus Tires from Thailand*: *Initiation of Less-Than-Fair-Value Investigation*, 88 Fed. Reg. 77,960 (November 14, 2023).

11.    Commerce selected Bridgestone Corporation and Prinx Chengshan Tire (Thailand) Co. Ltd. as the mandatory respondents.  Bridgestone Corporation, through its subsidiaries, produces truck and bus tires in Thailand, which are then imported into the United States by its U.S. subsidiary, BATO.

12.    During the questionnaire phase of the investigation, Bridgestone submitted the following responses:

- Section A response (January 8, 2024) ("AQR");

- Sections B-D response (January 29, 2024) ("BCDQR");

- Supplemental Section A response (February 20, 2024) ("SAQR");

- Supplemental Section D response (March 12, 2024) ("SDQR");

- Supplemental Sections A-B response (April 15, 2024) ("SABQR");

- Supplemental Section C response (April 22, 2024) ("SCQR");

- Second Supplemental Section C Response (May 2, 2024) ("2SCQR"); and

- Second Supplemental Sections B-C Response (May 22, 2024) ("2SBCQR").

13.     On May 2, 2024, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Petitioner") filed its pre-preliminary results comments.

14.     On May 10, 2024, Bridgestone filed its rebuttal pre-preliminary results comments ("Pre-Prelim Rebuttal Comments").

15.     On May 20, 2024, Commerce issued its preliminary determination and calculated a dumping margin of 2.35 percent for Bridgestone.  *See Truck and Bus Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination*, 89 Fed. Reg. 43,806 (May 20, 2024); *see also* Preliminary Determination Margin Calculation for Bridgestone Corporation (May 14, 2024).

16.     Commerce conducted three verifications – home market sales, U.S. sales, and cost.  Commerce's verification of Bridgestone's U.S. sales took place from June 26 to 28, 2024, at BATO's headquarters in Nashville, Tennessee (the "Verification").

17.     On July 8, 2024, Bridgestone filed the documents collected by Commerce's verifiers during the Verification (the "Verification Exhibits").

18.     On August 22, 2024, Commerce issued its sales verification report (the "Verification Report").

19.     On September 16, 2024, Bridgestone submitted its administrative case brief (the "Case Brief").

20.     Commerce's briefing schedule allowed only three days for submitting rebuttal briefs.  Commerce's regulations provide that an interested party may submit a rebuttal brief within five days after the deadline for case briefs unless Commerce alters the time limit. *See* 19

C.F.R. § 351.309(d)(1). Bridgestone requested an extension to provide the standard five-day

period, but Commerce denied the request.

21.    Despite the shortened period for rebuttal briefs, Bridgestone submitted its

administrative rebuttal brief on September 19, 2024, pursuant to Commerce's briefing schedule.

22.    On October 17, 2024, Commerce published its final determination in its

investigation concerning truck and bus tires from Thailand.  *See* Final Determination.

Commerce assigned a dumping margin of 48.39 percent for Bridgestone, based on total facts

available, with an adverse inference.  *See* Final IDM, at 4.

23.    In the Final IDM, Commerce admitted the following errors in the Verification

Report:

- In the Verification Report, Commerce claimed that "screenshots of the total
  values of BATO's billing adjustments for its sales reconciliation" were
  requested but not provided by Bridgestone.  *See* Verification Report, at 2.
  Despite its claim to the contrary in the Verification Report, Commerce
  admitted in the Final IDM that such screenshots were, in fact, provided by
  Bridgestone and incorporated into the Verification Report.  *See* Final IDM, at
  23.

- In the Verification Report, Commerce claimed that "the values reported for
  individual bills of lading reported in Exhibit C-24 of {… Bridgestone's initial
  Sections B-D response[1]} for international freight, U.S. duty, and other U.S.
  movement expenses (INTNFRU, USDUTYU, USOTHTRU) did not match
  the values in the calculation worksheet Bridgestone used to calculate the per-

---

[1] Defined in this Complaint as "BCDQR."

unit amounts for these expenses." Verification Report, at 3. Despite its claim to the contrary in the Verification Report, Commerce admitted in the Final IDM that such expenses did, in fact, match the values in the calculation worksheet that Bridgestone used to calculate the per-unit amount for these expenses. *See* Final IDM, at 31.

24.    In the Final IDM, Commerce based its decision to apply total adverse facts available ("Total AFA") on the following findings: (1) Bridgestone withheld information related to GCR, an affiliated reseller of tires in the United States; (2) Bridgestone withheld information related to rebates paid to U.S. customers; (3) Bridgestone withheld information related to other discounts; and (4) Bridgestone withheld information related to the destination of its U.S. shipments.

25.    Bridgestone believes Commerce's decision to apply Total AFA was not supported by substantial evidence and/or was not in accordance with the law as set forth in Counts I through X below.

## COUNT I

### (GCR - Alleged Failure to Provide A/R Report)

26.    Paragraphs 1 through 25 are realleged and incorporated herein.

27.    Commerce unlawfully determined that Bridgestone withheld information related to GCR during the Verification.  This information was provided during the Verification but was not collected by Commerce's verifiers.  Commerce's refusal to collect the information constitutes an abuse of discretion.

28.    "Verification procedures are reviewed for an abuse of discretion." *PT. Asia Pacific Fibers Tbk v. United States*, Court Case 22-00007, Slip Op. 23-175, at 10 (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).

29.    In its Section A response, Bridgestone explained that most GCR locations were sold to unaffiliated parties prior the Period of Investigation ("POI"), but eleven GCR locations were affiliated during the POI – two GCR locations in Spokane, WA that were sold to Commercial Tire, Inc. on October 14, 2022 (fourteen days after the beginning of the POI) and nine GCR locations that remained affiliated with Bridgestone throughout the POI.

30.    On January 29, 2024, Bridgestone reported its sales to all GCR locations, in addition to its sales to other customers.  Bridgestone also submitted a list of customer codes and ship-to codes which, when combined with the information in its Section A response, could be used to identify which sales were made affiliated or unaffiliated GCR locations.  *See* CQR, at Exhibit C-1 and Exhibit C-17.

31.    On May 22, 2024, Bridgestone responded to Commerce's second supplemental Sections B-C questionnaire and provided a dataset containing sales by the affiliated GCR's locations to its customers. *See* 2SBCQR, at Exhibit 3SC-1b.

32.     On June 3, 2024, Commerce issued its sales verification outline.  The outline did not include general requests related to GCR, nor did it request information regarding GCR's affiliation status or the methodology Bridgestone employed to account for sales to affiliated customers.

33.     In the Verification Report, Commerce states that it requested "BATO to provide a reconciliation of its accounts receivable for sales made to affiliated GCR locations {…}."  This statement is factually incorrect.  Commerce's verifiers did not request any "reconciliation" with respect to the accounts receivable ("A/R").  They simply requested A/R for the eleven GCR locations.

34.     Bridgestone's counsel retains a picture of the common board, taken during the Verification, describing this request as simply "A/R."

35.     In response to the verifier's request, Bridgestone provided the A/R reports for the eleven GCR locations.

36.     Commerce declined to accept Bridgestone's A/R reports at Verification.  The only reason provided by Commerce's verifiers at the time of declining the documents was that the person that prepared the report was not available at the precise time Commerce requested to speak with the preparer (approximately 3:30 p.m. on Friday, the last day of the scheduled Verification).  The verifiers did not indicate which questions it had regarding the reports, nor did it ask if any other person could answer questions.  During the Verification, Bridgestone had a total of fourteen people on standby to answer any questions from the verifiers.  *See* Verification Report, at Attachment 2 (p. 2).

37.     Commerce's finding that Bridgestone withheld information is not supported by substantial evidence, constitutes an abuse of discretion, and is otherwise not in accordance with

law.  The reports were available for review at 9:00 am (on Friday, the last day of the scheduled

Verification), and Commerce asked to speak with the person who prepared the A/R reports at

around 3:30 p.m. (again on Friday, the last day of the scheduled Verification).  When the person

was unavailable at that precise moment, the verifiers declined to accept the A/R report.  The

verifiers ended the Verification prior to 5:00 p.m. on that date.  Commerce's failure to

incorporate the A/R reports into the administrative record constitutes an abuse of discretion and

is not in accordance with the law, and its assignment of Total AFA based, in part, on the absence

of this information in the administrative record is unsupported by substantial evidence.


## COUNT II

### (GCR - Alleged Incompleteness of A/R Report)

38.    Paragraphs 1 through 37 are realleged and incorporated herein.

39.    Commerce's finding that the A/R reports provided by Bridgestone during the

Verification were not complete is unsupported by substantial evidence.

40.    "{T}he record supporting an agency's decision must support a 'rational

connection between the facts found and the choice made.'"  *Goodluck India Ltd. v. United

States*, Slip Op. 23-164, Court No. 22-00024, at 16 (Ct. Int'l Trade Nov. 21, 2023) (citing

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

41.    At Verification, Commerce's verifiers requested A/R reports for the eleven GCR

locations identified as having been affiliated during the POI.

42.    In response to the verifier's request, Bridgestone provided the A/R reports for the

eleven GCR locations.  The reports indicated the A/R balances for the eleven locations as of

September 30, 2023 (the last day of the POI).

43.    At the time Commerce's verifiers declined to accept the A/R reports, the verifiers did not indicate that they were incomplete.  The only reason provided by Commerce's verifiers for declining the documents was that the person that prepared the report was not available at the precise time Commerce requested to speak with the preparer (approximately 3:30 pm on Friday, the last day of the scheduled Verification).  During the Verification, Bridgestone had a total of fourteen people on standby to answer any questions from the verifiers.  *See* Verification Report, at Attachment 2 (p. 2).  However, the verifiers did not indicate which questions it had regarding the reports, nor did it ask if any other person could answer questions.

44.    In the Final IDM, Commerce explains that it did not collect the A/R report because "it was not complete."  *See* Final IDM, at 20.

45.    The A/R reports were complete.  They indicated A/R balances for the eleven GCR locations as requested by Commerce's verifiers and showed A/R balances (and details of such balances) for all GCR locations reported in Bridgestone's U.S. sales data.

46.    Commerce's finding that the A/R reports were incomplete is unsupported by substantial evidence.  The A/R reports were complete and contained exactly the information requested by the verifiers.


## COUNT III

### (GCR - Relevance of the A/R Reports)

47.    Paragraphs 1 through 46 are realleged and incorporated herein.

48.    Bridgestone's A/R reports are not rationally related to (1) the affiliation status of the GCR locations, and (2) the reasonableness of the methodology employed by Bridgestone to account for sales to unaffiliated customers.  Commerce claims, without adequate explanation, that its request for the A/R reports "was intended to verify" these points.  *See* Final IDM, at 18.

49.    "To support its factual findings with substantial evidence, an agency must explain the standards that it applied and demonstrate a rational connection between the facts on the record and the conclusions drawn." *Alloy Piping Products, Inc. v. U.S.*, Slip Op. 09-29, Consol. Court No. 08-00027, at 3 (Ct. Int'l Trade Apr. 14, 2009) (citing *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). An agency's failure to adequately explain its determination not only renders the determination unsupported by substantial evidence, but it also renders the decision not in accordance with law, given that an inadequately explained decision may be arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382-83 (Fed. Cir. 2001).

50.    In the Final IDM, Commerce asserts the issue concerning Bridgestone' alleged failure to provide the A/R report is whether sales *by* GCR were accurately reported – "the issue at hand is whether Bridgestone reported its sales to the first unaffiliated customer, <u>through its affiliate GCR</u> locations, accurately and to the best of its ability." *See* Final IDM, at 17 (emphasis added).

51.    However, Commerce's Verification inquiry focused on sales <u>*to*</u> GCR.  In the Verification Report, Commerce claimed is that it was "unable to identify the CEP sales in Bridgestone's U.S. sales database that were made to its affiliate GCR locations or reconcile these sales to BATO's accounting system during the Verification." *See* Verification Report, at 17. Notwithstanding the foregoing, Commerce subsequently concedes that sales to GCR were verified and not contested – "Whether Bridgestone completely reported its sales of subject merchandise from BATO to BATO's immediate customers is not in question." *See* Final IDM, at 17.

52.     The record does not indicate that Commerce's Verification inquiry, including the request for A/R reports, was related to sales *by* GCR.  However, in the Final IDM, Commerce attempts to link these issues by stating that the request "was intended to verify Bridgestone's identification of sales to affiliated GCR locations and the reasonableness of its proposed allocation methodology of sales from GCR to the first unaffiliated customer."  *See* Final IDM, at 18.

53.     The A/R reports are not rationally related to these points. Commerce requested, and Bridgestone provided, a report based on accounts receivable, not sales.  Accounts receivable reflects the amount owed by a customer at given point and cannot be used to verify whether a particular sale was made to an unaffiliated or affiliated party.  Bridgestone's A/R reports cannot possibly verify the reasonableness of its reporting of sales from GCR to unaffiliated customers.

54.     There is no rational connection between the two points Commerce claimed to have failed to verify and the absence of A/R reports in the record.  Therefore, Commerce's conclusion that Bridgestone's failed to verify the accuracy of its reporting of sales by GCR by failing to provide the requested A/R report lacks a rational connection.

## COUNT IV

### (GCR – Insufficient Grounds for AFA)

55.     Paragraphs 1 through 54 are realleged and incorporated herein.

56.     Bridgestone's alleged failure to provide the A/R reports for affiliated GCR locations does not provide substantial evidence to support Commerce's decision to apply Total AFA.

57.     The purpose of Section 1677e(b) is to provide respondents with an incentive to cooperate, "not to impose punitive, aberrational, or uncorroborated margins.'' *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000 (citing *Borden, Inc., Gooch Foods, and Hershey Foods Corp. v. United States*, No. 96-08-01970, at 4 (Ct. Int'l Trade Dec. 16, 1998)). "The purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation, not to impose punitive damages." *Essar Steel*, 678 F.3d at 1276 (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A.*, 216 F.3d at 1032).

58.     Bridgestone's sales to the eleven GCR locations, affiliated with Bridgestone during the POI, accounts for [     ] percent of all reported U.S. sales.   Rejecting Bridgestone's entire response based on a finding related to such a small portion of its sales is both disproportionate and punitive.

59.     Commerce's determination to apply Total AFA in part because of alleged inability to verify a group of sales constituting only [     ] percent of all reported U.S. sales is unsupported by substantial evidence.

## COUNT V

### (Rebates – Alleged Failure to Provide the Breakdown List)

60.     Paragraphs 1 through 59 are realleged and incorporated herein.

61.     Commerce unlawfully determined that Bridgestone failed to provide a breakdown of the largest and smallest total values received by BATO's customers for each type of rebate. *See* Final IDM, at 21.

62.    "{A}n agency acts arbitrarily, and therefore unreasonably, when it {…} 'offer{s} an explanation for its decision that runs counter to the evidence before {it}.'" *Ad Hoc Shrimp Trade Action Comm. v. United States*, Slip Op. 15-53, Court No. 13-00346 (Ct. Int'l Trade Jun. 5, 2015) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 43 (1983)).

63.    In the Investigation, Bridgestone disclosed three U.S. rebate programs: (1) Volume Bonus, (2) Exceptional Growth, and (3) Smart Resource (collectively, the "Rebate Programs"). *See* Final IDM, at 24.

64.    During the Verification, Commerce requested a breakdown of the largest and smallest total values received by BATO's customers for each type of rebate (the "Rebate Breakdown List").

65.    Bridgestone provided the requested Rebate Breakdown List.  Commerce's verifier reviewed the list and used it to request documentation for the customers with the smallest and largest values for the Exceptional Growth rebate program (i.e., the customers with the highest and lowest rebate payments).

66.    To prepare the Rebate Breakdown List, Bridgestone used a report from Vistex displaying actual payout amounts of rebates under its various rebate agreements for each month of the POI for each customer" (the "Vistex Report") and the list of rebate agreements with associated rebate types. (the "Rebate Type List").

67.    During the Verification, Commerce's verifier inquired about the status of the Rebate Breakdown List. Bridgestone's counsel informed the verifier that the list for the two rebate programs was complete and provided him with a printout.  Bridgestone's counsel noted that the list for the Smart Resource program would be ready shortly.

68.    The verifier reviewed the Rebate Breakdown List for the two programs and highlighted customers [      ] and [      ], identified as the recipients of the largest and smallest values under the Exceptional Growth program (i.e., the allegedly withheld information).

69.    The verifiers requested that Bridgestone provide sample supporting documentation regarding payouts made to these two customers.  When asked whether he wanted to collect the full list, the verifier stated it was unnecessary.  He also indicated that completing the list for the Smart Resource program would not be required.

70.    Shortly after the verifier reviewed the list, Bridgestone's counsel sent an email to a company official, at 1:04 p.m., requesting documentation regarding the selected customers. The email included an Excel file identifying specific rebate payouts to customers [      ] and [ ] and requested detailed supporting documentation about the payouts.

71.    Bridgestone's counsel retains two Excel files containing working versions of the Rebate Breakdown List as provided to the verifier.  The metadata from these Excel files show that they were last saved on June 28, 2024, at 11:31 a.m. and 11:44 a.m., while the Verification was ongoing.  Both files identify customers [      ] and [      ] as having the largest and smallest rebate payments under the Exceptional Growth program.

72.    Commerce's verifiers subsequently collected: (1) sample selection of the Vistex Report (3 out of 35 pages); (2) the rebate type list; (3) the summary of the Rebate Breakdown List; and (4) documentation related to rebate payouts for the customers with the highest and lowest rebate amounts, customers [      ] and [      ].

73.    Commerce's determination that Bridgestone withheld information related to the highest and lowest rebate customers is unsupported by substantial evidence.  Commerce not only

reviewed, but used, the complete list to identify the customers with the highest and lowest rebate values.

## COUNT VI

### (Rebates – Alleged Failure to Provide Documentation Regarding GL)

74.    Paragraphs 1 through 73 are realleged and incorporated herein.

75.    Commerce unlawfully applied Total AFA based on Bridgestone's alleged failure to provide documentation regarding the credit balance in account [        ]. *See* Final IDM, at 21.

76.    Commerce is not required to apply AFA for a respondent's failure to provide information if that information is deemed irrelevant. *See Husteel Co., Ltd., et al., v. United States*, Consol. Court No. 14-00215, Slip. Op. 15-100, at 68 (Ct. Int'l Trade Sept. 2, 2015) (Even if Commerce could have concluded that NEXTEEL did not act to the best of its abilities, Commerce did not abuse its discretion by choosing to rely on later submitted information instead of applying AFA "because of supposed deficiencies regarding information that Commerce ultimately deemed irrelevant {…}.").

77.    During Verification, Commerce's verifiers requested documentation regarding a credit balance in BATO's general ledger account [        ] for Volume Bonus rebates for January through September 2023.

78.    However, account [        ] was not used to record reportable rebate expenses. Bridgestone officials explained that account pertained to Volume Bonus rebates to the affiliated customer, GCR. *See* Sales Verification Report, at 24.

79.    Moreover, the credit balance referenced by Commerce was only [          ], representing approximately [        ] of the reported Volume Bonus amount and [         ] of total U.S. sales.

80.    Any impact resulting from the credit balance would arise only if Bridgestone had claimed the credit balance as a deduction to the reported rebate expenses.  Bridgestone did not claim the credit balance as a deduction to the reported rebate expenses.

81.    In its Final IDM, Commerce failed to articulate a rational explanation as to how the alleged failure to provide the requested credit balance documentation rendered Bridgestone's sales information so unreliable as to justify application of Total AFA.

82.    Accordingly, Commerce's reliance on this issue in support of its Total AFA determination is unlawful.

## COUNT VII

### (Rebates – Commerce' Refusal to Accept Correction)

83.    Paragraphs 1 through 82 are realleged and incorporated herein.

84.    At the beginning of the Verification, Bridgestone attempted to report certain revisions in its rebate expense fields as minor errors.  *See* Final IDM, at 24.

85.    Commerce's verifiers, however, declined to accept this information as a minor error on the grounds that the requested corrections to the field were not minor in nature.  *See* Final IDM, at 24.

86.    Bridgestone's proffered minor correction regarding rebate claims did not provide any new factual information and referenced record evidence that could be used to repopulate the rebate data points.

87.    The amounts of rebates paid were verified by Commerce.

88.    Commerce's determination not to accept revisions to the reported rebate amounts is not supported by substantial evidence and in accordance with the law.

89.    "'{A}n agency must either conform itself to its prior decisions or explain the reasons for its departure.' {…} If Commerce does decide to depart from its practice, it is required to provide a reasonable explanation for doing so." *Dalian Hualing Wood Co. v. United States*, Slip Op. 23-179, Court No. 22-00334, at 10 (Dec. 18, 2023 Ct. Int'l Trade 2023) (citing *NTN Bearing Corp. of America v. United States*, 14 CIT 623, 634, 747 F. Supp. 726, 736 (1990) and *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)).

90.    "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

91.    Commerce routinely accepts minor errors despite their impact on "allocations, matches, and calculations that follow."  See *Goodluck India Ltd. v. United States*, Slip Op. 19-110, Court No. 18-00162 (Ct. Int'l Trade 2019) (citing *National Steel Corp. v. United States*, 870 F. Supp. 1130 (Ct. Int'l Trade 1994)).

92.    Bridgestone's proffered minor correction regarding rebate claims did not provide any new factual information and referenced record evidence that could be used to repopulate the rebate data points.

93.    The amounts of rebates paid were verified by Commerce.

94.    Commerce's rejection of the proffered minor correction as it related to rebate claims is not supported by substantial evidence.

## COUNT VIII

### (Other Discounts)

95.    Paragraphs 1 through 94 are realleged and incorporated herein.

96.    Commerce's determination that Bridgestone withheld information about other discounts at Verification is unsupported by substantial evidence.

97.    Substantial evidence is "more than a mere scintilla" and amounts to what a "reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

98.    At Verification, Bridgestone provided a monthly schedule of debit and credit notes (the "Monthly Debit/Credit Schedule").  Bridgestone explained to Commerce how the Monthly Debit/Credit Schedule ties to Bridgestone's accounting system.

99.    The Verification Report confirms that "{c}ompany officials provided a monthly schedule of the total credit and debit notes issued to dealers." Sales Verification Report, at 23. The Verification Report then explains that Commerce "requested an itemized reconciliation for the OTHDISU values reported in this ***schedule*** to BATO's accounting system but did not receive this reconciliation prior to the conclusion of verification." *Id* (emphasis added).

100.    In its Case Brief, Bridgestone reexplained how the amounts in the Monthly Debit/Credit Schedule tied to Bridgestone's accounting system, and how and where the reconciliation between debit and credit notes and Bridgestone's accounting system is discussed in the Verification Report and referred Commerce to the supporting exhibits.  *See* Bridgestone's Admin. Case. Br. at 17-19.

101.     In the Final Determination, Commerce admits that it "agree{s} with Bridgestone's argument that the total amount of credit and debit notes were reconciled to BATO's trial balance {…}", contrary to the claim in the Verification Report.  *See* Final IDM, at 23.

102.     In the Final IDM, Commerce incorrectly suggests that it had requested a reconciliation between credit/debit notes (which may include items beyond the Monthly Debit/Credit Schedule) and Bridgestone's accounting system: "detailed reconciliation … to allow the verifiers to examine the appropriateness of using the ***total value of the credit and debit notes*** as an expense adjustment."  *Id (emphasis added).*

103.     No such request was made, and no such request is referenced in the verification outline or report.  Only the reconciliation between the Monthly Debit/Credit Schedule and Bridgestone's accounting system is referenced in the Verification Report as having been requested.

104.     Bridgestone maintained a list of outstanding items during the Verification on a common board, and no such request was made or recorded.

105.     At approximately 3:00 p.m. on June 28, 2024, the final day of Verification, one of Commerce's verifiers was observed taking a picture of the outstanding items list. That list did not contain a request for a "detailed reconciliation … to allow the verifiers to examine the appropriateness of using the total value of the credit and debit notes as an expense adjustment."

106.     Commerce's determination that information related to other discounts was withheld by Bridgestone is unlawful.

## COUNT IX

### (Other Issues Cited for Total AFA)

107.    Paragraphs 1 through 106 are realleged and incorporated herein.

108.    In the Final IDM, Commerce bases its decision to apply Total AFA in part on inaccurate reporting of warehousing, indirect selling, and warranty expenses. *See* Final IDM, at 29-31, 33.  Commerce also relies in part on inaccurate reporting of ship-to destinations. *Id*. at 28. Commerce's application of Total AFA based on these grounds is unlawful.

109.    Total AFA is appropriate "where none of the reported data is reliable or usable" because, for example, all of the "submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed.Cir.2011); *see also Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, Slip Op. 11–123, 2011 WL 4829947, at * 14 (CIT Oct. 12, 2011) (noting that Total AFA involves a deficiency pertaining to "core, not tangential" information).

110.    Bridgestone's calculation of indirect selling expense adjustment was fully disclosed in its supplemental Section C response.  The amount of Bridgestone's indirect selling expense was verified.  No concerns regarding the amount of indirect selling expense were noted in the Verification Report.

111.    Bridgestone's calculation of warehousing expense adjustment was fully disclosed in its supplemental Section C response.  The amount of Bridgestone's warehousing expense was verified.  No concerns regarding the amount of warehousing expense were noted in the Verification Report.

112.    Bridgestone reported both its sold-to and ship-to destination codes in its Section C response.  Destination codes are only used to determine the method used to calculate the

antidumping duty and the appropriateness of using the targeted dumping methodology and do not impact the underlying antidumping duty calculation.

113.    Even assuming *arguendo* that some inaccuracies exist in these fields, they cannot be considered core information that contaminates the entire submission.

114.    For example, Bridgestone's warehousing and warranty expenses are less than 0.33 percent of constructed export price and are insignificant adjustments. Commerce's regulations provide that any individual adjustment or any group of adjustments having an *ad valorem* effect of less than 0.33 percent or 1.0 percent respectively, of constructed export price is ordinarily considered "insignificant." 19 C.F.R. § 351.413. Commerce may decline to take into account such insignificant adjustments. 19 U.S.C. § 1677f-l(a)(2).

115.    Commerce's application of Total AFA based on methodological concerns related to non-core information is unlawful.


## COUNT X

### (Corroboration for AFA Rate)

116.    Paragraphs 1 through ___ are realleged and incorporated herein.

117.    Commerce's failure to corroborate the AFA rate for Bridgestone is unlawful.

118.    The statute provides that when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it "shall, to the extent practicable, corroborate that information from independent source." *See* 19 U.S.C. § 1677e(c)(1). Commerce's regulation provides that independent sources may include published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation. *See* 19 C.F.R. § 351.308(d).

119.    "The corroboration requirement constrains Commerce to select an AFA rate that is a 'reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.' *BMW of North America LLC v. United States*, Slip Op. 20-41, Court No. 15-00052, at 14 (Ct. Int'l Trade Mar. 26, 2020) (citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

120.    In the Final Determination, Commerce assigned Bridgestone the petition rate of 48.39 percent, which is secondary information. *See* Final IDM, at 11. Commerce claims that this rate is corroborated because it is within the range of the individual sales margins calculated for Prinx. *Id.*

121.    However, Prinx's individual sales margins reflect Commerce's application of partial facts available with adverse inferences.  *See* Final IDM, at 4.  Commerce applied "partial AFA to Prinx's claims expense, a direct selling expense, and one of its U.S. rebates."  *Id.* at 10.

122.    A rate based on application of AFA in the investigation itself cannot be used to corroborate another AFA rate in the same investigation, because it is not an "independent source" of information. Thus, Commerce failed to provide independent sources of probative information to corroborate Bridgestone's AFA rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in favor of Plaintiff, declare that Commerce erred in the Final Determination in the subject investigation alleged herein, and remand to the Department with instructions to publish a new final determination in conformity with the opinion of this Court.  Specifically, the Plaintiff prays that this Court remand Commerce to determine that the application of adverse facts available to Bridgestone is unwarranted.  Plaintiff otherwise requests that the Court grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Daniel Cannistra*
Daniel Cannistra, Esq.
Pierce Lee, Esq.

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004

*Counsel for Bridgestone Americas*
*Tire Operations, LLC*

December 23, 2024