**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JUDGE GARY S. KATZMANN**

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,<br><br>*Defendant-Intervenor.* | Court No. 24-00263 |

**MOTION FOR PLAINTIFF
FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 Motion of the Rule of the U.S. Court of International Trade, Plaintiff Bridgestone Americas Tire Operations, LLC ("Bridgestone" or "BATO")  moves for judgment upon the agency record in this action challenging the factual and legal conclusions of the U.S. Department of Commerce (the "Department" or "Commerce") in the final determination issued by the United States in the antidumping investigation of Truck and Bus Tires from Thailand, published on October 17, 2024, *Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 89 Fed. Reg. 83636 (October 17, 2024), and associated Issues and Decision Memorandum.

For the reasons set forth in the attached Plaintiff's Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, Commerce's decision to apply total Adverse Facts Available ("AFA") to Bridgestone is unsupported by substantial evidence and otherwise not in accordance with the law.  Plaintiff respectfully moves this Court to so hold, remand this case to Commerce to reconsider its refusal to calculate Bridgestone's antidumping deposit rate using the company's own data, and grant such other relief as this Court may deem just and proper.

Dated: September 5, 2025

Respectfully submitted,

/s/ Daniel J. Cannistra
Daniel J. Cannistra
Pierce J. Lee
Valerie Ellis

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 508-8780
Email: dcannistra@crowell.com

*Counsel for Plaintiff*

DCACTIVE-81909062.1

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JUDGE GARY S. KATZMANN

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,<br><br>*Defendant-Intervenor.* | Court No. 24-00263<br><br>PUBLIC VERSION<br><br>Confidential Business Proprietary Information Deleted from Pages: 22-23, 27-28, and 38-40 |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee
Valerie Ellis
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2500
Email: dcannistra@crowell.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

RULE 56.2 STATEMENT ....................................................................................1

    A.    Administrative Determination Sought to be Reviewed .........................1

    B.    Issues Presented ..................................................................................1

STANDARD OF REVIEW ..................................................................................1

STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT ...................2

I.     COMMERCE'S APPLICATION OF TOTAL AFA WAS
      UNSUPPORTED BY SUBSTANTIAL EVIDENCE, NOT IN
      ACCORDANCE WITH LAW, AND ABUSE OF DISCRETION................................4

    A.    Commerce's Finding that Requested Information Was Not
        Provided, or That A Gap in the Record Exists, Is Not Supported by
        Substantial Evidence ............................................................................5

    B.    Bridgestone Cooperated to the Best of Its Ability .............................7

    C.    Any Identified Errors Were not so Pervasive to Preclude
        Utilization of the Data .........................................................................8

II.    GCR ISSUES .............................................................................................11

    A.    Commerce's Finding That BATO Failed to Provide Requested
        Information Regarding GCR, Thereby Leaving Gaps in the
        Record, is Unsupported by Substantial Evidence ..............................11

    B.    Commerce's Finding That BATO Failed to put Forth a Maximum
        Effort is Unsupported by Substantial Evidence .................................12

        1.    The verifiers requested A/R reports for 11 stores, not a
            reconciliation.........................................................................12

        2.    BATO provided exactly what was requested by the
            verifiers – complete A/R reports for the 11 stores ................13

        3.    Commerce's claim that BATO failed to provide a
            "complete" reconciliation is unsupported by substantial
            evidence, as there is no rational connection between the
            A/R report and sales to affiliated stores. ...............................16

    C.    Commerce's Rejection of the A/R Reports During the Verification
        Constitutes an Abuse of Discretion....................................................17

        1.    The verifiers did not allocate sufficient time to review the
            A/R reports.............................................................................17

        2.    The verifiers did not explain the reasons for rejecting the
            A/R reports or seek clarification ...........................................17

III.   REBATE ISSUES ...................................................................................19

A.   Commerce's finding that BATO failed to provide requested information regarding rebates, thereby leaving gaps in the record, is unsupported by substantial evidence. ..............................................19

1.   BATO fully cooperated with Commerce's requests for Rebate Data ..................................................................19

B.   Commerce's Refusal to Accept the Minor Correction Regarding Rebate Reporting Constitutes Abuse of Discretion ........................20

1.   The minor correction only referenced the record and did not include new factual information .....................................20

2.   Commerce routinely accepts minor corrections regarding allocation ..............................................................21

C.   The Allegedly Missing Rebate GL Documentation is Irrelevant to Rebate Reporting .............................................................22

1.   The GL was not related to reportable rebates .........................22

2.   The amount in the GL is negligible ....................................23

IV.   NATIONAL ACCOUNT DISCOUNT (OTHDISU) .....................................23

A.   Commerce's Finding That BATO Failed to Provide the Requested Itemized Reconciliation is Unsupported by Substantial Evidence ....................23

V.   MISCELLANEOUS CLERICAL ERRORS ................................................27

A.   Commerce's Finding That Unrelated Clerical Errors had a "Cumulative" Impact is Unsupported by Substantial Evidence .......................27

1.   Domestic warehousing, indirect selling, U.S. warehousing, and warranty expenses ...........................................27

a.   The clerical errors did not result in information gap in the record                                      27

b.   Commerce verified all data points related to these expenses                                              28

c.   Bridgestone Did Not Impede the Investigation         29

d.   The expenses were insignificant compared to the total sales                                            30

2.   Postal codes ...............................................................31

a.   Any issue related to postal codes became moot after Commerce found targeted dumping                       31

DCACTIVE-81904711.1

          b.     ZIP Code Reporting and Cohen's d Zeroing —
Commerce Has Already Applied an Adverse
Inference           31

     3.    Commerce's "Cumulative Minor Errors" Theory Is
Incompatible with the Investigative Standard and Record ....................33

VI.   CORROBORATION OF AFA RATE.................................................................34

    A.    Commerce failed to corroborate the AFA rate ....................................34

VII.  COMMERCE SHOULD CONSIDER THE INFORMATION
CONTAINED IN THE DISPUTED DOCUMENTS AS PART OF THE
ADMINISTRATIVE RECORD AND RECONSIDER ITS AFA
DECISION..................................................................................................36

    A.    The Court Determined That Those Documents Were Requested
and Presented During the Verification.................................................36

     1.    The judicial record demonstrates that the verifiers used the
rebate report and the rebate breakdown list to verify total
rebate amounts and select sample documents.........................................38

     2.    The judicial record shows that the GCR A/R report was
complete with information for all 11 stores requested by the
verifiers ..................................................................................................39

    CONCLUSION AND RELIEF SOUGHT ...............................................................40

iii

DCACTIVE-81904711.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Celik Halat Ve Tel Sanayi A.S. v. United States*,
    557 F. Supp. 3d 1363 (Ct. Int'l Trade 2022) ....................................................9, 22

*Changzhou Hawd Flooring Co. v. United States*,
    77 F. Supp. 3d 1351 (Ct. Int'l Trade 2017) ...............................................................33

*Consol. Bearings Co. v. United States*,
    412 F.3d 1266 (Fed. Cir. 2005)....................................................................................2

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)......................................................................................................2

*Daido Corp. v. United States*,
    893 F. Supp. 43 (Ct. Int'l Trade 1995) .......................................................................8

*Dalian Hualing Wood Co. v. United States*,
    675 F. Supp. 3d 1294 (Ct. Int'l Trade 2023) ............................................................21

*Dupont Teijin Films USA v. United States*,
    407 F.3d 1211 (Fed. Cir. 2005)....................................................................................2

*Euro SME Sdn Bhd. v. United States*,
    No. 1:22-cv-00108 (SAV), 2024 Ct. Intl. Trade LEXIS 16 (Ct. Int'l Trade Feb.
    12, 2024) ....................................................................................................................34

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000)..................................................................................10

*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*,
    35 C.I.T 1398 (2011) .................................................................................................30

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*,
    178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ...........................................................18

*Garg Tube Exp. LLP v. United States*,
    740 F. Supp. 3d 1355 (CIT 2024)................................................................................1

*Goodluck India Ltd. v. United States*,
    393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019) ......................................................21, 34

*Helmerich & Payne v. United States*,
    24 F. Supp.2d 304 (Ct. Int'l Trade 1998) ...................................................................8

iv

DCACTIVE-81904711.1

*Hitachi Energy USA Inc. v. United States,*
34 F.4th 1375 (Fed. Cir. 2022) ........................................................................7

*Husteel Co. v. United States,*
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .....................................................22

*Hyundai Elec. & Energy Sys. Co. v. United States,*
477 F.Supp. 3d, 1324 (2020) ..........................................................................37

*Loper Bright Enterprises v. Raimondo,*
144 S.Ct. 2244 (2024)........................................................................................1

*Micron Tech., Inc. v. United States,*
117 F.3d 1386 (Fed. Cir. 1997).......................................................................18

*Monsanto Co. v. United States,*
698 F. Supp. 275 (Ct. Int'l Trade 1988) .........................................................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)....................................2

*Nat'l Nail Corp. v. United States,*
390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ....................................................9

*Nippon Steel Corp. v. United States,*
337 F.3d 1373 (Fed. Cir. 2003)....................................................................7, 10

*Oman Fasteners, LLC v. United States,*
125 F.4th 1068 (Fed. Cir. 2025) .....................................................................35

*Pt. Asia Pac. Fibers TBK v. United States,*
673 F. Supp. 3d 1320 (Ct. Int'l Trade 2023) ..................................................18

*RHP Bearings v. United States,*
288 F.3d 1334 (Fed. Cir. 2002).......................................................................21

*Rubberflex Sdn. Bhd. v. United States,*
59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) ....................................................18

*Star Fruits S.N.C. v. United States,*
393 F.3d 1277 (Fed. Cir. 2005).........................................................................2

*Tatung Co. v. United States,*
18 C.I.T. 1137 (1994) ........................................................................................8

*Transactive Corp. v. United States,*
91 F.3d 232 (U.S. App. D.C. 1996) ................................................................21

DCACTIVE-81904711.1

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011)....................................................................30

**Statutes**

19 U.S.C. 1677e(a)........................................................................................29

19 U.S.C. 1677m(d).......................................................................................29

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................2

19 U.S.C. § 1516a(b)(1)(B)(ii).......................................................................2

19 U.S.C. §§ 1671-1677n..............................................................................33

19 U.S.C. § 1677a..........................................................................................11

19 U.S.C § 1677e(a)....................................................................................9, 29

19 U.S.C. § 1677e(a)-(b).............................................................................4, 32

19 U.S.C. § 1677e(b)...........................................................................6, 7, 10, 13

19 U.S.C. § 1677e(c)(1).................................................................................34

19 U.S.C. § 1677f-l(a)(2)...............................................................................30

19 U.S.C. § 1677m(d)....................................................................................29

**Regulations**

19 C.F.R. § 351.104.......................................................................................37

19 C.F.R. § 351.212.......................................................................................33

19 C.F.R. § 351.413.......................................................................................31

**Rules**

L.R. 56.2(c)(1)................................................................................................1

**Other Authorities**

*Certain Cold-Rolled Steel Flat Products from India: Final Determination of Sales
    at Less Than Fair Value*, 81 Fed. Reg. 49,938 (2016).............................37

*Ferrosilicon from Brazil: Final Results of Antidumping Duty Administrative
    Review*, 61 Fed. Reg. 59,407 (1996)..........................................................8

DCACTIVE-81904711.1

*Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand* (October 9, 2024) ................................................................................................ *passim*

*Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 89 Fed. Reg. 83636 (October 17, 2024) ..............................................1

*Truck and Bus Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination*, 89 Fed. Reg. 43,806 (May 20, 2024) ...........................................................................................20, 35

DCACTIVE-81904711.1

**RULE 56.2 STATEMENT**

Pursuant to Rule 56.2(c)(1) of the Rules of this Court, Plaintiff, Bridgestone hereby states the administrative decision sought to be reviewed and the issues of law presented.

### A.    Administrative Determination Sought to be Reviewed

The U.S. Department of Commerce ( "Commerce") published its contested final determination in the antidumping investigation of Truck and Bus Tires from Thailand, published on October 17, 2024.  *Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 89 Fed. Reg. 83636 (October 17, 2024), and associated Issues and Decision Memorandum.

### B.    Issues Presented

- Issue One:  Whether Commerce's finding that Bridgestone failed to provide information pertaining to affiliated reseller locations and rebates was supported by substantial evidence.

- Issue Two:  Whether Commerce's finding that Bridgestone significantly impeded the investigation is supported by substantial evidence.

- Issue Three:  Whether Commerce's application of facts otherwise available to Bridgestone is in accordance with the law.

- Issue Four:  Whether Commerce's application of adverse inferences is in accordance with the law.

- Issue Five:  Whether Commerce's refusal to maintain a complete an accurate record is an abuse of discretion or is otherwise not in accordance with the law.

**STANDARD OF REVIEW**

Courts exercise their independent judgment in deciding statutory meaning and in deciding whether an agency has acted within its statutory authority. See, *Garg Tube Exp. LLP v. United States*, 740 F. Supp. 3d 1355, 1365 (CIT 2024). (citing *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2263 & 2273 (2024).  This Court must hold unlawful any determination by Commerce in an antidumping proceeding that is "unsupported by substantial

evidence on the record, or otherwise {is} not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d

1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Moreover, to be upheld, Commerce's decisions must not be "arbitrary, capricious, {or}

an abuse of discretion." 19 U.S.C. § 1516a(b)(1)(B)(ii). An agency's actions are arbitrary and

capricious where the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n*

*of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed.

2d 443 (1983). In other words, {a}n abuse of discretion occurs where the decision is based on an

erroneous interpretation of the law, on factual findings that are not supported by substantial

evidence, or represents an unreasonable judgment in weighing relevant factors. *Consol. Bearings*

*Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (*quoting Star Fruits S.N.C. v. United*

*States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)).

## STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

This case arises from the Department of Commerce's ("Commerce") application of

adverse facts available ("AFA") to Bridgestone in the antidumping investigation of truck and bus

tires from Thailand. Commerce's actions throughout this proceeding fall into three categories:

(1) findings that are unsupported by substantial evidence, (2) determinations that are not in

accordance with law, and (3) a serious failure to maintain the record that amounts to an abuse of

discretion.

Commerce failed in its core responsibility: to diligently and transparently evaluate the record before it. Bridgestone fully cooperated with Commerce, provided complete responses, and opened its books during verification. Commerce's verifiers reviewed that information, found no discrepancies in dozens of tests, and even took corroborating documentation as exhibits. Yet in the Verification Report (as hereinafter defined), Commerce claimed—contrary to its own conduct at the time—that critical data was missing or unverifiable.

The record proves otherwise. Commerce's belated findings of "non-verification" rest not on the absence of evidence, but on Commerce's own delay, inattention, and refusal to accept documents it had in hand. For example, the supposed failure to reconcile sales between Bridgestone Americas Tire Operations, LLC ("BATO") and its affiliate GCR Tires & Service ("GCR") stems from nothing more than Commerce declining to take a copy of an accounts receivable printout it had already reviewed. Likewise, Commerce rejected a minor correction to the rebate database and denied that it went on to verify those same numbers, even though the underlying numbers were already reported elsewhere in Bridgestone's responses and had no material effect on the results.

Despite acknowledging in other instances that its Verification Report contained errors, Commerce doubled down on these two remaining claims—transforming immaterial issues into a pretext for assigning Bridgestone an AFA of 48.39%. This is indefensible. Commerce calculated dumping margins of 0.00 for both companies at the preliminary stage using the statutorily mandated average-to-average price comparison methodology, and even after zeroing (i.e., zeroing out non-dumped sales using an average-to-transaction comparison methodology that has since been deemed unlawful by the Federal Circuit), Bridgestone's verified sales data yielded a rate barely over the *de minimis* threshold. Commerce's refusal to use the sales data in the verified

record, and its assignment of a punitive AFA rate to Bridgestone, is unsupported by substantial evidence and contrary to law.

The Court should remand this case with instructions requiring Commerce to rely on the verified data actually on the record, and to assign Bridgestone a company-specific margin that reflects its true U.S. pricing practices.

## I.    COMMERCE'S APPLICATION OF TOTAL AFA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE, NOT IN ACCORDANCE WITH LAW, AND ABUSE OF DISCRETION

Bridgestone challenges as unlawful Commerce's application of total AFA in determining the antidumping duty deposit rate for Bridgestone's imports of truck and bus tires from Thailand. Application of total AFA is a multistep process requiring the absence of necessary information from the administrative record, a finding of a failure to cooperate to the best of one's ability, and a finding of pervasive errors rendering a respondent's data unreliable in its entirety.   19 U.S.C. § 1677e(a)-(b).   None of these criteria are met in this case.   Commerce's determination that gaps exist in the reported sales information provided by Bridgestone is plainly contradicted by the factual record and is based entirely on Commerce's own failure to follow its procedures combined with the failure of the verifiers in the administrative proceeding to understand the facts and record as provided. *See* discussion *infra* Sections II.A-C, III.B, IV.B, VI, VII.A.2. Likewise, Commerce's inference that Bridgestone somehow failed to cooperate, and that such alleged failure to cooperate significantly impeded Commerce's investigation, is also pure conjecture based on a fundamental misunderstanding of the information Commerce reviewed. *See* discussion *infra* Sections II.B, III.B, VI.A   Additionally, Commerce's allegation that information gaps and failure to cooperate are so pervasive that the entire data submission is deemed unusable is unsupported by the actual responses on the record, and is based on an incomplete record created by Commerce itself, as well as undocumented factual allegations that

do not withstand scrutiny. *See* discussion *infra* Sections II.B.3, III.A, IV.A, V.A  Commerce's determination fails to meet even the minimal legal standard for neutral facts available, much less the standards for partial or total AFA.  Therefore, Commerce's determination must be remanded.

### A. Commerce's Finding that Requested Information Was Not Provided, or That A Gap in the Record Exists, Is Not Supported by Substantial Evidence

In its Final Decision Memorandum, Commerce indicated that it had identified "five instances in which Bridgestone failed to provide requested information prior to the end of verification." *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand* (October 9, 2024) ("*Final Decision Memo*"), at 16-17. Commerce further found that for four of these five instances, Bridgestone failed to act to the best of its ability. *Final Decision Memo*, at 17.  Commerce goes on in the Final Decision Memo to identify three such instances: including a failure to reconcile BATO's accounts receivable to GCR locations, a failure to provide requested documentation for rebates in the U.S. market, and a failure to provide an itemized reconciliation of the OTHDISU (other discounts in the U.S. market) values. *Final Decision Memo*, at 17, 21-22.  The Final Decision Memo also acknowledges that Commerce's finding in the Verification Report alleging a failure to reconcile BATO's U.S. billing adjustments was erroneous. *Final Decision Memo*, at 23. The Final Decision Memo then returns to rebate expenses, where Commerce claims to have "found numerous issues with Bridgestone's reporting of rebates in the U.S. market in its initial and supplemental questionnaire responses**."** *Final Decision Memo*, at 24. After this discussion of rebate reporting, Commerce identifies an issue with reported zip codes for constructed export price ("CEP") sales, which were reported based on billing address rather than shipping address. *Final Decision Memo*, at 28.  Finally, Commerce claims that a domestic warehousing expense that was reported by Bridgestone as part of domestic indirect selling expenses for sales to the

U.S. was not accompanied by a worksheet allowing Commerce to verify the information "other

than an accounting value." *Final Decision Memo*, at 30. Taken together, Commerce claims these

alleged failures rendered Bridgestone's entire U.S. and home market sales databases unusable,

such that Commerce had to use other facts available, other than the record, to estimate

Bridgestone's dumping margin. Commerce's allegations that Bridgestone had failed to provide

requested information form the basis of Commerce's non-cooperation finding, which allegedly

serves as the basis for applying adverse inferences, in accordance with 19 U.S.C. § 1677e(b).

      The facts do not support Commerce's allegations.  As the Court by this point in the

litigation is well aware, Commerce's claims that the information was not provided have been

shown to be plainly false, both for the rebate expenses and for the reconciliation of BATO's AR

to GCR locations. *See* Bridgestone Rebuttal Br., at 5-6 (summarizing Commerce's false claims);

*see also* discussion *infra* Sections II.B, III.A-B.  Rather than a failure to provide the information,

what the record shows is that the information in question was in fact provided, was shown to be

reliable (i.e., was tested, tied, and verified) and then, inexplicably, left out of the record by

Commerce itself. *See* discussion *infra* Sections II.C, III.C, VII.A  Incredibly, Commerce

repeatedly denied the existence of these documents, stubbornly refused to consider the verified

information in reaching its determination, and subsequently submitted affidavits to the Court

baselessly recasting the alleged non-cooperation as a procedural decision by Commerce. *See*

discussion *infra* Sections II.A, II.B.3, III.A, IV.A   Commerce's conduct, including its

questionable representations in affidavits to the Court, should not be rewarded, but rather, should

be addressed accordingly in the Court's decision through an order requiring Commerce to use

Bridgestone's reported sales information to estimate Bridgestone's level of dumping.

### B.      Bridgestone Cooperated to the Best of Its Ability

A finding that Bridgestone did not cooperate in light of these facts would also be unsupported by substantial evidence and otherwise contrary to law. In this proceeding, Bridgestone cooperated to the best of its ability, timely responded to all of Commerce's requests, provided fulsome responses to the points included in the verification outline, and was ready on site to address the Department's questions during verification. *See* discussion *infra* Sections II.B, III.B, V.A.C. As discussed above, a finding that Bridgestone failed to cooperate is unsupported by the record. *See supra* Section I.A.  As such, the statutory condition predicate for applying adverse inferences against an interested party is not met.  See 19 U.S.C. § 1677e(b).

In order to find that a respondent has failed to cooperate to the best of its ability, the Department must (1) "make an objective showing that a reasonable and responsible importer would have known that the requested information was required," and (2) "make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information" but also has failed "to put forth its maximum efforts to investigate and obtain the requested information{.}"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382—83 (Fed. Cir. 2003). "Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382.  Where "Commerce made no such examination," the Federal Circuit has found invocation of an adverse inference to be unsupported by substantial evidence on the record. *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1386 (Fed. Cir. 2022).  If Commerce considers Bridgestone's actions, it is apparent that no reasonable respondent could have guessed that Commerce would have desired to see a GCR-specific reconciliation. *See* discussion *infra*

Section II.B. Without any mention of it in the verification outline, it would have been impossible for any respondent to meet the Department's expectations because it never communicated them.

### C.     Any Identified Errors Were not so Pervasive to Preclude Utilization of the Data

Commerce "possesses the 'discretion to determine whether a respondent has complied with an information request.'" *Helmerich & Payne v. United States*, 24 F. Supp.2d 304, 308 (Ct. Int'l Trade 1998) (quoting *Daido Corp. v. United States*, 893 F. Supp. 43, 49—50 (Ct. Int'l Trade 1995)). Through verification, Commerce tests the information provided by a party for accuracy and completeness so that Commerce can justifiably rely upon that information. *See Tatung Co. v. United States*, 18 C.I.T. 1137, 1140 (1994). Commerce usually concludes that errors in a response that are not substantial do not affect the integrity of the response. *See, e.g., Ferrosilicon from Brazil: Final Results of Antidumping Duty Administrative Review*, 61 Fed. Reg. 59,407, 59,409 (1996). "{T}he issue is not the value of the errors as a percentage of total U.S. sales, or the number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission." *Tatung Co. v. United States*, 18 C.I.T. 1137, 1141 (1994).

In this case, Bridgestone submitted the necessary information required to make a proper and accurate dumping determination, and Commerce verified the responses as accurate and reliable. *See generally*, *Dep't of Commerce, AD/CVD Operations, Memorandum: Verification of the Sales Response of Bridgestone Corporation in the Antidumping Duty Investigation of Truck and Bus Tires from Thailand* (Aug. 22, 2024) *("Verification Report")* (Finding "no discrepancies" in 36 separate instances specified in the report, including no discrepancies in all tests pertaining to total quantity and value of sales, and no discrepancies in 11 of 12 "completeness" tests, with the 12th test involving the disputed A/R report now before the Court.).

In arguing that Bridgestone did not provide the GCR-specific reconciliation, Commerce improperly ignores the information it received at verification, and compounds the error by claiming that this alleged missing information regarding sales to affiliated parties, somehow renders the affiliated party's verified resales of subject merchandise unusable, justifying the use of "facts otherwise available" in contradiction with the statute. *Final Decision Memo*, at 18; *see also* discussion *supra* Section I.A. Commerce is not free to ignore verified CEP sales information on the record. *See Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1363, 1375–76 (Ct. Int'l Trade 2022) (finding that Commerce exceeded its statutory authority to make an adverse inference by refusing to consider an untimely submitted questionnaire response); *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1381 (Ct. Int'l Trade 2019) (explaining that Commerce's use of facts available was improper because the information it "found was 'missing' {was} not, in fact, missing.").

Nothing in the record supports Commerce's claim that BATO failed to provide requested information. Moreover, the record demonstrates that none of the requested and allegedly "missing" information was material to Bridgestone's dumping margin, or that Bridgestone otherwise materially impeded Commerce's investigation of its fair value pricing practices. *See* discussion *infra* Sections II.A-B, III.A-B, IV.A-B, V.A. Commerce's adverse finding is instead a product of its own refusal to acknowledge the limits of the A/R report and its error in declining to document the report it reviewed. A determination based on a mischaracterized document that Commerce both examined and withheld from the record cannot constitute substantial evidence. Bridgestone Rebuttal Br., at 5-6. Nor is it in accordance with the statute, which requires Commerce to base its determinations on the record as a whole. 19 U.S.C § 1677e(a).

The statute does not permit Commerce to apply AFA to a cooperative respondent simply because Commerce misunderstands the information provided or chooses to stand by an erroneous Verification Report. As the Federal Circuit has held, compliance with the "best of its ability" standard does not require perfection, but a good faith, maximum effort to respond. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Where the record shows deficiencies without evidence of non-cooperation, Commerce's discretion is limited because "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *See F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Here, Bridgestone provided the requested information, Commerce verified it, and the record demonstrates full cooperation. *See* Exhibit I, attached. Commerce's contrary finding is not supported by substantial evidence, is not in accordance with law, and must be remanded with instructions to calculate Bridgestone's margin using the verified data it collected, rather than speculative "facts available" and adverse inferences.

At every turn, Commerce's position has reflected, and continues to reflect, a fundamental misunderstanding of standard verification procedures, basic accounting concepts, and the evidence provided during verification. Time and again Commerce has refused to acknowledge Bridgestone's actual good faith cooperation in the proceeding, while simultaneously misunderstanding the nature of the data it received, denying receiving documents it had in fact reviewed, or accusing Bridgestone of failing to provide information that was never requested. The common thread is not non-cooperation by Bridgestone, but confusion and error by government officials in charge of the investigation. Commerce's use of facts available in this

case is not a matter of filling gaps; it is a matter of Commerce punishing a respondent for its own mistakes.

## II.     GCR ISSUES

### A.     Commerce's Finding That BATO Failed to Provide Requested Information Regarding GCR, Thereby Leaving Gaps in the Record, is Unsupported by Substantial Evidence

In the Final Decision Memo, Commerce claims, "based on Bridgestone's failure to provide the information in the form and manner requested, *i.e.*, the accounts receivable reconciliation, for Commerce to complete its verification of GCR's sales to its affiliates and Bridgestone's alternative reporting methodology for reporting unaffiliated sales, we were unable to verify that Bridgestone properly reported its U.S. sales to the first unaffiliated party, as instructed in Commerce's questionnaire." *Final Decision Memo*, at 20.   This claim is unsupported by substantial evidence and cannot be affirmed by this Court. *See* discussion *infra* Section II.B. The A/R documents before the Court, which Bridgestone submits should be part of the administrative record, show exactly the opposite of what Commerce claims, that is, they are reconciled in precisely the way Commerce requested, and no information shown in these documents calls into question the already-verified completeness of Bridgestone's U.S. sales to the first unaffiliated party. *Verification Report*, at 17, Test 10 and 11.  Moreover, Commerce's "finding" in this regard is essentially nonsense, as the location codes for affiliated resellers has absolutely no bearing on CEP sales reporting.  (Constructed Export Price sales are defined as sales made in the United States to the first unaffiliated customer.  Commerce does not include transactions to affiliated resellers in its margin calculations, thus the identity of location codes for an intercompany transfer to affiliated resellers is irrelevant to the CEP calculation).   19 U.S.C. § 1677a.  Making such a finding through mere declaration, while intentionally excluding from the record the very documents that disprove the allegation, is unreasonable, an abuse of

11

discretion, and Commerce should not be permitted to punish Bridgestone for its own failure to understand the facts.

Commerce's determination that BATO failed to cooperate by not providing a reconciliation of sales to its GCR affiliate locations is unsupported by substantial evidence and not in accordance with law. The record demonstrates that BATO provided every document Commerce requested, including the accounts receivable reports, rebate documents, and an itemized reconciliation regarding the national account discount. *See* Exhibit 1; discussion *infra* Section II.B.   Commerce's adverse finding rests not on missing information, but on its own misunderstanding of standard accounting concepts, verification procedures, and the evidence actually reviewed.

**B.    Commerce's Finding That BATO Failed to put Forth a Maximum Effort is Unsupported by Substantial Evidence**

**1.    The verifiers requested A/R reports for 11 stores, not a reconciliation**

In the Verification Report, Commerce asserted that the verifiers requested Bridgestone to provide "a reconciliation of its accounts receivable for sales made to affiliated GCR locations{.}" *Verification Report*, at 17. Commerce then asserted that the reconciliation provided by Bridgestone was "incomplete" because "it did not include sales to all of the 11 requested affiliated customers." *Verification Report*, at 17.

However, Commerce's assertion that the verifiers requested a "reconciliation" based on Bridgestone's A/R records is factually incorrect. No such request was made during the verification. Rather, the verifiers specifically requested the A/R reports for the 11 stores operated by GCR during the Period of Investigation ("POI").[1] The Verification Report even identifies the

---

[1] In the Verification Report, Commerce specifically referred to those 11 stores as "the 11 requested affiliated GCR customers." See *Verification Report*, at 17. Commerce's verifier referred to those stores as "certain locations affiliated with Bridgestone during the period of investigation that had been requested by the verifiers." See ECF No.

ship-to codes for the 11 stores referenced in the verifier's request. *Verification Report*, at 17-18.

Therefore, the record demonstrates the verifiers' request was limited to the 11 stores. Also, as

stated in the Complaint for this action, Bridgestone's counsel retains a picture of the common

board, taken during the verification, describing this request simply as "A/R" for the 11 specific

locations. Compl. (Dec. 23, 2024), ECF Nos. 10 (publ.), 11 (conf.) ¶¶ 33-34.

### 2. BATO provided exactly what was requested by the verifiers – complete A/R reports for the 11 stores

The record does not support a finding that Bridgestone failed to cooperate to the best of

its ability with respect to the A/R reports for the affiliated GCR locations. Bridgestone responded

to the verifiers' requests by providing the A/R reports for the relevant stores, as requested, and

remained available for questions throughout the verification.[2] There is no evidence of intentional

withholding, refusal to provide information, or any other conduct that would justify the

application of adverse inference under Section 1677e(b). *See* Exhibit 1.

As stated above, Commerce's verifiers did not request any "reconciliation" based on

Bridgestone's A/R records. *Compl*. at ¶ 33.   See also ECF No. 60. The verifiers simply

requested the A/R reports for the 11 stores operated by GCR during the POI. When Bridgestone

provided the requested A/R reports, the verifiers did not indicate that they were "incomplete."

---

53-1 ¶ 2. These documents demonstrate that Commerce did not request a general reconciliation between accounts receivable and affiliated sales, but rather information pertaining to the specific 11 stores.

[2] Commerce's reason for rejecting the documentation was the unavailability of the person who prepared the accounts receivable reports specifically, not the general unavailability of company officials who could answer questions. *Final Decision Memo*, at 20; *see also* discussion *supra* Section II.C.1.  Additionally, while the Verification Report indicates that the verifiers "noted" that the documentation did not include sales to all 11 requested GCR stores, nowhere in the report does it indicate that this concern was expressed during the verification. *See Verification Report*, at 17.

*Compl.* at ¶ 43. The only stated reason for rejecting the documents was that the company official who prepared the reports was not available at that precise moment. *Final Decision Memo* at 20.

Only after the verification did Commerce assert that the A/R reports were rejected because they were not a "complete" reconciliation as requested by the verification, noting that the documents "did not include sales to all of the 11 requested affiliated GCR *{sic}* customers." *Verification Report*, at 17. However, while the A/R reports may not have been a reconciliation, they provide complete information about the accounts receivable for the 11 affiliated GCR stores.

In standard accounting practice, accounts receivable ("A/R") reports provide a snapshot of unpaid balances owed by customers at a given point in time. These reports are typically organized by customer code, reflecting invoices that remain outstanding and amounts yet to be collected. A/R reports do not, as a matter of general practice, include every possible location associated with a customer, particularly where those locations have no unpaid balances.

The only customers associated with the 11 stores at issue are GCR and Commercial Tire, Inc. ("Commercial Tire"). See Section A Questionnaire, January 8, 2024, at A-11. (Bridgestone lists 9 GCR Mining stores that were affiliated during the POI and 2 GCR stores sold to Commercial Tire during the POI. Accordingly, Bridgestone provided two A/R reports—one each for GCR and Commercial Tire—showing their unpaid balances as of September 30, 2023, the last day of the POI. These documents were exactly the A/R reports requested by the verifiers. ECF No. 60.

Bridgestone's customers are typically large distributors of automotive tires with many stores across the country. Therefore, the customer would have one customer code and multiple ship-to codes, each associated with a store. The customer code identifies each legal entity (i.e.,

customer) obligated to pay for the goods, and the ship-to code identifies the specific location where goods are delivered.

GCR is Bridgestone's affiliated retailer of truck and bus tires. Section A, at A-19.  It has many stores across the United States. During the POI, GCR operated 11 stores in the United States. *See supra* Section II.B.2. Therefore, GCR had one customer code and 11 ship-to codes. During the POI, two of those stores were sold to Commercial Tire Inc. ("Commercial Tire"). In other words, they became Commercial Tire stores. Accordingly, those two stores were transferred to the Commercial Tire customer code and assigned new ship-to codes. *Verification Report*, at 17-18.

During the POI, the only customers associated with the 11 stores at issue were GCR and Commercial Tire. *Supra*. Accordingly, Bridgestone provided two A/R reports—one each for GCR and Commercial Tire—showing their unpaid balances as of September 30, 2023, the last day of the POI.  *Id.* These documents were exactly the A/R reports requested by the verifiers. They provided complete information about the unpaid balances associated with the 11 stores inquired by the verifiers.

The absence of a location code from an A/R report associated with a store that does have any unpaid balance does not indicate that the report is incomplete. Rather, it reflects that the system had no outstanding receivables for that location at the time of report generation. This is consistent with the fundamental accounting principle that receivables are recorded and monitored based on the legal entity obligated to pay.

**3.**      **Commerce's claim that BATO failed to provide a "complete" reconciliation is unsupported by substantial evidence, as there is no rational connection between the A/R report and sales to affiliated stores.**

Even if, arguendo, the verifiers had requested a "reconciliation" based on Bridgestone's A/R records that would somehow identify all sales made to affiliated stores, such a request would be nonsensical because there is no rational connection between A/R and sales to the affiliated stores. Any such request would reflect a fundamental misunderstanding of how accounts receivable are recorded in financial systems. Therefore, Commerce's allegation that BATO failed to produce such a reconciliation is unsupported by substantial evidence.

Accounts receivable are financial records that track unpaid balances owed by specific customer accounts, regardless of whether those customers are affiliated entities or not. Accordingly, A/R reports only reflect outstanding amounts owed, not the nature of the relationship between the seller and the buyer. Therefore, it would be conceptually impossible to use Bridgestone's A/R reports to identify sales to affiliated customers.

Moreover, even the A/R report for an affiliated customer will not display sales to all of its individual locations operated during a particular period. This is because store locations are not treated as separate financial entities for receivables purposes, and the report will only list those specific locations that have unpaid amounts at the time of report generation. The report will also display a store that is no longer operated by the customer if sales to that store remain unpaid.

Finally, the scope of Bridgestone's U.S. sales database in the underlying investigation is completely different from the scope of Bridgestone's A/R records. The former includes all sales of truck and bus tires from Thailand, whereas the latter includes all unpaid sales of truck and bus tires from all countries. Therefore, it would be impossible to reconcile the two datasets.

Had the verifiers' request been for such a reconciliation, Bridgestone's officials and counsel would have immediately advised the verifiers that such a reconciliation is not possible. However, the verifiers simply requested the A/R reports for the 11 stores, without explaining how they planned to use the information.

While this was not evident during the verification, the record now suggests that the verifiers' request for the A/R reports may have been based on a misunderstanding of the underlying facts. In the Verification Report, they stated, "Upon receipt of this reconciliation, we noted that the reconciliation did not include sales to all of the 11 requested affiliated GCR customers." *Verification Report*, at 17. The "customers" referenced in this statement were in fact individual stores operated by either GCR or Commercial Tire. Therefore, this statement suggests that the verifiers misunderstood that each of the stores was a separate customer for which a separate A/R report could be generated.

### C.    Commerce's Rejection of the A/R Reports During the Verification Constitutes an Abuse of Discretion

#### 1.    The verifiers did not allocate sufficient time to review the A/R reports

The reports were available for review at 9:00 a.m. (on Friday, the last day of the scheduled verification), and Commerce asked to speak with the person who prepared the A/R reports at around 3:30 p.m. (again on Friday, the last day of the scheduled verification). Compl. ¶ 36.  When the person was unavailable at that precise moment, the verifiers declined to accept the A/R report. Id. The verifiers ended the verification prior to 5:00 p.m. on that date. *Id.*; *see also* discussion *supra* Section II.B.2—3

#### 2.    The verifiers did not explain the reasons for rejecting the A/R reports or seek clarification

At verification, Commerce declined to accept Bridgestone's A/R reports for GCR and Commercial Tire. Compl. ¶ 36.  The only reason provided by Commerce's verifiers at the time

of declining the documents was that the person who prepared the report was not available at the precise time Commerce requested to speak with the preparer (approximately 3:30 p.m. on Friday, the last day of the scheduled verification). *Id*. The verifiers did not indicate which questions they had regarding the reports, nor did they ask if any other person could answer questions. *Id*.

"Verification procedures are reviewed for an abuse of discretion." *Pt. Asia Pac. Fibers TBK v. United States*, 673 F. Supp. 3d 1320, 1327 (Ct. Int'l Trade 2023) (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)). While Commerce has broad discretion in conducting verification, that discretion is not absolute. "Commerce's discretion in establishing and maintaining a schedule for verification, while great, is not unbounded. At all times, 'Commerce must give respondents a reasonable opportunity to participate in the review and verification process.'" *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1319 (Ct. Int'l Trade 2001) (quoting *Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999)).

Here, Commerce did not provide a reasonable opportunity to participate in the verification process. It rejected the A/R reports solely because the preparer was unavailable at a single moment late on the final day, without posing questions, seeking an alternative representative, or revisiting the issue before ending verification early. Compl. ¶ 36. This unreasonably inflexible response—despite the respondent's willingness to cooperate—violates the principles set forth in Fujian Machinery and Rubberflex, and reflects an arbitrary exercise of discretion untethered from any substantive justification.

III.    **REBATE ISSUES**

A.    **Commerce's finding that BATO failed to provide requested information regarding rebates, thereby leaving gaps in the record, is unsupported by substantial evidence.**

1.    **BATO fully cooperated with Commerce's requests for Rebate Data**

In the Final Decision Memo, Commerce claims that "Because Bridgestone did not provide information essential to the attempted verification of its rebates, we find that information requested by Commerce that is crucial to the calculation of an accurate dumping margin is missing from the record within the meaning of section 776(a)(1) of the Act, because Bridgestone failed to comply with Commerce's requests for information." *Final Decision Memo*, at 22. Commerce's finding that BATO failed to provide information essential to the attempted verification of its rebates is directly contradicted by the documents now included as part of the judicial record. Specifically, notwithstanding Commerce's claims to the contrary, Bridgestone provided Commerce with full access to its rebate accounting system, sorted and summed the data in any and all of the various ways that Commerce requested, and had no reason at verification to believe Commerce had even mistakenly identified what it thought to be a discrepancy. Compl. ¶¶ 61—72 ; ECF 60. Commerce examined comprehensive reconciling data pertaining to rebates, and then elected not to include any of these data on the record. Compl. ¶ 73. Nevertheless, as with the GCR A/R report, in its Verification Report, which was relied upon for the above-quoted false assertion regarding Bridgestone, Commerce claimed it had not received or reviewed the information required to demonstrate that all of Bridgestone's rebates were captured in its questionnaire responses. *Verification Report* at 17. Incredibly, Commerce goes on in the Final Decision Memo to claim that without having examined rebates, it was able to discern that this adjustment "appeared to potentially have a large impact on Bridgestone's U.S. sales prices." *Final Decision Memo*, at 22. Once again, this is a nonsensical claim. As discussed further infra,

Commerce verified both the largest and smallest rebates by type and customer, and nothing on the record suggests that these expenses are significant or material. ECF No. 60. Indeed, when Commerce subtracted all U.S. rebate expenses from U.S. price at the Preliminary Determination (as hereinafter defined), while at the same time leaving all home market rebates in the comparison market prices the impact on the margin was immaterial. *Preliminary Margin Calc*. at 5. In fact, without a "Cohen's D" statistical analysis, even with this unfavorable apples-to-oranges comparison, Bridgestone was found to be pricing fairly in the U.S. market (i.e., it's preliminary dumping margin with all rebate expenses subtracted from only U.S. price, was zero). *See Truck and Bus Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination*, 89 Fed. Reg. 43,806 (May 20, 2024) ("*Preliminary Results*") and accompanying issues and decision memorandum dated May 14, 2024 ("*Preliminary Decision Memo*"), at 5.

### B. Commerce's Refusal to Accept the Minor Correction Regarding Rebate Reporting Constitutes Abuse of Discretion

#### 1. The minor correction only referenced the record and did not include new factual information

Bridgestone attempted to report certain revisions in its rebate expense fields as minor errors at the beginning of verification. *See Final Decision Memo*, at 24. Commerce's verifiers, however, declined to accept these corrections, claiming they were not minor in nature. *See Final Decision Memo*, at 24. Bridgestone's proposed correction did not introduce any new factual information, but rather referenced existing record evidence that could be used to repopulate the rebate data.[3] The correction would not have affected the total amount of rebates reported by

---

[3] The proposed correction was included as part of the verification exhibits. See CEP verification exhibits, CEP-VE-10, at 1 ("BATO Rebate Reporting").

Bridgestone, but only the allocation of the rebates among transactions. Commerce routinely accepts minor errors despite their impact on "allocations, matches, and calculations that follow." *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1366 (Ct. Int'l Trade 2019).

### 2.    Commerce routinely accepts minor corrections regarding allocation

Commerce's refusal to accept Bridgestone's minor correction is inconsistent with its prior decisions and established practice. As the courts have held, "'{A}n agency must either conform itself to its prior decisions or explain the reasons for its departure.' … If Commerce does decide to depart from its practice, it is required to provide a reasonable explanation for doing so." *Dalian Hualing Wood Co. v. United States*, 675 F. Supp. 3d 1294, 1303 (Ct. Int'l Trade 2023) (collecting cases). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (U.S. App. D.C. 1996)).

Here, the proposed correction was minor, relied on existing record evidence, and did not undermine the accuracy of the reported data. It affected only the allocation of the total rebate amounts reported during the investigation, without changing the overall value.[4]  Notably, the rebate information at issue was requested by Commerce only in a very late supplemental questionnaire, to which the response was due after the Preliminary Determination had been issued.  Compl. ¶¶  12—15. (indicating supplemental response timing and prelim date). Bridgestone immediately turned to verification preparation after the rebate data was submitted, and upon discovering an error in transmitting this information from the response into the

---

[4] Bridgestone identified the account information containing the total amount of each rebate type. See CEP verification exhibits, CEP-VE-10, at 1 ("BATO Rebate Reporting"). Acceptance of the proposed correction would have resulted in equal allocation of the reported rebate amounts over all sales.

database, prepared a minor correction to present to Commerce as soon as practicable, i.e., the

first day of verification.  This hardly rises to a lack of diligence on Bridgestone's part, and is

actually a symptom of Commerce's late stage investigatory activity in this proceeding.

Therefore, Commerce's refusal to accept the minor correction was unreasonable, arbitrary, and

inconsistent with its prior practice. *See Celik Halat Ve Tel Sanayi A.S. v. United States*, 557 F.

Supp. 3d 1363, 1381 (Ct. Int'l Trade 2022) ("Commerce abused its discretion when applying

such an extreme sanction for an inconsequential violation of a technical filing requirement.")

### C.    The Allegedly Missing Rebate GL Documentation is Irrelevant to Rebate Reporting

#### 1.    The GL was not related to reportable rebates

During verification, Commerce requested documentation for a credit balance in

Bridgestone's general ledger account [      ], which was associated with Volume Bonus rebates

for January through September 2023. Compl. ¶ 77. Bridgestone officials explained that this

account was used exclusively for rebates to the affiliated customer, GCR. *Verification Report*, at

23-24. Rebates provided to affiliated customers are not reportable in the U.S. sales database,

which is limited to sales to unaffiliated customers. See questionnaire, I-7.  Accordingly, account

[    ] was not related to any rebate expenses that would be reported to Commerce. Therefore,

the requested documentation had no relevance to the calculation of adjustments for Bridgestone's

U.S. sales.

Commerce is not required to apply AFA for a respondent's failure to provide information

if that information is deemed irrelevant.  *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315,

1356 (Ct. Int'l Trade 2015) ("{E}ven if Commerce could have concluded that NEXTEEL did not

act to the best of its abilities, Commerce did not abuse its discretion by choosing to rely on

NEXTEEL's timely submitted and verified 2012 expenses instead of applying AFA because of supposed deficiencies that Commerce ultimately deemed irrelevant{.}").

Here, the credit balance at issue was unrelated to reportable rebates and had no impact on the completeness or reliability of Bridgestone's U.S. sales data. Accordingly, the requested documentation for the GL account was irrelevant to the margin calculation. As such, there is no basis for applying AFA due to the absence of this documentation in the record.

### 2. The amount in the GL is negligible

The balance in account [                    ] was a credit, meaning that if Bridgestone had claimed it as a deduction to its reported rebate expenses, it would have reduced the total amount of rebates. *See* Compl. ¶ 75. A lower rebate expense would result in a higher U.S. price, which in turn would lower the dumping margin. However, Bridgestone did not claim this credit balance as a deduction to its reported rebates. Compl. ¶ 80. Since Commerce was not required to adjust for deductions that Bridgestone did not claim, no inquiry regarding the GL account was unnecessary.

Moreover, the credit balance in question was only [          ], representing approximately [     ] of the reported Volume Bonus amount and [      ] of total U.S. sales. Compl. ¶ 79. Therefore, any potential adjustment based on this amount would have a negligible impact on the margin calculation.

## IV. NATIONAL ACCOUNT DISCOUNT (OTHDISU)

### A. Commerce's Finding That BATO Failed to Provide the Requested Itemized Reconciliation is Unsupported by Substantial Evidence

Bridgestone sells to many independent dealers. When a dealer sells tires to a customer who has a national account with Bridgestone, that customer is entitled to the national account price. The national account price is different from the price paid by the dealer. Therefore,

Bridgestone credits the dealer for the original amount charged and issues a debit note to the national account customer reflecting the negotiated national account price.

In the underlying investigation, Bridgestone reported its sales to the independent dealers. It then reported the difference between the credit notes and the debit notes issued due to national account pricing as other discounts ("OTHDISU"). Supp C Questionnaire response (April 22), 11; *Verification Report*, at 22-23. This allowed a full and complete reconciliation of its reported sales with its financial records.

During verification, Bridgestone provided a monthly schedule of the credit and debit notes used to calculate the reported OTHDISU amounts. *See Verification Report*, at Exhibit CEP-VE-8. The schedule listed monthly totals for credit and debit notes for billing item types ZDG2 and ZDL2. The verifiers requested an itemized reconciliation of this schedule to Bridgestone's accounting system. Verification report, at 23.  Bridgestone explained that this reconciliation had already been provided as part of the quantity and value reconciliation. See Compl. ¶ 100.  Indeed, the verification exhibits include itemized reconciliations of the monthly total values of ZDG2 and ZDL2 to Bridgestone's accounting system. *See Verification Report*, at Exhibit CEP-VE-5A.

In the Verification Report, Commerce erroneously alleged that Bridgestone had failed to provide the itemized reconciliation of the monthly schedule to Bridgestone's accounting system. Bridgestone addressed this issue in its administrative case brief, citing to the record showing that the itemized reconciliation was provided and is found in the verification exhibits.  *See* Bridgestone's Admin. Case Br. at 17-19.

In the Final Decision Memo, Commerce admitted that it had overlooked the record. Commerce acknowledged that the itemized reconciliation referenced in the Verification Report

was provided. See Final Decision Memo, at 23.  Specifically, Commerce stated: "we agree with Bridgestone's argument that the total amount of credit and debit notes were reconciled to BATO's trial balance." *Final Decision Memo*, at 23.

However, Commerce then alleged for the first time that the verifier had requested a separate, more detailed reconciliation to "examine the appropriateness of using the total value of the credit and debit notes as an expense adjustment" *Final Decision Memo*, at 23. It remains unclear what documents, accounts, or numbers this detailed reconciliation was requested to tie. Importantly, Commerce does not cite to any record evidence showing that this separate reconciliation was requested.

The record demonstrates that the verifiers requested only one reconciliation regarding OTHDISU, and Bridgestone provided it. The record also shows that no other reconciliation was requested or outstanding at any point during the verification. Therefore, Commerce's finding that Bridgestone withheld information regarding OTHDISU is unsupported by substantial evidence.

During the verification, Bridgestone maintained a list of outstanding items during the verification on a common board, and no such request was ever recorded. Compl. ¶ 104.  At approximately 3:00 p.m. on June 28, 2024, the final day of verification, one of Commerce's verifiers was observed taking a picture of the outstanding items list. At that time, no outstanding request related to OTHDISU appeared on the common board. Compl. ¶ 105. There is no informational gap on the record regarding the national account discount reporting.

In the Final Decision Memo, Commerce claimed that the record is missing information that is "necessary" to examine the appropriateness of using the total value of the credit and debit notes as an expense adjustment. *See Final Decision Memo*, at 2, 23. Commerce reasoned that this information was necessary because the credit and debit notes included both tire-related and non-

tire-related amounts. *See Final Decision Memo*, at 23. However, the record contains this information. *See* Final Decision Memo, at 23; Compl. ¶ 101.

During verification, Bridgestone provided sample documentation regarding a national account transaction. The debit note listed two amounts—one for emergency service call and one for replacement tires. *See Verification Report*, at Exhibit CEP-VE-8. The verifiers traced those amounts in the underlying data for the monthly schedule and confirmed that only the tire-related amount was recorded as billing item type ZDL2 and found in the data. *See Verification Report*, at Exhibit CEP-VE-8.

Likewise, the verifiers reviewed the corresponding credit note for the same transaction. The note listed both tire-related amounts (i.e., tire price and associated commission) and non-tire related amounts (i.e., emergency service call and administrative fee). *See Verification Report*, at Exhibit CEP-VE-8. The verifiers traced those amounts in the underlying data and confirmed that only the tire-related amounts were recorded as billing item type ZGD2 and found in the data. *See Verification Report*, at Exhibit CEP-VE-8.

The record shows that the "total" values of the credit and debit notes used for calculating OTHDISU were, in fact, the total values in those notes related to tire transactions. Therefore, Commerce's assertion that the record is missing information to confirm this fact is unsupported by substantial evidence.

V.      **MISCELLANEOUS CLERICAL ERRORS**

   A.      **Commerce's Finding That Unrelated Clerical Errors had a "Cumulative" Impact is Unsupported by Substantial Evidence**

      1.      **Domestic warehousing, indirect selling, U.S. warehousing, and warranty expenses**

         a.      **The clerical errors did not result in information gap in the record**

Commerce based its decision to apply total AFA in part on the cumulative effects of various "errors and inaccuracies," including purported inaccuracies in the reporting of warehousing, indirect selling, and warranty expenses. *See Final Decision Memo*, at 29-34. Commerce's inclusion of these alleged inaccuracies as a basis for total AFA was unreasonable. They merely consisted of clerical errors that could easily be addressed and did not amount to any information gap in the record. See **Exhibit 1**.

Commerce alleged that Bridgestone failed to report DWAREHU, which represents the warehousing expenses incurred in Thailand for sales made to the United States. *See Final Decision Memo*, at 30. This allegation is based on the fact that the Excel file for Bridgestone's U.S. sales was not properly updated to include this field. However, Bridgestone reported the expenses in its narrative with detailed supporting information. First supp c questionnaire (April 22, 2024), at 30.

Bridgestone stated that its affiliated manufacturer, Bridgestone Tire Manufacturing (Thailand) Co., Ltd. ("BTMT"), incurred expenses "related to external warehouse utilized temporarily due to the container and vessel shortage in 2022." Supplemental Section C Questionnaire Response (Apr. 22, 2024) ("SSCQR"), at 30. Bridgestone also indicated that the total amount of this expense was [        ] Thai Baht and recorded under account [            ] in BTMT's financial books. SSCQR, at 30. Bridgestone provided its trial balances for the POI,

confirming this amount. *See* 2nd Supplemental Sections B and C Questionnaire Response (May

22, 2024) ("2SSBCQR"), at Exhibit 2SB-7. During the POI, BTMT sold [        ] tires to the

United States. *See* SSCQR, at Exhibit SC-22b. Since BTMT incurred [        ] Thai Baht,

the per-unit expense for BTMT's sales to the U.S. market was [   ] Thai Baht per tire. This

information was readily available throughout the investigation.

Commerce also alleged that inaccuracies in Bridgestone's indirect selling, U.S.

warehousing and warrant expenses has a cumulative impact on the useability of its sales data.

*See Final Decision Memo*, at 33. The referenced "inaccuracies" were clerical errors in expense

calculation worksheets, such as incorrect cell references in Excel formulas or calculation

mistakes due to misaligned numbers. *See* Bridgestone's Sales Verification Report at 4 and 34.

These simple errors could be easily corrected, and their impact would be limited to minor

changes in the expense allocation ratios applied to sales data.

**b.    Commerce verified all data points related to these expenses**

All relevant worksheets were provided to Commerce prior to verification and were

clearly explained. See Sec C QR, at Exhibit C-5B (warranty) and Exhibit C-11 (indirect selling);

see Supp Sec C, at Exhibit SC-19 (U.S. warehousing). The clerical errors went unnoticed by both

Commerce and Bridgestone, but could easily be corrected without any new data points. See

verification exhibits, noting the clerical errors without introducing new factual information, at

CEP-VE-20, page 1 (indirect selling), CEP-VE-18 (U.S. warehousing), page 1, CEP-VE-13

(warranty). Moreover, despite these errors, all of the data points in the worksheets were fully

verified during the verification. Therefore, Commerce could have corrected the errors by issuing

a post-verification questionnaire, a procedure routinely used in such situations.

### c.    Bridgestone Did Not Impede the Investigation

In the Final Decision Memo, Commerce determined that Bridgestone impeded the investigation by failing to provide the required data for DWAREHU. *See Final Decision Memo*, at 30. This is a gross overstatement of a simple clerical error. The record does not suggest that Bridgestone either intended or acted to impede the investigation.

In response to Commerce's questionnaire, Bridgestone fully disclosed its warehousing expenses incurred in the country of export, including the amount, accounting details, and the nature of the expenses. SSCQR at 30. Bridgestone expressly stated that this expense had been updated in a separate field in the Excel file and referred to supporting calculations in a separate exhibit. However, the specifically referenced data field and supporting exhibit were missing in the actual submission, which clearly indicated that a clerical error occurred.

Despite many opportunities, Commerce did not raise this issue until the verification. 19 U.S.C. 1677m(d) provides that when a submission is deficient, Commerce shall promptly inform the respondent of the deficiency and provide an opportunity to remedy it. It also provides that Commerce will only disregard the response if the respondent repeatedly fails to cure the deficiency. 19 U.S.C. 1677m(d). Section 1677e(a) provides that Commerce's application of AFA is subject to these requirements. 19 U.S.C. 1677e(a).

Commerce had ample time to request additional information from Bridgestone. In fact, Commerce issued two subsequent questionnaires, and neither mentioned the missing data field or the missing exhibit. *See Final Decision Memo*, at 37; Compl. ¶¶ 31, 40, 45, 54-55.  Commerce then applied AFA based on a clerical error that went unnoticed by both Commerce and Bridgestone. Therefore, Commerce failed to meet the requirements under Sections 1677m(d) and 1677e(a).

The record does not indicate that Bridgestone attempted to impede the investigation. In fact, it shows that Bridgestone fully cooperated with Commerce to provide all available information regarding DWAREHU. Bridgestone attempted to provide this information in multiple places, including the narrative, the Excel file, and the supporting exhibit. Despite the clerical error, the fact that all the data points are still available on the record demonstrates that Bridgestone made extra efforts to ensure that all required information was provided.

> **d.      The expenses were insignificant compared to the total sales**

Total AFA is appropriate "where none of the reported data is reliable or usable" because, for example, all of the "submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data." *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011); see also *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 35 C.I.T 1398, 1416 (2011) (noting that Commerce's application of total AFA is reasonable where deficiencies pertain to "core, not tangential" information.). Worksheets containing all relevant data points and clearly explained calculation methods, but deficient only due to formula mistakes or misalignment, do not constitute unusable information.

In the Final Decision Memo, Commerce refused to examine each alleged error separately, instead claiming that the errors raised "several significant issues that, taken together, render Bridgestone's data unusable." *Final Decision Memo*, at 33. However, none of these errors raised significant issues, and at least two are not even significant within the meaning of the statutory and regulatory provisions.

19 U.S.C. § 1677f-l(a)(2) says Commerce may "decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise."  Commerce's regulations provide that any individual adjustment or any group of adjustments having an *ad*

*valorem* effect of less than 0.33 percent or 1.0 percent respectively, of constructed export price is ordinarily considered "insignificant."  19 C.F.R. § 351.413.

### 2.    Postal codes

#### a.    Any issue related to postal codes became moot after Commerce found targeted dumping

In the Final Decision Memo, Commerce claimed that the reporting methodology used for the field provided Commerce with a basis to apply AFA. *See Final Decision Memo*, at 28-29.  In fact, the zip code field is not a price field, and is used only in the Cohen's-D analysis for determining the region of the sales. *See Preliminary Decision Memo*, at 5; *Preliminary Margin Calc.* at 162—63. This is only one of three data points in the sales database that is used for Cohen's-D, and failing any one of them is sufficient for Commerce to apply zeroing in its analysis, as described further below.  Here, because Bridgestone's sales did not pass the Cohen's-D test on any of these other factors, the zip code field could have no impact on Bridgestone's estimated cash deposit rate. Id. Indeed, even deleting this field altogether would have no effect, because once zeroing was already applied for other reasons, zeroing on the basis of zip code could have no mathematical impact.

#### b.    ZIP Code Reporting and Cohen's d Zeroing — Commerce Has Already Applied an Adverse Inference

The only purpose for which Commerce uses zip code data in an antidumping context is in its Cohen's D statistical analysis to determine whether there is a pattern of price differences among U.S. sales in different geographic areas.  *Id*. If Commerce finds a "pattern" under Cohen's D, it may depart from the statutory average-to-average comparison methodology and instead apply "zeroing," where only dumped sales are included in the average margin calculation.  *Id*.  Notably, the DESTU field, where zip code is reported, is not the only field to which Commerce applies its Cohen's D test.  *Id*.  Commerce's own margin program at line 9802

to 9806 explains, "The Cohen's-D Test is run three ways: 1) by purchaser, 2) by region and 3) by time period. U.S. sales are compared to sales to other purchasers/regions/periods to see if they pass the test. At the end of the test, the percentage of U.S. sales found to pass the test is recorded."  Dep't of Commerce, AD/CVD Operations, *Memorandum: Preliminary Determination Margin Calculation for Bridgestone Corporation* (May 14, 2024) ("*Preliminary Margin Memo*"), at 233.

At the Preliminary Determination, Commerce followed its standard practice of running the Cohen's D test by purchaser, region and period, and found that some percentage of Bridgestone's sales failed the Cohen's D test **in all three categories**.  See *Preliminary Margin Memo*, at PDF 439.  The effect was dramatic: Bridgestone preliminary dumping margin without zeroing due to Cohen's D would have been 0% (no dumping when positive and negative margins are averaged together), but with Cohen's D, the margin went to 2.35% (dumping found only because non-dumped sales were zeroed out).  *Id*.  This outcome would not have changed, even if Commerce adversely inferred that all reported zip codes failed Cohen's D's regional dumping analysis, because Bridgestone's sales already failed Cohen's D on the other two factors tested. *Id*. In other words, because Commerce applied zeroing due to the results of the Cohen's D test by purchaser and/or the results of the Cohen's D test by region, whether or not destination-based zip code reporting for CEP sales would have changed the outcome of the Cohen's D test for sales by region **is now moot**.

Having already applied the most adverse margin calculation methodology warranted by the zip code field by applying Cohen's D zeroing, there is no basis to impose an additional, far more punitive total AFA rate for any identified discrepancies in the zip code field. The statute requires Commerce to use the verified information available on the record. *See* 19 U.S.C. §

1677e(a)–(b). All of Bridgestone's reported sales and cost data — apart from the zip code field for CEP sales — were verified and can be used in calculating an accurate margin. The law does not permit Commerce to discard that verified information simply to maintain an inflated margin based on unrelated issues.

The Court should instruct Commerce to use the verified record data, without compounding the effect of the already-applied adverse methodology of Cohen's D zeroing, to calculate Bridgestone's actual dumping margin.

### 3.    Commerce's "Cumulative Minor Errors" Theory Is Incompatible with the Investigative Standard and Record

By statute, an antidumping investigation produces estimated cash deposit rates, not final duty liabilities. *See generally,* 19 U.S.C. §§ 1671 to 1677n (establishing the statutory scheme for determining estimated duty deposit rates in investigations, and final assessment rates in administrative reviews.). As the Court of International Trade has explained, "The rate set {during an investigation} is only a cash deposit rate, an estimate of potential duties{,}" but a respondent's "actual liability {is} determined in the {administrative} review." *Changzhou Hawd Flooring Co. v. United States*, 77 F. Supp. 3d 1351, 1360 (Ct. Int'l Trade 2017) The operative regulation, 19 C.F.R. § 351.212, likewise makes clear that final assessment rates are calculated in administrative reviews. See e.g., 351.212(a) ("Unlike the systems of some other countries, the United States uses a "retrospective" assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported. Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time.")

Verification in this setting is "a spot check and is not intended to be an exhaustive examination of a respondent's business." *Monsanto Co. v. United States*, 698 F. Supp. 275, 281

(Ct. Int'l Trade 1988). The antidumping laws are "remedial, not punitive," and Commerce's overriding duty is "to determine margins as accurately as possible." *Goodluck India Ltd. v. United States*, 393 F. Supp. 3d 1352, 1356 (Ct. Int'l Trade 2019).

Here, the Department identified only clerical, non-core issues that do not impede accurate estimation—e.g., a miscoded zip code field and a mislabeling of certain downward price adjustments as "rebates" rather than "billing adjustments," even though both are allocated and netted from price in precisely the same manner in Commerce's margin program. On comparable facts, the Court has sustained Commerce's decision not to apply AFA where discrepancies were "largely immaterial" and attributable to rounding, and where the respondent did not fail to cooperate. *Euro SME Sdn Bhd. v. United States*, No. 1:22-cv-00108 (SAV), 2024 Ct. Intl. Trade LEXIS 16, at *17 (Ct. Int'l Trade Feb. 12, 2024). The law does not permit transforming a handful of immaterial clerical issues into grounds for total AFA—particularly in the compressed context of an original investigation where estimated accuracy, not flawless perfection, is the statutory standard.

## VI.    CORROBORATION OF AFA RATE

### A.    Commerce failed to corroborate the AFA rate

Commerce's assignment of an AFA rate to Bridgestone was unlawful because it was not corroborated in accordance with 19 U.S.C. § 1677e(c)(1). The statute requires that, when selecting an AFA rate, Commerce must corroborate "to the extent practicable" the margin it applies using an independent source. 19 U.S.C. § 1677e(c)(1).  Here, however, Commerce purported to corroborate Bridgestone's total AFA rate by reference to the margin calculated for Prinx, but Prinx's margin itself was derived from partial AFA. *Final Decision Memo*, at 47 ("we determine that Prinx withheld information that has been requested by Commerce regarding its warranty claims expenses, certain bank charges, and its U.S. market rebates, which warrants the

application of partial AFA"). In effect, Commerce corroborated Bridgestone's AFA rate with Prinx's AFA rate, meaning the rate was corroborated only against itself. That circular exercise does not satisfy the statute's requirement.

Moreover, Commerce's own preliminary determinations demonstrate the implausibility of the chosen AFA rate. At the preliminary stage, neither Bridgestone nor Prinx had positive dumping margins based on their reported data. *See Preliminary Margin Memo*, at PDF 5; *Truck and Bus Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination ("Preliminary Determination")*, 89 Fed Reg 43806, 43807 (May 20, 2024) (assigning no dumping margin to Prinx at the prelim).  Bridgestone's margin rose above de minimis only because Commerce applied adverse inferences — disallowing home market rebates, subtracting all rebates from U.S. price, and applying its discredited practice of zeroing. *Preliminary Margin Memo*, at PDF 2 ("For the preliminary determination, we are not including Bridgestone's reported rebate and discount expenses in field REBATEH in the programming.") Prinx, likewise, had no dumping margin at the preliminary determination, and was assigned a margin at the final determination only after Commerce resorted to partial AFA.  *Compare Preliminary Determination* and *Final Determination*, (changing Prinx's margin from 0.00 to partial AFA). Nothing in the verified record evidence suggests that subject tires were sold at less than fair value. While Commerce's corroboration obligation is not exacting, it cannot be satisfied by recirculating unsubstantiated AFA margins or by resorting to results untethered to the record. See e.g., *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1085 (Fed. Cir. 2025) (Finding application of a 154.33% rate an abuse of discretion where calculated rates range from 0 to 9 percent, and where no "particularly serious failure to cooperate" was found).

**VII.    COMMERCE SHOULD CONSIDER THE INFORMATION CONTAINED IN THE DISPUTED DOCUMENTS AS PART OF THE ADMINISTRATIVE RECORD AND RECONSIDER ITS AFA DECISION**

Commerce's refusal to include verification documents that it requested and reviewed is unsupported by substantial evidence and not in accordance with law. The Court has already determined that the disputed documents were requested and presented during verification, yet Commerce declined to place them on the record. Without them, Commerce's finding that Bridgestone failed to cooperate rests on a record that Commerce itself made incomplete.

**A.    The Court Determined That Those Documents Were Requested and Presented During the Verification**

Since the filing of Bridgestone's complaint, the Court has considered and granted Bridgestone's motion to complete the judicial record with documents that the U.S. Department of Commerce officials requested and reviewed at verification, but did not include in the verification exhibits originally compiled during that phase of the administrative proceeding. *See* Amended Opinion and Order, ECF No. 59-1. These documents complete the factual record before the court. Notably, before this Court, Commerce first denied requesting these documents, then admitted requesting them but claimed it did not receive them or claimed it did not recognize them, then finally admitted requesting, receiving and reviewing all of the contested documents, each of which formed a significant part of the government's finding that Bridgestone was non-cooperative and significantly impeded the investigation in the underlying administrative proceeding. *See generally* Gov't Opp'n to Pl.'s Mot., ECF No. 36, at 1; Gov't Resp. to the Oral Arg. Questions, ECF No. 44, at 3; Hr'g Tr. at 27; Gov't Aff., ECF No. 53-1, at 2-4; Gov't Aff., ECF No. 53-2, at 2-4. Commerce's confusion and vacillating position before this Court regarding the documents presented in Bridgestone's motion are illustrative of Commerce's behavior and comprehension throughout the underlying administrative proceeding.

36

Commerce indicated in the findings section of its Verification Report that Bridgestone was unable to provide a complete reconciliation of sales made to GCR affiliate locations. *Verification Report*, at 2.   Until Bridgestone saw this Verification Report, the company had no inkling that Commerce had failed to understand the documents requested and reviewed.  Rather, it appeared that Commerce had elected not to take copies of documents that verified information already on the record. In other words, by not taking copies of the documents in question, Commerce was indicating that there were no new facts or findings to be made from these same documents.  Not documenting the corroborating evidence reviewed for every existing undisputed and verified fact on the record is a common practice in trade remedy verification proceedings. *See generally Certain Cold-Rolled Steel Flat Products from India: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 49,938 (2016).   However, when Commerce makes a new finding of fact, such as here, where it claimed Bridgestone could not reconcile its sales to affiliate locations, it must document that fact.  *Hyundai Elec. & Energy Sys. Co. v. United States*, 477 F.Supp. 3d, 1324 (2020).  Commerce is not free to declare information on the record to be unreliable by fiat.  Rather, Commerce must provide the contrary factual indications allowing it to reject record information.  Here, Commerce did exactly the opposite.  It refused to take documents it had requested, either mischaracterized them, or denied having ever seen them, then, begrudgingly, after briefing an oral argument, admitted to receiving and reviewing them.  These documents do not support the findings Commerce claims to have made, and Commerce's refusal to place them on the record to allow for examination and argument is not in accordance with the law.   The law requires Commerce to maintain the factual record.  19 C.F.R. § 351.104.  It did not do so here.

1.    **The judicial record demonstrates that the verifiers used the rebate report and the rebate breakdown list to verify total rebate amounts and select sample documents**

Commerce's refusal to place the rebate report and rebate breakdown list on the record is unsupported by substantial evidence and not in accordance with law. The judicial record shows that Commerce's verifiers relied directly on these documents to confirm total rebate expenses and to select sample customers for further testing.   ECF No. 60.

Having used these documents to make findings incorporated into the Final Decision Memo, Commerce cannot now exclude them from consideration or deny their significance. The rebate report was used to verify the total amount of rebate expenses. *See Verification Report*, at 25. The rebate breakdown list was used to identify the smallest and largest rebate customers to solicit *additional* information for these specific smallest/largest customers. ECF No. 60.

The full rebate report demonstrates that it contains the information referenced by the verifiers in the verification.  ECF No. 60. Specifically, it shows that Bridgestone paid [                    ] and [                    ] in total rebates, which support the rebate amounts based on accruals and payouts as reported by Bridgestone during the questionnaire phase.

The rebate breakdown list demonstrates that the customer codes identified for the smallest and largest values for the Exceptional Growth rebate program are [        ] and [        ] respectively. *Id*. The verification exhibits confirm that the verifier collected documentation regarding rebate payout amounts, email correspondences, accounting screenshots, and calculation worksheets, all specific to those highest and lowest rebate customers. *See Verification Report*, at Exhibit CEP-VE-10.

2.    **The judicial record shows that the GCR A/R report was complete with information for all 11 stores requested by the verifiers**

Commerce's finding that Bridgestone failed to provide a complete GCR accounts receivable report is unsupported by substantial evidence. The judicial record demonstrates that the report included all eleven requested stores, and that the apparent omissions reflect only locations where no sales occurred. ECF 60.  An A/R report cannot show unpaid balances where no sales exist. By faulting Bridgestone for an "incomplete" report under these circumstances, Commerce disregarded the record evidence before it and invented a deficiency that does not exist.  In the Verification Report, Commerce asserted that the A/R reports were complete because they "did not include sales to all of the 11 requested affiliated GCR {sic} customers." *Verification Report*, at 17. However, the A/R reports on the judicial record demonstrate they included complete information about the accounts receivable for the 11 affiliated GCR stores. Based on the Verification Report and the relevant exhibits, the 11 stores are as follows:[5]

| Store Location | | Customer Code | Ship-to Code | Section C | GCR A/R |
|---|---|---|---|---|---|
| [          ] | | [     ] | [     ] | [   ] | [   ] |
| [          ] | | [     ] | [     ] | [   ] | [   ] |
| [          ] | | [     ] | [     ] | [   ] | [   ] |
| [           ] | | [     ] | [     ] | [   ] | [   ] |
| [          ] | | [     ] | [     ] | [   ] | [   ] |
| [           ] | | [     ] | [     ] | [   ] | [   ] |

---

[5] The Verification Report identifies the four stores located in Montana and Washington. *See Verification Report*, at 17-18. For the remaining seven stores, the Verification Report refers to Exhibit SC-8 of Bridgestone's 1SSCQR. *Id.* at 18. This exhibit includes the ship-to codes for 14 stores with "GCR" in their names. *See id.*, at Exhibit SC-8 (sheet 3). Based on Bridgestone's explanation of the sales history for GCR stores in its Section A response, only seven of those stores were affiliated at any point during the POI. *See* Section A Questionnaire Response (Jan. 9, 2024) ("AQR"), at A-9-A-11. Bridgestone summarized this information in its pre-preliminary comments. *See* Pet'r's Pre-Prelim. Comments, at 3-4.

| [                    ] | [      ] | [      ] | [   ] | [   ] |
|------------------------|----------|----------|-------|-------|
| [                    ] | [      ] | [      ] | [   ] | [   ] |
| [                    ] | [      ] | [      ] | [   ] | [   ] |
| [                    ] | [      ] | [      ] | [   ] | [   ] |
| [                    ] | [      ] | [      ] | [   ] | [   ] |

The table above summarizes whether these stores appear in Bridgestone's U.S. sales database or GCR's A/R report. As shown, seven of the eleven stores are found in both the sales database and the A/R report. See summary of sales to GCR stores in Bridgestone's rebuttal pre-prelim comments (May 10, 2024), at 2-3; *see also* Supp. C QR, at Exhibit 3SC-1a; see also, ECF 60. The remaining four stores do not appear in the A/R report, but there are no sales to those stores in the sales database either. *See Section II, supra.* Since no sales were made to these locations, it makes sense that the A/R report does not display any unpaid balances for those stores. Therefore, Commerce's finding that the document was "incomplete" because it did not include all eleven locations is unsupported by substantial evidence.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Commerce's application of AFA to Bridgestone was not supported by substantial evidence, an abuse of discretion and otherwise not in accordance with the law.   Plaintiff therefore respectfully requests that this Court remand this action to Commerce for reconsideration, and with instructions to calculate a rate for Bridgestone using the company's own record information.

Respectfully submitted,

/s/ Daniel J. Cannistra
Daniel J. Cannistra
Pierce J. Lee
Valerie Ellis
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2500
Email: dcannistra@crowell.com

*Counsel for Plaintiff*

**Exhibit I**

**Summary of Alleged Record Gaps and Contrary Evidence**

Commerce identified four instances of informational gap related to documents requested during the verification. See Final IDM, 16-17

| Alleged gap | Purported Purpose | Record Evidence |
|---|---|---|
| Reconciliation of BATO's accounts receivable for sales made to affiliated GCR locations | "Because we were unable to verify this information, a gap in the record exists with respect to whether Bridgestone's sales to unaffiliated customers made through GCR are, or can be, accurately identified and reported." Final IDM, ⎯⎯⎯ | The requested documentation was the A/R reports for the 11 GCR stores. The reports are on the judicial record. They demonstrate no discrepancy in Bridgestone's identification of affiliated stores. |
| Breakdown of the largest and smallest total values received by BATO's customers for each type of rebate | "Because Bridgestone did not provide information essential to the attempted verification of its rebates, we find that information requested by Commerce that is crucial to the calculation of an accurate dumping margin is missing from the record within the meaning of section 776(a)(1) of the Act {...}." Final IDM, ⎯⎯⎯ | The breakdown of the largest and smallest rebate values was presented during the verification and is part of the judicial record. |
| Documentation regarding a large credit balance in BATO's general ledger account for volume bonus rebates | | The record shows that the GL account at issue is unrelated to reportable rebates. |
| Itemized reconciliation between national account discount debit/credit schedule to BATO's accounting records | "This was necessary given the fact that the credit and debit notes were not solely related to the reported discounts, but reflected the total value of the credit and debit notes inclusive of other charges and reimbursements not related to the reported expense that could potentially result in the underreporting of the reported value of the discount. Accordingly, we find that information is missing from the record within the meaning of section 776(a)(1) of the Act because Bridgestone did not provide the requested documents." Final IDM, ⎯⎯⎯ | The verification exhibits include itemized reconciliations of the monthly total values of ZDG2 and ZDL2 to Bridgestone's accounting system. See Verification Exhibit CEP-VE-5A at 29. During verification, the verifiers confirmed that only tire-related amounts were recorded as billing item types ZDG2 and ZDL2. See CEP-VE-8, at 10, 12 |

Additionally, Commerce alleged the following informational gaps:

| Alleged gap | Purported Purpose | Record Evidence |
|---|---|---|
| ZIP code of the place of delivery | "The accuracy in sales destination reporting is crucial in calculating AD margins because, as discussed in the *Preliminary Determination*, a part of Commerce's determination regarding dumping is to determine whether there is a pattern of CEPs for comparable merchandise that differs significantly among purchases, regions, or time periods." | The information is in BATO's customer list and freight expense list. See _____. Moreover, the issue became moot once Commerce found differential pricing in the Preliminary Determination. |
| Warehousing expenses incurred in the country of export | "Regardless of the fact that the value of the account was reported within the DINDIRSU expense, information is missing from the record because Bridgestone did not provide the requested calculation for DWAREHU, {...} | The warehousing expense in the narrative. SSCQR, at 30. Trial balances for the POI confirms this amount. See Exhibit 2SB-7. |
| Other errors and inaccuracies in expense calculations | "We do not agree with Bridgestone that it would be appropriate to examine each deficiency in isolation. Rather, we have identified several significant issues that, taken together, render Bridgestone's data unusable. We find it significant that Bridgestone's data contained numerous deficiencies, and that Bridgestone in several instances explicitly stated that the deficiencies had been addressed when, in fact, they had not." | Commerce admits that it did not determine whether each deficiency results in a record gap. Moreover, the referenced "inaccuracies" were clerical errors in expense calculation worksheets, such as incorrect cell references in Excel formulas or calculation mistakes due to misaligned numbers. They did not omit any datapoints. |

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 12,555 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

*/s/ Daniel J. Cannistra*
Daniel J. Cannistra

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JUDGE GARY S. KATZMANN**

|  |  |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC<br><br>       *Plaintiff,*<br><br>  v.<br><br>UNITED STATES,<br><br>       *Defendant,*<br><br>    and<br><br>UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,<br>       *Defendant-Intervenor.* | Court No. 24-00263 |

**PROPOSED ORDER**

Upon consideration of the Motion for Judgment on the Agency Record filed by Bridgestone Americas Tire Operations LLC, and upon consideration of all other papers and proceedings herein, it is hereby

    **ORDERED** that the motion is **GRANTED**; and it is further

    **ORDERED** that the final determination of the Department of Commerce published as *Truck and Bus Tires from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 89 Fed. Reg.

83636 (October 17, 2024), and associated Issues and Decision Memorandum is hereby remanded

for reconsideration in accordance with this opinion.

_____

HON. GARY S. KATZMANN, JUDGE

Dated: _____, 2025
New York, New York