**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) Court No. 24-00263 |
| and | ) |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) |
| Defendant-Intervenor. | ) |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment on the agency record and defendant's response thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____
        New York, NY                              _____
                                                 Judge

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE**

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, <br><br> Defendant-Intervenor. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Court No. 24-00263 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL

FRANKLIN E. WHITE, JR.
Assistant Director

AYAT MUJAIS
Assistant Chief Counsel
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7568
Sosun.bae@usdoj.gov

January 16, 2026

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT PURSUANT TO RULE 56.2 ............................................................... 2

I.     The Administrative Determination Under Review .......................................... 2

II.    Issues Presented ............................................................................................ 2

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

SUMMARY OF THE ARGUMENT ........................................................................ 5

ARGUMENT ........................................................................................................... 5

I.     Standard of Review ....................................................................................... 5

II.    Commerce's Application of Total AFA to Bridgestone Was Lawful and
Supported by Substantial Evidence .............................................................. 7

     A.    Relevant Legal Background for Application of Facts Available
with an Adverse Inference ................................................................ 7

     B.    Commerce Reasonably Applied Total AFA, Finding Bridgestone's
Data Unreliable and Unusable .......................................................... 9

     C.    Each of The Bases for Commerce's Application of Total AFA Was
Supported by Substantial Evidence ................................................ 12

          1.    Commerce Reasonably Determined that BATO Had Failed
to Provide Requested Information Regarding GCR's Sales .... 12

          2.    Commerce's Determinations Regarding Bridgestone's
Rebates Are Supported by Substantial Evidence .................. 17

               a.    BATO Did Not Comply with Requests to Provide Certain
Rebate Information ...................................................... 17

               b.    Commerce Properly Declined to Consider Bridgestone's
Rebate-Related Submissions as Minor Corrections ..... 20

          3.    BATO Failed to Provide the Requested Itemized
Reconciliation for Other Discounts ...................................... 24

          4.    Bridgestone Incorrectly Reported the Destination of Its
U.S. Sales ............................................................................ 25

5.    Bridgestone Failed to Accurately Report Certain
Warehousing Expenses ......................................................................27

III.    Commerce Lawfully Corroborated Bridgestone's AFA Rate ...........................29

IV.    Commerce Acted Within Its Discretion in Not Placing the Disputed
Documents on the Record ...................................................................32

CONCLUSION ...........................................................................................................35

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bebitz Flanges Works Priv. Ltd. v. United States*,
    433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ........................................................................ 13

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ......................................................................... 14, 26, 29

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ........................................................................................................ 6

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ........................................................................................................ 6

*Dalian Meisen Woodworking Co., Ltd. v. United States*,
    No. 20-00109, 2023 WL 3058783 (Ct. Int'l Trade 2023) ...................................... 8, 28

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021) ..................................................................................... 30

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ....................................................................................... 6

*Fischer S.A. Comercio v. United States*,
    700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ............................................................... 20

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*,
    276 F. Supp. 2d 1371 (Ct. Int'l Trade 2003) ............................................................... 11

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ................................................................. 6

*Goodluck India Ltd. v. United States*,
    11 F.4th 1335 (Fed. Cir. 2021) ............................................................................. passim

*Gov't of Quebec v. United States*,
    567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022), *aff'd*, 105 F.4th 1359 (Fed. Cir. 2024) .............. 11

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ................................................................. 8

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013) ..................................................................................... 14

*Linyi Chengen Imp. & Exp. Co. v. United States*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ................................................................. 8

*Max Fortune Indus. Co. v. United States*,
  37 CIT 549 (Ct. Int'l Trade 2013) ........................................................ 15

*Micron Tech., Inc. v. United States*,
  117 F.3d 1386 (Fed. Cir. 1997) ........................................................ 8, 33

*Mosaic Co. v. United States*,
  774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) ................................... 22

*Mukand, Ltd. v. United States*,
  767 F.3d 1300 (Fed. Cir. 2014) ........................................................ 10

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003) ...................................................... 7, 8

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) .......................................................... 6

*Pastificio Gentile S.r.l. v. United States*,
  798 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ................................... 28

*Pro-Team Coil Nail Enter., Inc. v. United* States,
  483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) ................................... 30

*Pro-Team Coil Nail Enter., Inc. v. United States*,
  No. 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024) ............. 30

*PSC VSMPO-Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012) ............................................................ 6

*Royal Brush Mfg. v. United States*,
  545 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ................................... 16

*SeAH Steel Corp. v. United States*,
  659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) ................................... 20

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ............................................................ 29

*Tatung Co. v. United States*,
  18 CIT 1137 (Ct. Int'l Trade 1994) ................................................... 15

*Thyssen Stahl AG v. United States*,
  886 F. Supp. 23 (Ct. Int'l Trade 1995) ............................................. 15

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
  353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004), *aff'd*, 146 F. App'x 493 (Fed. Cir. 2005) ........... 21

*Timken Co. v. United States*,
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ......................................................... 6

*Tung Mung Dev. Co. v. United States*,
   25 CIT 752 (2001) ........................................................................................... 7

Statutes

19 U.S.C. § 1516a(b) ........................................................................................... 5

19 U.S.C. § 1677a .............................................................................................. 13

19 U.S.C. § 1677e .......................................................................................... 7, 30

19 U.S.C. § 1677f-1(a)(2) ................................................................................. 29

19 U.S.C. § 1677m .............................................................................................. 8

Regulations

19 C.F.R. § 351.413 ........................................................................................... 28

Other Authorities

*Welded Stainless Pressure Pipe from Thailand*,
   79 Fed. Reg. 31,093 (Dep't of Commerce May 30, 2014) ........................... 30

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*,
   86 Fed. Reg. 28,559 (Dep't of Commerce May 27, 2021) ........................... 31

*Truck and Bus Tires from Thailand*,
   88 Fed. Reg. 77,960 (Dep't of Commerce Nov. 14, 2023)............................. 2

*Truck and Bus Tires from Thailand*,
   89 Fed. Reg. 43,806 (Dep't of Commerce May 20, 2024) ............................. 3

*Truck and Bus Tires from Thailand*,
   89 Fed. Reg. 83,636 (Dep't of Commerce Oct. 17, 2024)............................. 2

Statement of Administrative Action, H.R. Rep. No. 103-316 (1994),
   *as reprinted in* 1994 U.S.C.C.A.N. 4040 .................................................... 30

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | )     Court No. 24-00263 |
| and | ) ) |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) |
| Defendant-Intervenor. | ) ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiff Bridgestone Americas Tire Operations, LLC's (Bridgestone). *See* Bridgestone Br., ECF No. 63. Bridgestone challenges the Department of Commerce's (Commerce) application of facts available with a total adverse inference (AFA) to Bridgestone in the final determination of Commerce's less-than-fair-value investigation of truck and bus tires from Thailand, as well as the rejection of certain documents from the administrative record. As we demonstrate below, Commerce's final results are supported by substantial evidence and in

accordance with law.  Accordingly, we respectfully request that the Court deny Bridgestone's motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.    The Administrative Determination Under Review

Bridgestone challenges Commerce's final determination in its less-than-fair-value investigation of truck and bus tires from Thailand.  *See Truck and Bus Tires from Thailand,* 89 Fed. Reg. 83,636 (Dep't of Commerce Oct. 17, 2024) (final determination) (P.R. 297), and accompanying Issues and Decision Memorandum (IDM) (P.R. 290).  The period of investigation is October 1, 2022, through September 30, 2023.

### II.    Issues Presented

1.    Whether Commerce's application of total AFA to Bridgestone was supported by substantial evidence and in accordance with law.

2.    Whether Commerce's corroboration of the AFA rate was lawful.

3.    Whether Commerce acted within its discretion in not considering the documents Bridgestone later moved to complete the record with and properly rejected the documents from the administrative record.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 14, 2023, Commerce initiated a less-than-fair-value investigation of truck and bus tires from Thailand.  *See Truck and Bus Tires from Thailand,* 88 Fed. Reg. 77,960 (Dep't of Commerce Nov. 14, 2023) (P.R. 56).  Commerce selected Bridgestone and Prinx as mandatory respondents for the investigation.  *See* Dec. 4, 2023 Respondent Selection Memo (P.R. 69) (C.R. 26).  Commerce issued its initial questionnaire to Bridgestone on December 13, 2023.  *See* Bridgestone Questionnaire (P.R. 75).  Bridgestone responded, and Commerce

requested further information regarding Bridgestone's sales reporting in multiple supplemental questionnaires.  IDM at 16.

On May 20, 2024, Commerce published its preliminary determination in its antidumping investigation covering truck and bus tires from Thailand.  *See Truck and Bus Tires from Thailand*, 89 Fed. Reg. 43,806 (Dep't of Commerce May 20, 2024) (preliminary determination) (P.R. 233), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 218).

Following the preliminary determination, Commerce conducted an on-site sales verification of Bridgestone and its U.S. affiliate Bridgestone Americas Tire Operations, LLC (BATO).  Bridgestone Verification Agenda (P.R. 241).  During verification, Commerce uncovered many previously-unknown discrepancies and errors, most of which Bridgestone had not already disclosed to Commerce.  IDM at 7, 16; *see generally* Bridgestone Sales Verification Report (C.R. 558).  Commerce found that Bridgestone had reported certain sales information in a form and manner so inaccurate that Commerce was unable to rely on the information as reported or successfully verify it.  Bridgestone Sales Verification Report at 2-4.  Specifically, Commerce discovered discrepancies or errors regarding Bridgestone's reporting of U.S. market rebate expenses, U.S. destination of sales, and certain missing or unverifiable sales expenses.  *Id.* Commerce also found several problems with the reporting of other sales expenses, which called into question the overall accuracy and propriety of Bridgestone's application of the selling expense values found in its trial balances to its home market and U.S. sales.  *Id.*  And, while Bridgestone was afforded the opportunity to report minor corrections to its submitted databases at the beginning of both its sales verification and its cost verification, Commerce found that Bridgestone's data still contained numerous discrepancies and errors.  IDM at 16; Bridgestone Sales Verification Report at 2-5.

Subsequent to verification, petitioner (and defendant-intervenor) United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (USW) submitted case briefs urging Commerce to apply total AFA to Bridgestone, citing both Bridgestone's ample opportunities to submit complete and accurate data, and the numerous errors and deficiencies discovered at verification.  USW Case Br. at 1-26 (C.R. 563); USW Rebuttal Br. at 1-17) (C.R. 566).  In its final determination, Commerce found that significant issues with Bridgestone's sales reporting merited the application of total AFA. IDM at 7-8, 15-37.  As AFA, Commerce assigned the highest margin assigned in the petition— 48.39 percent—and corroborated the margin to the extent practicable by comparing it to the calculated margins for the individual sales of Prinx, the other mandatory respondent in the investigation, finding the petition margin to fall within the range of the highest individually-calculated margins for Prinx.  IDM at 9-10, Margin Corroboration Memo (C.R. 568-569).

Bridgestone filed a complaint with this Court contesting Commerce's application of AFA.  Subsequently, Bridgestone filed a motion to complete or supplement the record, alleging that Commerce had examined three sets of documents at verification but had erroneously excluded them from the administrative record.  *See generally* Bridgestone Am. Mot. To Supplement (ECF No. 33).  After extensive briefing and oral argument, the Court granted Bridgestone's motion, ordering Commerce to place the three sets of documents on the record for judicial review with a "Rejected and Retained" designation, such that the Court could determine whether Commerce properly rejected the documents.  *See* July 3, 2025 Order at 16, 18 (ECF No. 59) (Supplementation Order).  In doing so, the Court noted the difference between the record for review in front of the Court and the administrative record compiled by Commerce.  *Id.* at 14.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final determination, as Commerce's application of total AFA to Bridgestone was both lawful and supported by substantial evidence. Commerce identified no less than six significant inconsistencies, inaccuracies, or other errors in Bridgestone's sales reporting, in addition to several other errors in Bridgestone's calculation of its expenses. The pervasive nature of Bridgestone's misreporting rendered the entirety of its sales data unreliable and unusable, and Commerce properly declined to rely on it.

Commerce also lawfully corroborated the 48.39 percent rate it selected as the AFA margin, comparing it against transaction-specific margins for Prinx, the other mandatory respondent, and finding the AFA rate within the range of those margins. Bridgestone cannot demonstrate that Commerce was disallowed from corroborating the AFA rate with Prinx's margin simply because that margin was based on partial AFA.

Finally, Commerce acted within its discretion in declining to place on the administrative record certain documents tendered by Bridgestone during verification. While the Court previously found that Bridgestone had presented the documents to Commerce and ordered the documents added to the record for judicial review, it did not hold that Commerce was required to put the documents on its administrative record. Because the documents did not fully comply with Commerce's requests or represented untimely new factual information, Commerce properly rejected them.

## ARGUMENT

### I.     Standard of Review

This Court holds lawful Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b). "Substantial evidence" consists of "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

Finally, "{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (reversing the Court's order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance.").

II.   **Commerce's Application of Total AFA to Bridgestone Was Lawful and Supported by Substantial Evidence**

   A.   **Relevant Legal Background for Application of Facts Available with an Adverse Inference**

Commerce will use "facts otherwise available" to fill gaps in the record if: (1) necessary information is not available, (2) an interested party withholds information requested by Commerce or fails to provide the information by the deadline or in the manner requested, (3) the party significantly impedes the proceedings, or (4) the party provides information that cannot be verified.  19 U.S.C. § 1677e(a).  Where an agency's request is clear and relates to issues in an investigation, a respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Tung Mung Dev. Co. v. United States*, 25 CIT 752, 758 (2001).  "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

If Commerce further finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  When determining whether a respondent has complied to the "best of its ability," Commerce "assess{es} whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382.  Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when Commerce reasonably expected that "more forthcoming responses should have been made." *Id*. at 1383.  "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's

ability, regardless of motivation or intent." *Id.* "Respondents should be forthcoming with information, regardless of their views on relevancy, in the event the agency finds differently." *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1298 (Ct. Int'l Trade 2019) (citations omitted).

Normally, prior to resorting to AFA, Commerce must inform party of its deficiency and, where practicable, provide it with an opportunity to comply. 19 U.S.C. § 1677m(d). If a party complies, Commerce may nonetheless "disregard all or part of the original and subsequent responses" if it determines that the information provided is not satisfactory or untimely, subject to 19 U.S.C. § 1677m(e). *Id.* However, section 1677m(d) is inapplicable to deficiencies discovered at the verification stage. *Hung Vuong Corp. v. United States,* 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) (verification "does not entail a request for information" under the statute and "is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information."); *see also Dalian Meisen Woodworking Co., Ltd. v. United States*, No. 20-00109, 2023 WL 3058783, at *4 (Ct. Int'l Trade Apr. 24, 2023) ("if {Commerce} need not *accept* corrective substantive information at verification as to deficiencies in a respondent's *original* submissions, it need not *seek* corrective substantive information when *verification* responses are deficient.") (emphasis in original). As the Court of Appeals for the Federal Circuit has articulated, the purpose of verification is not to gather new information, but to "test information provided by a party for accuracy and completeness." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1344 (Fed. Cir. 2021) (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)). In short, "{v}erification represents a point of no return." *Id.* at 1343.

**B.    Commerce Reasonably Applied Total AFA, Finding Bridgestone's Data Unreliable and Unusable**

Commerce's application of total AFA was lawful and supported by substantial evidence. As Commerce explained in its final determination, Bridgestone's verification unveiled a mountain of discrepancies and other errors.  Commerce identified no less than six significant issues stemming from its verification of Bridgestone's sales questionnaire responses.  As discussed in more detail below, these include:  (1) the failure to provide a reconciliation of BATO's accounts receivable for its affiliate's GCR Tires & Service's (GCR) sales; (2) the failure to provide requested information regarding a breakdown of the smallest and largest rebate values received by BATO's customers by type of rebate and documentation regarding a large credit balance regarding volume bonus rebates; (3) the failure to provide an itemized reconciliation of values for other discounts in the U.S. market; (4) the misreporting of three rebate programs and failure to timely report a fourth rebate program; (5) the misreporting of the destination of U.S. sales; and (6) the failure to report certain warehousing expenses.  IDM at 16-31.

In addition, Commerce discovered numerous other errors and inaccuracies in Bridgestone's sales reporting during verification, including:  (1) the failure to report certain other discounts in the "OTHDISH" field in compliance with Commerce's instructions, as well as incorrect values with respect to one of Bridgestone's customers; (2) errors in Bridgestone's reporting of other U.S. warehousing expenses; (3) errors regarding home market packing expenses; (4) the failure to include an updated calculation for domestic inland freight in its U.S. sales database; and (5) the miscalculation of indirect selling expenses.  IDM at 31-33.

In sum, Commerce identified at least eleven distinct errors or inaccuracies of varying magnitude and reasonably concluded that its identification of "several significant issues { }, taken together, render Bridgestone's data unusable."  IDM at 33.  As Commerce explained, a

swath of Bridgestone's "sales information . . . was reported in a form and manner so inaccurate that Commerce was unable to either rely on the information as reported or successfully verify it." *Id*. at 7.  Accordingly, Commerce concluded that there was necessary information missing from the record, and that Bridgestone did not timely provide certain information in the form and manner requested, significantly impeded the proceeding, and provided information that could not be verified, therefore meeting the statutory requirements for the application of total facts available.  *Id.* at 7, 35-36.

Commerce further found that Bridgestone did not act to the best of its ability, observing that Bridgestone had multiple chances to report accurate sales data but did not do so, although the information at issue was maintained by Bridgestone in the ordinary course of business.  *Id.* at 7.  Commerce observed that, in multiple instances, Bridgestone even stated that it had made corrections but did not actually do so.  *Id.* at 34.  As such, Commerce found that Bridgestone did not put forth maximum effort and found an adverse inference warranted.  *Id.* at 7, 37.  Commerce's total AFA determination was reasonable, supported by the record, and in accordance with the relevant statutes.

Bridgestone claims that Commerce "refused to examine each alleged error separately," and that its "cumulative minor errors" theory is incompatible with the prevailing standard for application of AFA.  Bridgestone Br. at 30, 33.  This argument suffers from multiple flaws and has no basis in the relevant law.  First, Commerce is not required to assess whether each of Bridgestone's errors, standing alone, was sufficient to merit application of total AFA.  Rather, Commerce may apply total AFA when the data contains pervasive and persistent deficiencies rendering the data unreliable or unusable.  *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1305 (Fed. Cir. 2014).  Here, the sheer volume of errors and other deficiencies in Bridgestone's

reporting called into serious question the reliability of Bridgestone's entire sales reporting.  Due to Bridgestone's misreporting, Commerce found that it did "not have sufficient sales expense data to calculate a dumping margin with reliable accuracy and without undue difficulty," and that the numerous errors "undermine{d} the reliability of Bridgestone's sales databases, as well as Commerce's ability to calculate accurate sale-specific NV and U.S. prices and conduct an accurate differential pricing analysis{.}"  IDM at 7-8.  Commerce acted lawfully in considering the totality of Bridgestone's deficiencies and determining that they rendered Bridgestone's sales data unreliable and unusable.  Indeed, Commerce deemed the errors so pervasive as to require construction of an entirely new U.S. sales database in order to calculate a dumping margin using Bridgestone's own information.  *Id.* at 36.

Moreover, even if the Court were to consider each error—standing alone—to be minor (which it should not), Commerce would still have been justified in applying total AFA, given the pervasiveness of the misreporting.  In other words, Commerce discovering as many problems as it did during verification reasonably led it to question the reliability of Bridgestone's entire sales response.  *See, e.g., Gov't of Quebec v. United States*, 567 F. Supp. 3d 1273, 1286 (Ct. Int'l Trade 2022), *aff'd*, 105 F.4th 1359 (Fed. Cir. 2024) (holding that, "{w}hile the impact of the discovered errors, take alone, . . . may be small, Commerce could reasonably infer that there may remain other errors."); *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 276 F. Supp. 2d 1371, 1061 n.2 (Ct. Int'l Trade 2003) ("numerous oversights would likely suggest a pattern of unresponsiveness justifying not only the application of facts available { } but of AFA.") (internal quotation marks omitted).  Commerce explained as much, noting its inability to examine every aspect of Bridgestone's data and observing that "{t}he errors described call into question whether Bridgestone fully examined its own accounts in order to determine how to correctly

11

report its selling expenses, and even if it did, whether those expenses would be accurately calculated{.}"  IDM at 34.

Finally, Commerce *did* separately examine six significant problems with Bridgestone's sales reporting.  IDM at 16-31.  While it grouped several smaller issues into "other errors and inaccuracies," this was to illustrate the pervasiveness of the errors in Bridgestone's sales reporting.  *Id.* at 31-33 (explaining that Bridgestone's responses contained numerous deficiencies and that, taken together, the deficiencies rendered Bridgestone's data unusable.).

In sum, Commerce's decision to apply total AFA to Bridgestone, based on the depth and breadth of deficiencies across Bridgestone's sales reporting, was supported by the record, lawful, and adequately explained.  Bridgestone cannot demonstrate otherwise.  Below, we address Bridgestone's arguments with regard to the several significant issues separately examined by Commerce.

C.    **Each of The Bases for Commerce's Application of Total AFA Was Supported by Substantial Evidence**

1.    **Commerce Reasonably Determined that BATO Had Failed to Provide Requested Information Regarding GCR's Sales**

In its final determination, Commerce found that, while Bridgestone reported sales of subject merchandise from BATO to BATO's immediate customers, it did not completely report sales from BATO to the first unaffiliated customer through its affiliate GCR locations.  IDM at 17-18.  Specifically, at verification, Commerce requested a reconciliation of accounts receivable for sales made to GCR locations and, while Bridgestone provided an accounts receivable report, it did not include all of GCR's affiliated customers.  *Id.* at 18, 20; Montgomery Decl. ¶ 5 (ECF No. 53-1).  Because Commerce was unable to verify Bridgestone's full identification of sales to affiliated GCR locations, it did not accept the proffered documentation, deeming it incomplete and not fully responsive to Commerce's request.  *Id.*  In light of the missing information,

12

Commerce determined that there was a gap in the record and that Bridgestone did not provide

information in the form and manner requested.  *Id.* at 18, 20-21.  Commerce also found that it

was unable to verify whether the sales made to GCR locations reconciled to BATO's accounting

system.  Bridgestone Sales Verification Report at 17.  Finally, Commerce concluded that,

because the documentation was available to Bridgestone but it still failed to comply with

Commerce's multiple requests for information, Bridgestone did not put forth a maximum effort

and cooperate to the best of its ability.  *Id.* at 21*; see also Bebitz Flanges Works Priv. Ltd. v.*

*United States*, 433 F. Supp. 3d 1297, 1308-09 (Ct. Int'l Trade 2020) ("that {respondent} put forth

*some* effort is not inconsistent with Commerce's conclusion that {respondent} failed to act to the

'best of its ability.'").

Commerce's decision to decline the accounts receivable report and apply AFA was

justifiable and supported by the record.  As Commerce explained, verifying sales to affiliate

GCR locations was necessary for Commerce to determine whether Bridgestone's proposed

allocation methodology of sales from GCR to the first unaffiliated customer was reasonable.

IDM at 18; *see also* 19 U.S.C. § 1677a(b), (e) (directing Commerce to specifically calculate

constructed export price based on the price at which the merchandise was first sold to an

unaffiliated customer).  Because Bridgestone did not provide the full set of information requested

by Commerce, a gap existed in the record.  IDM at 18.  Indeed, other record evidence shows that

not all of the affiliated locations were listed in the report Bridgestone tendered to Commerce.

*See* Bridgestone Sales Verification Report at 17-18; Bridgestone Supp. Section C Resp. at Exh.

SC-8 (C.R. 388-389).

Compounding Bridgestone's failure to submit the full set of GCR affiliated locations,

Bridgestone also failed to make available the person who had created the report and could have

answered Commerce's questions regarding the lack of information or potentially updated the report prior to the end of verification.  IDM at 20, Montgomery Decl. ¶ 5; Bridgestone Sales Verification Report at 17.  Because Bridgestone failed to make the required personnel available, Commerce reasonably declined to accept the incomplete document for the record.

Bridgestone complains that Commerce did not afford it sufficient time to make the person responsible for the report available, claiming that Commerce waited until 3:30pm on the last day of verification to view the report and then ended verification before 5pm without explaining its rejection of the document.  Bridgestone Br. at 17.  First, Bridgestone does not appear to have articulated this argument before Commerce; as such, the Court should reject it for failure to administratively exhaust.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017).  While certain exceptions to the exhaustion requirement—such as futility or pure question of law—exist; *see, e.g., Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145-48 (Fed. Cir. 2013); Bridgestone cannot establish that any of the limited exceptions apply to its failure to raise this argument before Commerce.

Even if the Court considers the argument, it must fail.  Contrary to Bridgestone's representations, Commerce did not close verification until 5:15pm and did not leave the premises until approximately 6pm.  Montgomery Decl. ¶ 11; Schueler Decl. ¶ 10.  Nor does the record support Bridgestone's contention that it gave Commerce the report at 9am.  Moreover, Commerce verifiers made it clear they were not accepting the document and explained the reason for doing so.  Montgomery Decl. ¶ 5.

Even if Bridgestone could demonstrate that it had given Commerce the document at 9am, Bridgestone's attempts to blame Commerce for not reviewing it earlier have no merit.  Commerce has an extremely large amount of information to parse during verification, and

adhering to its timeline does not constitute an abuse of discretion.  There will always be issues left to the later part of verification, and it was incumbent on Bridgestone to ensure that the requested documents were ready by the start of verification and the appropriate personnel made available to Commerce.  Indeed, Commerce's verification agenda stated that Bridgestone should have its personnel ready to speak to the verifiers and warned that "{i}f your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on . . . If, due to time constraints, it is not possible to return to that item, we may consider the item unverified" and apply AFA.  Bridgestone Verification Agenda at 1-2 (P.R. 241).  Bridgestone did not convey to Commerce in advance that the person responsible for the report would not be available the afternoon of the final day of verification, and Commerce did not abuse its discretion by not waiting for that person to become available, declining to accept the incomplete document, or permitting Bridgestone to submit an updated document at a later time.  *See Tatung Co. v. United States*, 18 CIT 1137, 1140–41 (Ct. Int'l Trade 1994) ("Due to stringent time deadlines and the significant limitations on Commerce's resources, 'it is vital that accurate information be provided promptly to allow the agency sufficient time for review.'"); *see also Max Fortune Indus. Co. v. United States*, 37 CIT 549, 555 (Ct. Int'l Trade 2013) ("Commerce properly exercised its discretion in rejecting the late-submitted information."); *Thyssen Stahl AG v. United States*, 886 F. Supp. 23, 26-27 (Ct. Int'l Trade 1995) (holding that Commerce "is not required to request that missing information be provided at a future date.").

In addition to arguing that Commerce acted inappropriately in rejecting the incomplete document, Bridgestone now purports to explain why the omitted information in its report actually reflects locations where no sales occurred.  Bridgestone Br. at 15 (claiming that the absence of a location does not show that the report is incomplete but rather demonstrates that

there were no outstanding receivable for that location).  But Bridgestone cites no support for this proposition and fails to explain why it should have been clear to Commerce from the face of the document that the absence of requested information was actually confirmation of a lack of sales.  Perhaps Bridgestone would have been able to explain as much to Commerce during verification, but *it failed to make the person who created the report available*, despite the clear instructions in the verification agenda.

Bridgestone also alleges that the Commerce verifiers did not request a "reconciliation" of Bridgestone's accounts receivable records during verification, and that the request was limited only to 11 stores.  Bridgestone Br. at 12-14.  This argument is a red herring—even if Commerce did not use the word "reconciliation," that does not change that Commerce requested sales to all of GCR's affiliated locations and the report tendered by Bridgestone did not include sales to all the locations.  IDM at 18; Bridgestone Sales Verification Report at 17.  Nonetheless, the record demonstrates that Commerce *did* request a reconciliation of Bridgestone's accounts receivable records at verification.  Bridgestone Sales Verification Report at 17 ("we requested BATO to provide a reconciliation of its accounts receivable for sales made to affiliated GCR locations").[1] Bridgestone, in claiming that Commerce did not request a reconciliation, cites only a non-record photograph describing the request as "A/R."  Bridgestone Br. at 13.  The shorthand language used on a whiteboard would hardly constitute proof that Commerce did not ask for a reconciliation, even if the photograph were part of the record.

---

[1]  Of course, the point of the verification report is to accurately reflect what transpires during verification.  *See, e.g., Royal Brush Mfg. v. United States,* 545 F. Supp. 3d 1357, 1369 (Ct. Int'l Trade 2021) ("a verification report documents the verification processes").  Indeed, the verification report itself states that "{t}he attached report outlines the procedures followed at the verification and describes our findings. . . . The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected and obtained during {verification.}"  Bridgestone Sales Verification Report at 1.

Finally, Bridgestone argues that the accounts receivable report is now on the judicial record, that it is reconcilable, and that the missing information for affiliated resellers has no bearing on constructed export price sales reporting. *Id.* at 9, 11, 15-17. But the fact that the report is on the judicial record does not mean that the information contained therein is reconcilable or verifiable, or that it fully and accurately represents sales. Additionally, as discussed above, given the missing information and Bridgestone's failure to make the requisite personnel available, Commerce acted within its discretion in not accepting the documents on the administrative record and finding Bridgestone's reporting of its U.S. sales not fully verifiable. Finally, even if Commerce had accepted the document for the record, it would still be missing necessary information requested by Commerce. The location codes were still missing, and were necessary to calculate the constructed export price, as Commerce must use the first sale to an unaffiliated customer to do so.

### 2.    Commerce's Determinations Regarding Bridgestone's Rebates Are Supported by Substantial Evidence

Bridgestone raises two arguments regarding its reporting of rebates: (1) Commerce's finding that Bridgestone had failed to provide requested information regarding both the values of the rebates received by customers and a credit balance for volume bonus rebates, and (2) Commerce's decision not to accept, at verification, changes to the reporting of various rebate programs as minor corrections. Commerce's rebate determinations were supported by the record, and it did not abuse its discretion in declining to take the information tendered by Bridgestone.

### a.    BATO Did Not Comply with Requests to Provide Certain Rebate Information

During verification, Commerce requested that Bridgestone provide documentation showing a breakdown of the smallest and largest values received by BATO's customers for each

type of rebate, as well as documentation regarding a large credit balance for volume bonus rebates.  IDM at 21; Bridgestone Sales Verification Report at 2-3, 25-26.  While Bridgestone gave Commerce a report generated from BATO's tracking system that contained a list of rebate agreements and the amount by month, Commerce found that the report did not actually contain—in the form and manner requested—the full universe of information for the smallest and largest total values of each type of rebate on a per-customer basis.  IDM at 21.  Commerce verifiers also deemed the information in the report to be new factual information, as it reflected all rebates of all types awarded to each U.S. customer.  Schueler Decl. ¶ 7.  Accordingly, Commerce declined to accept the full report for the record, but did collect an excerpt to demonstrate the capabilities of BATO's tracking system.  *Id.*; Bridgestone Verification Exhibit CEP-VE-10 at 19-21 (C.R. 525).  Bridgestone did not provide the requested documentation for the large credit balance for volume bonus rebates.

Because Bridgestone did not provide information in the form and manner requested, Commerce considered it unverified.  IDM at 22.  Commerce determined to apply facts available, explaining that the information missing from the record was crucial because rebates are a significant part of the sales process and could potentially have a large impact on U.S. sales prices.  Commerce also noted Bridgestone's acknowledgment that the requested information was readily available and found that Bridgestone did not cooperate to the best of its ability or put forth maximum effort.  *Id.*

Bridgestone contends that it provided Commerce with "full access to its rebate accounting system, sorted and summed the data in any and all of the various ways that Commerce requested{,}" and that Commerce was able to review all the requested information. Bridgestone Br. at 19.  However, Commerce verifiers determined that this information (described

18

elsewhere as a "pivot table") constituted untimely new factual information that should have been presented prior to verification and declined to accept it. Schueler Decl. ¶ 8. While Bridgestone, at Commerce's request, provided a summary of the information, it did not provide the breakdown of largest and smallest rebate values by customer and rebate type that Commerce had originally requested. *Id.*; IDM at 21-22.

Bridgestone also decries Commerce's statement that the value of certain rebates appears to have had a potentially large impact on Bridgestone's U.S. sales prices, asserting that Commerce could not reasonably make this claim without having examined the rebates. Bridgestone Br. at 19-20. But simply because Commerce did not accept the contested documentation for the record does not mean Commerce entirely failed to examine rebates. In fact, both the Sales Verification Report and the final determination clearly demonstrate that Commerce closely examined multiple aspects of BATO's rebates. Moreover, BATO maintains a large number of rebate programs that are customer-specific, and understanding both the correct amount of the rebates provided and the potential per-customer effects on the gross unit price of BATO's sales is important to Commerce's determination. IDM at 22. Because rebates are a significant part of BATO's sales process, it was reasonable for Commerce, based on its examination of the record data, to conclude that the value of certain examined rebates would potentially have a large impact on Bridgestone's U.S. sales prices. *Id.*

With regard to documentation concerning large credit balance for volume bonus rebates, Bridgestone acknowledges that it failed to provide the information requested by Commerce. However, Bridgestone argues that the missing documentation is irrelevant to rebate reporting and the balance amount was negligible in the context of the total volume bonus amount, and therefore Commerce should not have considered it as a basis for application of AFA.

Bridgestone Br. at 22-23. But, as Commerce explained, regardless of the amount of the balance, Bridgestone still completely failed to provide information explicitly requested by Commerce. IDM at 22. Commerce was allowed to take such conduct into account when determining whether to apply AFA. And, because the information was missing, Commerce was unable to verify whether it was appropriate to include as a deduction from the reported volume bonus rebate value, or verify the overall correctness of that volume bonus rebate value. *Id.*

### b. Commerce Properly Declined to Consider Bridgestone's Rebate-Related Submissions as Minor Corrections

Commerce acted reasonably and within its discretion in rejecting Bridgestone's attempt to submit corrections to its erroneous reporting of four rebate programs as minor corrections. As part of the verification process, Commerce allows parties to submit minor corrections to information already submitted in their questionnaire responses. *See* Bridgestone Verification Agenda at 2 (P.R. 241). However, verification is *not* an opportunity to submit new factual information or corrections deemed not to be minor. *See Goodluck India*, 11 F.4th at 1343-44 (affirming Commerce's practice "to accept corrective information at verification only for minor corrections to information already on the record."); *see also SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2023). This Court has agreed, holding that, while Commerce abuses its discretion by rejecting "corrective information," including submissions "to correct information already provided {to Commerce}" or to "clarif{y} information already in the record," *Fischer S.A. Comercio v. United States*, 700 F. Supp. 2d 1364, 1373 (2010), verification does not serve to "fill { } gap{s} caused by {a respondent's} failure to provide a questionnaire response or evidence requested during verification{.}" *Id*. at 1377. Verification "is intended to test the accuracy of data already submitted, {not} to provide a respondent with an opportunity to

submit a new response{.}" *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), a*ff'd*, 146 F. App'x 493 (Fed. Cir. 2005).

During the underlying investigation, Commerce directed Bridgestone to report its use of rebate programs, and create a separate field for each rebate granted and describe each rebate program.  Bridgestone Questionnaire at C-24 (P.R. 75).  Bridgestone reported the use of three rebate programs for its U.S. sales database—an annual volume bonus program, exception growth programs, and a smart resource funds program.  Bridgestone Section B-D Questionnaire Resp. at C-28 – C-29 and Exh. C-21 (P.R. 116, 121) (C.R. 87, 149).  In a supplemental questionnaire, Commerce asked Bridgestone to clarify how it had calculated its per-customer rebate for each type of rebate program and "specifically identify which rebate program corresponded to which field of the U.S. sales database."  Bridgestone Supp. Questionnaire at 9 (P.R. 150); IDM at 24.  Bridgestone responded, but failed to comply with Commerce's instructions, not making clear how the values in its calculations corresponded to its reported sales database fields for rebates.  Bridgestone Supp. Section C Resp. at 17 (P.R. 188, C.R. 387).

During verification, Commerce found that Bridgestone's response to the supplemental questionnaire—in particular its statement that certain fields corresponded to the three types of rebate programs—was incorrect.  IDM at 24; Bridgestone Sales Verification Report at 2-3, 24-25.  Specifically, the expenses reported for the three programs were actually related to a different rebate program that had not previously been disclosed to Commerce as in use—the Milestone program.  *Id.*  At verification, Bridgestone attempted to submit revisions to this misreported rebate data as minor corrections, but Commerce, finding the requested corrections not minor in nature, correctly declined to accept the proposed revisions.  IDM at 24.

21

Bridgestone argues that Commerce abused its discretion by not accepting the proposed revisions as minor corrections, and claims that Commerce routinely accepts minor corrections regarding allocations.  Bridgestone Br. at 21.  But Commerce appropriately considered the proposed revisions not to be minor corrections and acted well within its discretion in declining to accept the information at verification.  As the Federal Circuit has explained, "a minor correction is one that rectifies 'minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, or minor classification errors." *Goodluck India*, 11 F.4th at 1343.  Bridgestone's failure to properly report expense fields for three different rebate programs, on the other hand, was a significant error affecting every reported U.S. sale.  IDM at 25.  In addition, due to Bridgestone's erroneous reporting, Commerce was not aware until verification that the Milestone program was even used during the period of investigation.[2]  *Id.*  Commerce thus reasonably determined that Bridgestone's rebate reporting errors were systemic in nature, constituting missing record information for which the need should have been clearly evident, and found that, rather than minor corrections, the proposed revisions constituted untimely new factual information.  IDM at 25-27.

In *Mosaic Co. v. United States*, 774 F. Supp. 3d 1362, 1379-80 (Ct. Int'l Trade 2025), the Court sustained Commerce's application of AFA in a similar situation.  In *Mosaic*, Commerce discovered for the first time at verification that the respondent had used a previously undisclosed tax program during the period of review and deemed the disclosure of the program untimely new factual information rather than a minor correction.  *Id.* at 1379.  Commerce rejected the

---

[2]  Commerce also discovered multiple other issues with Bridgestone's rebate reporting when it attempted to verify the rebate information, including double-counting and a failure to reconcile.  IDM at 25-26.

respondent's data and applied an AFA rate with regard to the program.  *Id.*  On appeal, the Court held that Commerce had acted within its authority in determining that information pertaining to a previously unreported program was not a minor correction.  *Id.* at 1380.  Like in *Mosaic*, Commerce's decision to reject Bridgestone's information as a minor correction was within its authority, supported by the record, and adequately explained.

Bridgestone attempts to excuse its failures by characterizing its misreporting as a minor allocation error that did not undermine the accuracy of the overall data.  Bridgestone Br. at 21.  But Commerce reasonably determined that the missing rebate documentation was relevant to the calculation of adjustments in Bridgestone's margin calculations.  Allocating an equivalent value or percentage of each of these rebate programs across all sales, for example, would not accurately provide an adjusted U.S. sales price based on expenses incurred, and would not be consistent with Commerce's instructions for the reporting of rebates.  IDM at 25.  Because BATO's rebates are granted to specific customers and the price of the same merchandise between customers could vary greatly depending on the rebates for which a customer qualifies, the missing rebate information was crucial to Commerce's calculations.  *Id.* at 26.  Bridgestone's failure to timely provide necessary information concerning the rebate fields impacted Commerce's ability to accurately calculate a per-customer expense that reflects the actual gross unit price the customer paid for the merchandise.  *Id.* at 27.

In sum, Commerce determined that Bridgestone's U.S. rebate reporting contained a multitude of errors, including unreported information, incorrectly reported information, and unverified reported expenses and expense amounts.  IDM at 21-27.  And, although Commerce attempted to verify Bridgestone's rebate information, this only uncovered additional errors.  *Id.* at 25-26.  Accordingly, Commerce found that necessary information was not available on the

record, and that Bridgestone had significantly impeded the proceeding and failed to cooperate to the best of its ability. *Id.* at 28. Commerce thus appropriately considered Bridgestone's rebate-reporting failures as a basis for its application of total AFA.

### 3.   BATO Failed to Provide the Requested Itemized Reconciliation for Other Discounts

During verification, Commerce requested that Bridgestone provide an itemized reconciliation for items within the reported schedule for the OTHDISU field—which represents other discounts in the U.S. market—to BATO's accounting system. IDM at 22; Bridgestone Sales Verification Report at 23. And, while Bridgestone provided a schedule of the credit and debit used to calculate the OTHDISU amounts, it did not submit the itemized reconciliation asked for by Commerce. Verification Exh. CEP-VE-8 (C.R. 524). Commerce found that, as a result of Bridgestone's failure to provide the information, it could not determine whether Bridgestone's calculation of other discounts was reasonable. Commerce concluded that requested information was missing from the record, that Bridgestone had withheld requested information and significantly impeded the proceeding, and that Bridgestone had not put forth maximum effort to provide Commerce with full and complete answers at verification. IDM at 23.

Bridgestone argues that the record includes the total values of credit and debit notes for calculating the other discounts, such that there was no gap in the record. Bridgestone Br. at 26. But, as Commerce explained, the credit notes contained multiple additional items beyond those cited by Bridgestone. IDM at 23. To ensure that these additional items were correctly included any adjustment, Commerce had requested a detailed reconciliation to allow it to examine whether it would be appropriate to use the total value of the credit and debit notes as an expense

adjustment.[3]  *Id.*  Commerce found the need for a reconciliation significant because the credit

and debit notes were not solely related to the reported discounts, but reflected the total value of

credit and debit notes inclusive of other charges and reimbursements, and could have resulted in

the underreporting of the value of the discount.  *Id.*  Because Commerce identified a gap in the

record and explained why the requested itemized reconciliation was necessary, it appropriately

considered Bridgestone's failure to provide the information as one of the bases for the

application of total AFA.

### 4.    Bridgestone Incorrectly Reported the Destination of Its U.S. Sales

Next, Commerce found that, although Bridgestone had claimed to have reported its U.S.

sales destinations in accordance with Commerce's questionnaire request, it had actually

misreported the destinations for its U.S. sales, using the zip code for the billing address of the

purchasing company rather than the delivery address contained in the invoice and delivery

information.  IDM at 28; Bridgestone Sales Verification Report at 3, 20.  Because Bridgestone

had not reported any difficulties in reporting the zip codes, but instead had represented its

compliance with Commerce's question, Commerce did not realize the error until verification.

In its final determination, Commerce emphasized the significance of accurate sales

destination reporting, explaining that Commerce must determine whether there is a pattern of

constructed export prices for comparable merchandise that differs significantly among purchases,

regions, or time periods, and that accurate sales destinations matter for accurately calculating a

---

[3]  Bridgestone appears to believe that Commerce stated for the first time in its final
determination that verifiers had requested a detailed reconciliation.  Bridgestone Br. at 25.  But
Commerce was clearly referring to the itemized reconciliation mentioned in the verification
report, which Bridgestone never provided.  Bridgestone Verification Report at 23 ("we requested
an itemized reconciliation for the OTHDISU values reported in this schedule to BATO's
accounting system, but did not receive this reconciliation prior to the conclusion of
verification.").

dumping margin.[4]  IDM at 29.  Commerce found that, due to Bridgestone's misreporting and failure to timely correct, there was a gap in the record, and that the information was not timely provided and could not be verified.  *Id.*  Commerce concluded that, because the zip code information was readily available to Bridgestone and Bridgestone still misreported, Bridgestone had not cooperated to the best of its ability.  *Id.*

Bridgestone does not dispute that it misreported the zip codes for the sales destinations, or argue that Commerce should have been aware of the error prior to verification.  Indeed, the only argument Bridgestone makes with regard to its misreporting of the sales destinations is that the error does not matter because its sales did not pass the Cohen's *d* test.  Bridgestone Br. at 31. But Bridgestone did not raise this argument during the administrative proceeding; because Bridgestone failed to exhaust its administrative remedies before Commerce and cannot demonstrate that any exceptions to the exhaustion requirement exist, the Court should not consider the argument.  *Boomerang Tube*, 856 F.3d at 912.

Moreover, it is not for Bridgestone to determine whether its misreporting of sales destination zip codes had an impact or caused a gap in the record.  Commerce found that Bridgestone's existing sales destination information was not complete and accurate, and explained the significance of the missing information.  IDM at 29.  And, while Bridgestone claims its sales did not pass the Cohen's *d* test, this ignores that Commerce was unable to conduct a differential pricing analysis *using accurate information*.  Bridgestone used billing

---

[4]  Bridgestone characterizes its misreporting as a mere "clerical error."  Bridgestone Br. at 27, 31.  However, Commerce did not characterize it as a clerical error but instead explained the significance of the misreported zip codes.  Nor did Bridgestone simply mistype a few numbers into the zip code field; rather, it systematically reported the billing address rather than the delivery address.  IDM at 28.  The Court should not heed Bridgestone's attempts to downplay its misreporting as a mere clerical error.  In any event, even if the misreporting did constitute a clerical error, Bridgestone did not attempt to rectify it prior to or at the start of verification.

addresses instead of delivery addresses, meaning sales would have been attributed to the wrong locations.  Between this and the multitude of other errors in Bridgestone's reporting, the results of Commerce's differential pricing test—made at the preliminary stage—have no bearing on whether Bridgestone's misreporting of sales destinations effected the estimated cash deposit rate. Bridgestone cannot demonstrate that the preliminary outcome of the differential pricing test would have stayed the same absent all the errors in its reporting.  Accordingly, Commerce properly relied on Bridgestone's misreporting of its U.S. sales destinations as a basis for application of total AFA.

> ### 5.    Bridgestone Failed to Accurately Report Certain Warehousing Expenses

Commerce also determined that Bridgestone, which had initially misreported certain foreign warehousing expenses, still failed to include requested information in its U.S. sales database even after a supplemental questionnaire and response.  IDM at 30.  Specifically, while Bridgestone explained in a supplemental questionnaire response that a particular expense field— DINDIRSU—was not applicable and that it was instead using a different field—DWAREHU— to account for those warehousing expenses, it did not update its U.S. sales database with the inclusion of the DWAREHU field and removal of the DINDIRSU field.  *Id.* (citing Bridgestone Supp. Section C Resp. at 30 (P.R. 188, C.R. 387); Bridgestone Sales Verification Report at 3, 33-34).  Bridgestone also failed to provide the calculation of the DWAREHU expense, as the reported exhibit containing the relevant calculation was not in Bridgestone's responses.  *Id*. Accordingly, Commerce could not verify the accuracy or appropriateness of the calculation and found that requested information was missing from the record, the information could not be verified, and Bridgestone impeded the proceeding.  IDM at 30.  Given that Bridgestone noted its corrections for the warehousing expense fields but failed to actually update the sales database

and provide the requested calculation, Commerce also found that Bridgestone did not cooperate to the best of its ability to fully and completely respond to Commerce's questionnaires. *Id.* at 30-31.

This finding was supported by record evidence, and Bridgestone cannot demonstrate otherwise. Bridgestone attempts to excuse its failures,[5] but does not meaningfully contest Commerce's finding that Bridgestone failed to update its U.S. sales database with accurate fields and did not submit the calculation of the DWAREHU expense. Rather, it claims that information on the warehousing expenses existed elsewhere in its submissions and Commerce could have issued a post-verification questionnaire. Bridgestone Br. at 27-28. But Commerce is not required to comb through a respondent's submissions to discern whether information relevant to Commerce's requests may appear somewhere other than the place where Commerce requested it. *See Pastificio Gentile S.r.l. v. United States*, 798 F. Supp. 3d 1352, 1359 (Ct. Int'l Trade 2025) (sustaining application of total AFA when respondent failed to provide information in direct response to Commerce's request even when the information was elsewhere on the record). Moreover, while Bridgestone claims that the information that should have been included in the DWAREHU field in the sales database was available elsewhere in its responses, it still failed to provide the requested calculation of the DWAREHU expense such that Commerce could verify its accuracy. IDM at 30. And, while Commerce has the discretion to issue post-verification questionnaires, it has no obligation to do so. *See Dalian Meisen*, 2023 WL 3058783, at *4 (rejecting argument that Commerce was obligated to issue a supplemental questionnaire and

---

[5] As with its misreporting of U.S. sales destinations, Bridgestone minimizes its reporting errors for warehousing expenses as mere "clerical errors." Bridgestone Br. at 27. But a failure to update the sales database by removing one field and adding another, along with the failure to provide a requested calculation, cannot, under any reasonable interpretation, constitute a clerical error.

explaining that "there is no requirement for any sort of 'give-and-take' in verification.") (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021)).  Here, Bridgestone misreported certain warehousing expenses in the first instance, then, in response to a supplemental questionnaire, purported to rectify its error.  IDM at 29-30.  Commerce was not required to give Bridgestone a third bite at the apple by issuing another questionnaire *after* verification when Bridgestone should have provided the information correctly in the first place.

Finally, Bridgestone contends that Commerce inappropriately applied total AFA because the warehousing expenses were "insignificant compared to the total sales," citing 19 U.S.C. § 1677f-1(a)(2) and 19 C.F.R. § 351.413.  Bridgestone Br. at 30-31.  But Bridgestone failed to exhaust this argument at the administrative level; because none of the limited exceptions to exhaustion apply, the Court should not consider it here.  *See Boomerang Tube*, 856 F.3d at 912.  But even if the Court entertains the argument, it has no merit.  First, Bridgestone's failure to accurately and completely report warehousing expenses was not the sole basis for the application of AFA and, as explained elsewhere, Commerce properly considered the totality of Bridgestone's reporting errors rather than analyzing whether each one, standing alone, could justify total AFA.  Second, neither the statute nor regulation pertain to AFA; instead, they speak to Commerce's discretion to decline to take insignificant adjustments into account when determining an export price or constructed export price.  As such, they are inapposite to whether Commerce acted unlawfully or unreasonably in assigning Bridgestone a total AFA rate.

## III.    Commerce Lawfully Corroborated Bridgestone's AFA Rate

Commerce complied with the relevant statutory requirements in selecting and corroborating the AFA rate of 48.39 percent—the highest dumping margin alleged in the petition.  When relying on AFA, Commerce may rely upon information derived from the petition, the final determination from the investigation, a previous administrative review, or any

other information placed on the record. 19 U.S.C. § 1677e(b)(2). Section 1677e(c) further provides that, when Commerce relies on secondary information in selecting an AFA rate, *i.e.*, information not obtained in the course of an investigation or review, it must, "to the extent practicable, corroborate that information from independent sources that are reasonably at {its} disposal." 19 U.S.C. § 1677e(c). Information derived from the petition that gave rise to the investigation is considered secondary information. Statement of Administrative Action, H.R. Rep. No. 103-316, at 870 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4199; *see also Pro-Team Coil Nail Enterprise, Inc. v. United* States, 483 F. Supp. 3d 1242, 1250-51 (Ct. Int'l Trade 2020).

The SAA explains that, in corroborating an AFA margin based on secondary sources, Commerce should satisfy itself that the secondary information to be used has probative value. SAA at 870. Commerce will, to the extent practicable, evaluate the reliability and relevance of information to be used but need not estimate what the dumping margin would have been if the non-cooperating party had cooperated fully or demonstrate that the dumping margin reflects an alleged commercial reality of the party. *See* 19 U.S.C. § 1677e(d)(3). Commerce may corroborate the highest petition margin using individual transaction-specific margins. *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300 (Fed. Cir. 2021) (upholding Commerce's corroboration using the transaction-specific approach); *see also Pro-Team Coil Nail Enter., Inc. v. United States*, No. 2022-2241, 2024 WL 3824005, at *5 (Fed. Cir. Aug. 15, 2024).

Here, consistent with its practice, Commerce determined to apply the highest dumping margin alleged in the petition as the total AFA rate, as that rate was higher than the highest calculated rate of the other mandatory respondent in the investigation—Prinx, which received a 12.33 percent rate. IDM at 8-9 (citing *Welded Stainless Pressure Pipe from Thailand*, 79 Fed.

Reg. 31,093 (Dep't of Commerce May 30, 2014), and accompanying IDM at Cmt. 3); *see also Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,559 (Dep't of Commerce May 27, 2021), and accompanying IDM at Cmt. 1.  To corroborate the 48.39 percent rate from the petition, Commerce employed the transaction-specific approach, comparing the AFA rate to Prinx's final transaction-specific dumping margins.  Margin Corroboration Memo at 1-2 (C.R. 568).  Finding that the petition rate fell within the range of the individual sales margins for Prinx, Commerce deemed the transaction-specific margins probative and, thus, sufficiently corroborative.  *Id.*; IDM at 10.  Commerce thus fulfilled its responsibility to corroborate the AFA rate.

Bridgestone claims that, because Prinx's calculated rate was based on partial AFA, Commerce could not use that rate to corroborate Bridgestone's AFA rate, as the rate was "corroborated only against itself."[6]  Bridgestone Br. at 35.  This statement is simply not accurate. Commerce did not corroborate the AFA rate for Bridgestone with that same AFA rate.  Rather, Commerce relied on transaction-specific dumping margins from Prinx, which received a calculated 12.33 percent rate, to corroborate Bridgestone's total AFA rate of 48.39 percent.  IDM at 8-10, Margin Corroboration Memo at 1-2.  And, while Prinx's margin was based on partial AFA, it was still calculated using Prinx's own information; thus, the partial AFA rate was not based on a dumping margin alleged in the petition like Bridgestone's total AFA rate.  Instead, it was grounded in Prinx's own data.  *See* Prinx Final Sales Calc. Memo (C.R. 571); Prinx Corrected Margin Calc. (C.R. 580); IDM at 52-55.  Moreover, Bridgestone cites no authority to

---

[6]  Notably, Bridgestone does not argue that, other than an alleged failure to corroborate, Commerce erred in its selection of the AFA rate.  For instance, Bridgestone does not claim that the rate is unduly punitive or does not fall within the range of Prinx's transaction-specific margins.  And it has waived any ability to raise additional arguments on reply regarding the selection of the AFA rate.

support its position that calculated rates based on partial AFA may not serve as a basis for corroboration of a total AFA rate.  Finally, the statute only requires Commerce to corroborate secondary information "to the extent practicable" from sources reasonably at its disposal, and Commerce need only satisfy itself that the information has probative value.  Commerce did so, and the Court should not heed Bridgestone's request to have the Court impose more stringent requirements than the statute and SAA require.

Bridgestone also contends that Commerce's preliminary determination demonstrates the "implausibility" of the chosen AFA rate.  Bridgestone Br. at 35.  But the fact that Bridgestone and Prinx received lower margins in the preliminary determination than in the final one is not probative, particularly with regard to Bridgestone, whose data came into question during verification, well after the publication of the preliminary determination.  Indeed, Bridgestone's argument amounts to no more than a rehashing of its claim that Commerce erred in applying a total AFA rate at all.  Because Commerce appropriately applied total AFA to Bridgestone and correctly calculated Prinx's individual rate in the final determination, the margins it preliminary assigned have no relevance to the corroboration of the 48.39 percent rate.

## IV.    Commerce Acted Within Its Discretion in Not Placing the Disputed Documents on the Record

Bridgestone claims that Commerce should be required to use the documents it moved the Court to complete or supplement the judicial record for review with as part of the administrative record (*i.e.*, the disputed documents) and reconsider its decision to apply total AFA in light of those documents.  Bridgestone Br. at 36.  Bridgestone largely relies on the fact that the Court, in granting the motion to complete or supplement, found that Commerce had been presented with the disputed documents at verification.  *Id.*  But the Court, while holding that the disputed documents warranted inclusion in the record for review by the Court, explicitly reserved

judgment on whether Commerce lawfully rejected such documents from its administrative record, explaining that it needed to consider the content of the documents in order to determine whether Commerce erred in rejecting them from the administrative record. Supplementation Order at 15-16. As such, the Court's order does not demonstrate that Commerce abused its discretion in not accepting the disputed documents for the record. [7]

As Commerce made clear prior to verification, it was Bridgestone's responsibility to be fully prepared to provide information in the form and manner requested by Commerce, even if that information was not explicitly requested in advance of verification, and to make personnel available to Commerce to answer questions or explain the information it purports to submit. *See* Verification Agenda (P.R. 241). Bridgestone failed to do so, and Commerce should not be required to add documents to the record that it—within its broad discretion—declined to accept during the investigation, even if Commerce verifiers viewed the disputed documents at verification.

Bridgestone claims that the disputed documents were requested by and presented to Commerce during verification, but mischaracterizes the nature of Commerce's requests. As discussed above, while Commerce requested specific information regarding GCR's sales and customer-specific rebate information, it found that the documents proffered by Bridgestone at verification and submitted to this Court for the judicial record were missing relevant information, were not in the form and manner requested, or constituted untimely new factual information. IDM at 2, 7-8, 20-22; Bridgestone Sales Verification Report at 2-3, 17, 25; Schueler Decl. ¶ 8.

---

[7] As noted elsewhere, the correct standard for reviewing Commerce's verification procedures, including its decisions to accept or reject information offered at verification, is abuse of discretion, and Commerce is owed "considerable deference." Govt. Resp. to Oral Argument Questions at 4 (quoting *Micron Tech.*, 117 F.3d at 1396) (ECF No. 51).

That Commerce viewed the disputed documents during presentation does not suggest that Commerce was required to put the documents on the record and analyze their substance in rendering its determination, particularly given Commerce's explanations of the documents' deficiencies.

Moreover, despite Bridgestone's implication to the contrary, the disputed documents do not constitute the lynchpin for Commerce's application of AFA. Commerce's AFA determination was based on a multitude of discrepancies, inaccuracies, and other errors, the majority of which have no relation to the disputed documents. And, as discussed in more detail above, even with the two issues related to the disputed documents, Commerce did not rely on the substance of the disputed documents in making its determination, and Bridgestone cannot demonstrate the likelihood that Commerce would have made a different determination had it done so. Rather, Commerce reasonably determined that the GCR and rebate customer information proffered by Bridgestone at verification was deficient in one or more respects, and it acted within its discretion in declining to accept and rely on the disputed documents.

Bridgestone alleges that Commerce actually used the rebate report and the information from the pivot table (characterized as a "rebate breakdown list" in Bridgestone's brief), claiming that the contents of the documents themselves demonstrate that Commerce relied on them. Bridgestone Br. at 38. But it is unclear how Commerce could have used the data that exclusively appeared in the rebate report and pivot table in rendering its final determination, given the information was not on the record. Bridgestone's argument also ignores that Commerce accepted an excerpt of the rebate report, in order to better understand BATO's system for tracking rebates, as well a summary reflecting the total amount of rebates paid by program type. Bridgestone Sales Verification Report at 25; Schueler Decl. ¶ 7; IDM at 21. In addition,

Commerce accepted, as verification exhibits, a significant quantity of other information concerning rebates. *See* Verification Exhibit CEP-VE-10 (525). Bridgestone has not demonstrated that the specific data it cites was data that appears *only* in the disputed documents or that Commerce relied on information that appears *only* in the disputed documents, such that they must be placed on the record.

### CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

/s/ Sosun Bae
SOSUN BAE
AYAT MUJAIS                                  Senior Trial Counsel
Assistant Chief Counsel                      Commercial Litigation Branch
Office of the Chief Counsel                  Civil Division
  for Trade Enforcement & Compliance    Department of Justice
U.S. Department of Commerce                  P.O. Box 480
                                         Ben Franklin Station
                                         Washington, DC 20044
                                         Telephone: (202) 305-7568
                                         Fax: (202) 307-0972
                                         Email: sosun.bae@usdoj.gov

January 16, 2025                             Attorneys for Defendant

**<u>CERTIFICATE OF COMPLIANCE</u>**

Defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 10,301 words, excluding those exempted portions of this brief.

<u>/s/ Sosun Bae</u>
January 16, 2026