# UNITED STATES COURT OF INTERNATIONAL TRADE
### Before: The Honorable Gary S. Katzmann, Judge

BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC,

    *Plaintiff*,

  v.

UNITED STATES,

    *Defendant*,

  and

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC,

    *Defendant-Intervenor*.

**PUBLIC VERSION**

Court No. 24-00263

Business proprietary information
removed from pages 6–12, 18–
19, 21–22, 25–26, and 28–31.

## DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Luke A. Meisner
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to the United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union, AFL-CIO, CLC*

Date: January 16, 2026

*Admitted only in New York and New
Jersey. Practice limited to matters before
federal courts and agencies.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. i

STATEMENT PURSUANT TO RULE 56.2(c) ................................................................ 2

    I.    Administrative Determination Under Review ................................................ 2

    II.    Issues Presented for Appeal ........................................................................... 2

BACKGROUND ........................................................................................................... 3

    I.    LEGAL FRAMEWORK FOR DETERMINING DUMPING MARGINS AND ACHIEVING A FAIR COMPARISON BETWEEN NORMAL VALUE AND U.S. PRICE ................................................................................................ 3

    II.    THE PETITION AND INITIATION OF THE INVESTIGATION............................. 5

    III.    COMMERCE'S ATTEMPTS TO OBTAIN SALES INFORMATION FROM BRIDGESTONE.................................................................................. 6

        A.    INITIAL QUESTIONNAIRE AND BRIDGESTONE'S RESPONSE................. 6

        B.    SUPPLEMENTAL QUESTIONNAIRES AND BRIDGESTONE'S RESPONSES .............................................................................. 8

        C.    THE PRELIMINARY DETERMINATION ................................................ 9

        D.    POST-PRELIMINARY SUPPLEMENTAL QUESTIONNAIRE AND BRIDGESTONE'S RESPONSE ................................................ 10

    IV.    VERIFICATION UNCOVERED WIDESPREAD AND SERIOUS PROBLEMS WITH BRIDGESTONE'S REPORTED SALES DATA............................................. 11

    V.    THE APPLICATION OF TOTAL AFA IN THE FINAL DETERMINATION ....... 13

SUMMARY OF ARGUMENT ........................................................................................ 14

ARGUMENT .............................................................................................................. 16

    I.    STANDARD OF REVIEW .......................................................................... 16

    II.    COMMERCE'S DECISION TO RESORT TO FACTS OTHERWISE AVAILABLE SHOULD BE SUSTAINED ................................................. 16

        A.    LEGAL FRAMEWORK FOR COMMERCE'S AUTHORITY TO USE FACTS OTHERWISE AVAILABLE................................................ 16

        B.    COMMERCE LAWFULLY RESORTED TO FACTS OTHERWISE AVAILABLE .................................................................. 18

        C.    BRIDGESTONE'S ARGUMENTS AGAINST COMMERCE'S USE OF FACTS OTHERWISE AVAILABLE ARE UNAVAILING ........................................... 23

            1.    The Record Supports Commerce's Findings Regarding GCR Sales.............. 24

            2.    The Record Supports Commerce's Findings Regarding U.S. Rebates........... 28

            3.    The Record Supports Commerce's Findings Regarding Other Errors .......... 32

III.    COMMERCE'S DECISION TO APPLY TOTAL AFA SHOULD BE
        SUSTAINED ........................................................................................... 34

    A.    LEGAL FRAMEWORK FOR COMMERCE'S DISCRETIONARY
          AUTHORITY TO APPLY AFA ............................................................ 34

    B.    COMMERCE LAWFULLY APPLIED TOTAL AFA ........................................ 35

    C.    BRIDGESTONE FAILS TO DEMONSTRATE THAT COMMERCE'S
          DECISION TO APPLY TOTAL AFA IS UNLAWFUL .................................... 38

        1.    The Record Supports Commerce's Finding that Bridgestone Failed to
              Cooperate to the Best of its Ability .................................................. 38

        2.    The Record Supports the Application of Total AFA ..................................... 39

        3.    Bridgestone's Arguments On Corroboration Should Be Rejected ................. 42

CONCLUSION ........................................................................................................ 46

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABB Inc. v. United States*,
    355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................16

*ABB Inc. v. United States*,
    190 F. Supp. 3d 1159 (Ct. Int'l Trade 2016) ............................................................28

*Acciai Speciali Terni S.P.A. v. United States*,
    142 F. Supp. 2d 969 (Ct. Int'l Trade 2001) ............................................................38

*Ad Hoc Shrimp Trade Action Committee v. United States*,
    616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ............................................................28

*AK Steel Corp. v. United States*,
    21 C.I.T. 1265 (1997) ............................................................17–18

*Altx, Inc. v. United States*,
    370 F.3d 1108 (Fed. Cir. 2004) ............................................................16

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
    624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ............................................................4

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ............................................................43–44

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ............................................................16

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007) ............................................................43

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021) ............................................................39

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015) ............................................................27

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*,
    357 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ............................................................31

*FCC v. NextWave Pers. Commc'ns, Inc.*,
    537 U.S. 293 (2003) ............................................................16

*Goodluck India Ltd. v. United States*,
  11 F.4th 1335 (Fed. Cir. 2021) ........................................................................................17, 32

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
  992 F.3d 1348 (Fed. Cir. 2021) ..................................................................................................44

*Heveafil Sdn. Bhd. v. United States*,
  25 C.I.T. 147 (2001)...............................................................................................................17–18

*Hung Vuong Corp. v. United States*,
  483 F. Supp. 1321 (Ct. Int'l Trade 2020) ..................................................................................27

*Huvis Corp. v. United States*,
  525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ............................................................................16

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015) ...........................................................................................27–28

*KYD, Inc. v. United States*,
  607 F.3d 760 (Fed. Cir. 2010) .............................................................................................44–45

*Maverick Tube Corp. v. United States*,
  857 F.3d 1353 (Fed. Cir. 2017) ..................................................................................................33

*Micron Tech., Inc. v. United States*,
  117 F.3d 1386 (Fed. Cir. 1997) ..................................................................................................17

*Mukand Ltd. v. United States*,
  767 F.3d 1300 (Fed. Cir. 2014) ...........................................................................................37, 40

*Nan Ya Plastics Corp. v. United States*,
  810 F.3d 1333 (Fed. Cir. 2016) ...................................................................................16, 23, 46

*New Mexico Garlic Growers Coalition v. United States*,
  352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ............................................................................33

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...................................................................................................16

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003) .................................................................14–15, 34–36, 38–39

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995) ....................................................................................................41

*NTSF Seafoods Joint Stock Co. v. United States*,
    Court No. 20-00104, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022) ...................................28

*Özdemir Boru San ve Tic. Ltd. Sti. v. United States*,
    273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ...............................................................17

*QVD Food Corp. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ...........................................................................16, 23

*Samsung Elecs. Co. v. United States*,
    70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ...............................................................17

*SeAH Steel Corp. v. United States*,
    659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) ..............................................................27

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
    353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005) ........17

*Torrington Co. v. United States*,
    68 F.3d 1347 (Fed. Cir. 1995) ..................................................................................4

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
    50 F.4th 98 (Fed. Cir. 2022) ....................................................................................35

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ............................................................................39–40

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................................16

19 U.S.C. § 1673d(a)(1) ...............................................................................................3

19 U.S.C. § 1673d(c)(5)(A) .....................................................................................45–46

19 U.S.C. § 1677(35)(A) ...............................................................................................3

19 U.S.C. § 1677(35)(B) ...............................................................................................3

19 U.S.C. § 1677a .........................................................................................................3

19 U.S.C. § 1677a(a) ....................................................................................................3

19 U.S.C. § 1677a(b) ....................................................................................................3

19 U.S.C. § 1677a(c) ....................................................................................................4

19 U.S.C. § 1677a(c)(2)(A) ..................................................................................4

19 U.S.C. § 1677a(d) ..........................................................................................4

19 U.S.C. § 1677b ...............................................................................................3

19 U.S.C. § 1677b(a) ..........................................................................................4

19 U.S.C. § 1677b(a)(1) ......................................................................................3

19 U.S.C. § 1677b(a)(6)–(8) ...............................................................................4

19 U.S.C. § 1677e .........................................................................................17–18

19 U.S.C. § 1677e(a) .............................................................................2, 13, 23

19 U.S.C. § 1677e(a)(1) .............................................................14, 17, 23, 25

19 U.S.C. § 1677e(a)(2)(A) ...........................................................14, 17, 23

19 U.S.C. § 1677e(a)(2)(B) ...........................................................14, 17, 23, 25

19 U.S.C. § 1677e(a)(2)(C) ...........................................................14, 17, 23

19 U.S.C. § 1677e(a)(2)(D) ...........................................................14, 17, 23, 25

19 U.S.C. § 1677e(b) .............................................................2, 14, 37–38, 42

19 U.S.C. § 1677e(b)(2)(A) .........................................................................43–44

19 U.S.C. § 1677e(c)(1) ...............................................................................3, 42

19 U.S.C. § 1677e(d)(3) ......................................................................................44

19 U.S.C. § 1677f-1(a)(2) ...................................................................................40

19 U.S.C. § 1677m(d) .........................................................................................33

19 U.S.C. § 1677m(i) .....................................................................................17–18

19 U.S.C. § 1677m(i)(1) .....................................................................................17

28 U.S.C. § 2637(d) ............................................................................................27

## Regulations

19 C.F.R. § 351.212(c) ..................................................................................................40

19 C.F.R. § 351.309(c) ..............................................................................................27–28

19 C.F.R. §§ 351.401–351.416 ......................................................................................3

19 C.F.R. § 351.401 .......................................................................................................4

19 C.F.R. § 351.401(c) ...................................................................................................4

19 C.F.R. § 351.402 .......................................................................................................4

19 C.F.R. § 351.402(a) ...................................................................................................3

19 C.F.R. § 351.413 .................................................................................................40–41

## Federal Register Notices

*Certain Carbon and Alloy Cut-to-Length Plate from Belgium*,
    82 Fed. Reg. 16,378 (Dep't Commerce Apr. 4, 2017) ...............................................45

*Certain Carbon and Alloy Steel Cut-to-Length Plate from France*,
    82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017).............................................37

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*,
    80 Fed. Reg. 34,893 (Dep't Commerce June 18, 2015) ............................................35

*Certain Quartz Surface Products from the People's Republic of China*,
    84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) ............................................45

*Fine Denier Polyester Staple Fiber from the Republic of Korea*,
    83 Fed. Reg. 24,743 (Dep't Commerce May 30, 2018) ............................................31

*Truck and Bus Tires from Thailand*,
    89 Fed. Reg. 102,111 (Dep't Commerce Dec. 17, 2024) ...........................................2

*Truck and Bus Tires from Thailand*,
    89 Fed. Reg. 83,636 (Dep't Commerce Oct. 17, 2024).....................................*passim*

*Truck and Bus Tires from Thailand*,
    89 Fed. Reg. 43,806 (Dep't Commerce May 20, 2024) .......................................9–10

*Truck and Bus Tires from Thailand*,
    88 Fed. Reg. 77,960 (Dep't Commerce Nov. 14, 2023) ............................................5

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
    H.R. Doc. No. 103-316, 103rd Cong., 2d Sess. (1994) ..........................................................3–4

## UNITED STATES COURT OF INTERNATIONAL TRADE
### Before: The Honorable Gary S. Katzmann, Judge

BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC,

        *Plaintiff*,

    v.

UNITED STATES,

        *Defendant*,

    and

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC,

        *Defendant-Intervenor*.

**PUBLIC VERSION**

Court No. 24-00263

Business proprietary information
removed from pages 6–12, 18–
19, 21–22, 25–26, and 28–31.

### DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2, Defendant-Intervenor United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO,

CLC (the "USW") respectfully submits this response in opposition to the motion for judgment on

the agency record filed by Plaintiff Bridgestone Americas Tire Operations, LLC ("Bridgestone

or "BATO") in the above-captioned action.[1] As demonstrated below, the Court should deny

Bridgestone's motion.

---

[1] The brief accompanying Bridgestone's motion (ECF Nos. 63 and 64) is hereinafter referred to
as "Bridgestone Br."

<u>**STATEMENT PURSUANT TO RULE 56.2(c)**</u>

**I.      Administrative Determination Under Review**

The administrative determination under review is the final affirmative determination issued by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of truck and bus tires from Thailand. *Truck and Bus Tires from Thailand*, 89 Fed. Reg. 83,636 (Dep't Commerce Oct. 17, 2024) (P.R. 297) ("*Final Determination*") and accompanying Issues and Decision Memorandum ("IDM") (P.R. 290); *Truck and Bus Tires from Thailand*, 89 Fed. Reg. 102,111 (Dep't Commerce Dec. 17, 2024) ("*AD Order*") (P.R. 309).[2]

**II.     Issues Presented for Appeal**

1.    Whether Commerce lawfully resorted to facts otherwise available pursuant to 19 U.S.C. § 1677e(a) in determining Bridgestone's final dumping margin when Bridgestone significantly impeded the investigation by withholding and failing to submit complete and accurate sales information that Commerce needed for its analysis.

2.    Whether Commerce lawfully applied adverse facts available ("AFA") pursuant to 19 U.S.C. § 1677e(b) in determining Bridgestone's final dumping margin based on the company's failure to comply with Commerce's requests for complete and accurate U.S. sales data.

3.    Whether Commerce abused its discretion under 19 U.S.C. § 1677e(b) when it applied total AFA in determining Bridgestone's final dumping margin, where verification revealed problems so numerous and widespread that Bridgestone's U.S. sales database was rendered wholly unreliable.

---

[2] Citations to record documents are designated as "P.R." (public) and "C.R." (confidential).

4.    Whether Commerce properly corroborated the petition rate it assigned to Bridgestone as total AFA pursuant to 19 U.S.C. § 1677e(c)(1) when it compared the petition rate to the other cooperating respondent's transaction-specific dumping margins.

## BACKGROUND

**I.    LEGAL FRAMEWORK FOR DETERMINING DUMPING MARGINS AND ACHIEVING A FAIR COMPARISON BETWEEN NORMAL VALUE AND U.S. PRICE**

In less-than-fair-value investigations, Commerce determines whether imports of subject merchandise are being, or are likely to be, sold in the United Sates at less than fair value, *i.e.*, dumped. 19 U.S.C. § 1673d(a)(1). Commerce makes this determination by comparing U.S. price (the price at which subject merchandise is sold in the United States) with normal value (the price at which the foreign like product is sold in the home market). *Id.* §§ 1677a(a), 1677b(a)(1). A product is sold at less than fair value (*i.e.*, dumped) when U.S. price is less than normal value, and the dumping margin is the amount by which normal value exceeds U.S. price. *Id.* § 1677(35)(A). After calculating a dumping margin for each sale of subject merchandise, Commerce determines a weighted-average dumping margin by dividing the aggregate dumping margins by the aggregate U.S. prices. *Id.* § 1677(35)(B).

The statute and regulations provide instructions regarding the calculation of normal value and U.S. price. 19 U.S.C. §§ 1677a, 1677b; 19 C.F.R. §§ 351.401–351.416. Commerce first identifies the relevant sale, referred to as the "starting price." 19 C.F.R. § 351.402(a). For U.S. price, the starting price must always be the price at which the subject merchandise is first sold to an unaffiliated customer. 19 U.S.C. § 1677a(a) and (b). Accordingly, where a respondent makes a sale through a U.S. affiliate, U.S. price is the price from the downstream sale at which the affiliate sold the subject merchandise to the first unaffiliated U.S. customer. This is a critical requirement of the antidumping statute, because it ensures that U.S. price reflects the true price

of importation into the U.S. market, not an artificial intra-company transfer price that can be manipulated to mask dumping. *See, e.g.,* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, 103rd Cong., 2d Sess. (1994) at 823 ("{C}onstructed export price is ... calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers.").

The statute also requires a "fair comparison" between normal value and U.S. price. 19 U.S.C. § 1677b(a). To achieve a fair comparison, the statute prescribes various upward and downward adjustments to the starting prices so that normal value and U.S. price reflect ex-factory prices. *See* 19 U.S.C. §§ 1677a(c)–(d), 1677b(a)(6)–(8); *see also* 19 C.F.R. §§ 351.401 and 351.402; *Torrington Co. v. United States*, 68 F.3d 1347, 1352–53 (Fed. Cir. 1995). For example, U.S. price must be reduced by "the amount, if any, … attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A). These reductions include movement-related expenses and warehousing expenses. Additionally, Commerce uses a price that is net of price adjustments (*e.g.*, discounts and rebates) that change the customer's final price. 19 C.F.R. § 351.401(c); *see also Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1351 and 1363 (Ct. Int'l Trade 2023).

Thus, to ensure a fair comparison as the statute requires, Commerce had to obtain from Bridgestone information regarding its sales to the first unaffiliated U.S. customer and information necessary to adjust U.S. price for movement-related expenses, warehousing expenses, discounts, and rebates. Without this information, Commerce could not calculate an accurate margin for Bridgestone in accordance with the statute.

## II.        THE PETITION AND INITIATION OF THE INVESTIGATION

On October 17, 2023, the USW filed a petition alleging that truck and bus tires from Thailand were being sold in the United States at less than fair value. Petition: Volume II (Oct. 17, 2023) (C.R. 1; P.R. 1). The USW identified Bridgestone's Thai affiliate, Bridgestone Tire Manufacturing (Thailand) Co., Ltd. ("BTMT"), as a major producer of subject merchandise. *Id.* at II-1–II-2. The USW based U.S. price on the average unit value ("AUV") of imports of truck and bus tires imported from Thailand. *Id.* at II-2–II-3 (C.R. 1; P.R. 1). To arrive at an ex-factory U.S. price, the USW deducted from the AUV movement expenses that were calculated using one of Bridgestone's production facilities as the point of origin. *Id.* at II-3–II-5 (C.R. 1; P.R. 1); *see also* First Petition Supplement at 9 and Exhibits Supp-II-2(c) and (d) (Oct. 24, 2023) (C.R. 13 and 16; P.R. 23 and 26). For normal value, the USW relied on constructed value because available home market price quotes from Bridgestone were below the cost of production. Petition: Volume II at II-5–II-13 (C.R. 1; P.R. 1). This comparison of U.S. price and normal value resulted in a dumping margin of 48.39 percent. Second Petition Suppl. at 3–4 and Exhibit Second Supp-II-12 (Oct. 30, 2023) (C.R. 18; P.R. 29).

On November 6, 2023, Commerce initiated the antidumping investigation. *Truck and Bus Tires from Thailand*, 88 Fed. Reg. 77,960 (Dep't Commerce Nov. 14, 2023) (P.R. 56) and accompanying Initiation Checklist (C.R. 23; P.R. 50). Commerce concluded that the dumping margin alleged in the petition was adequately supported by reasonably available information. *Id.* at 77,963 and accompanying Initiation Checklist at 5–7 (C.R. 23; P.R. 50). Thereafter, Commerce selected Bridgestone Corporation (*i.e.*, the Japanese parent company of BTMT and BATO) and Prinx Chengshan Tire (Thailand) Co. Ltd. ("Prinx") for individual examination as mandatory respondents and issued to them the initial questionnaire. *See generally* Respondent

Selection Memorandum (Dec. 4, 2023) (C.R. 26; P.R. 69); Initial Questionnaire (Dec. 13, 2023) (P.R. 75).

## III.    COMMERCE'S ATTEMPTS TO OBTAIN SALES INFORMATION FROM BRIDGESTONE

### A.    INITIAL QUESTIONNAIRE AND BRIDGESTONE'S RESPONSE[3]

In January 2024, Bridgestone responded to the initial questionnaire. In its initial Section A response, Bridgestone explained that BTMT sold the subject merchandise through U.S. affiliate BATO rather than directly to unaffiliated U.S. customers. Section A Resp. at A-2 (Jan. 8, 2024) (C.R. 28; P.R. 94). Bridgestone provided some materials on the company's discount and rebate programs. *Id.* at A-25 and Exhibits A-28.a–A-28.c (C.R. 40; P.R. 99).

BATO also sold subject merchandise through another U.S. affiliate. Specifically, BATO sold subject merchandise to GCR Tires and Service ("GCR") retail stores, including [    ] affiliated locations that Bridgestone owned during the period of investigation ("POI") and [        ] other locations that Bridgestone previously owned but sold prior to the POI. *Id.* at A-9–A-11. Of the [    ] affiliated GCR stores, [      ] were owned by Bridgestone for the entire period and [    ] were sold by Bridgestone during the period. *Id.* Bridgestone was fully aware of Commerce's reporting requirements, stating in its initial response that it "intends to report all direct sales and sales by affiliated resellers to unaffiliated customers." *Id.* at A-26 (C.R. 28; P.R. 94). In other words, Bridgestone knew at the outset that it was required to report the downstream sales by affiliated GCR stores to unaffiliated U.S. customers.

---

[3] Bridgestone's questionnaire responses were riddled with errors and inaccuracies. *See* IDM at Comment 1. For brevity, this brief highlights problems with Bridgestone's reporting in response to Sections A and C because those individual sections are most relevant to Bridgestone's claims in this action.

In its initial Section C response regarding its U.S. sales, Bridgestone submitted the first iteration of its U.S. sales database and provided a list of codes identifying the customer for each reported U.S. sale. Section C Resp. at C-19–C-20 and Exhibit C-1 (Jan. 29, 2024) (C.R. 87 and 124; P.R. 116 and 118). Bridgestone's sales to GCR stores, whether affiliated or not, were [

                                                          ]. *Id.* at Exhibit C-17 (C.R. 145; P.R. 118). Bridgestone's reporting did not [

          ]. Critically, despite what it had stated earlier in its Section A response about its intent to report all "sales by affiliated resellers to unaffiliated customers," as required by the statute and Commerce's antidumping questionnaire, Bridgestone did not report any downstream sales made by affiliated GCR stores to unaffiliated U.S. customers.

There were also problems with Bridgestone's reporting of price adjustments. Bridgestone explained that its U.S. customers benefited from three rebate programs during the POI — an annual volume bonus, smart resource funds, and an exceptional growth incentive. *Id.* at C-28–C-30 (C.R. 87; P.R. 116). Bridgestone reported the per-unit amounts for each of these rebate programs on a customer-specific basis, but the rebate amounts were reported in fields with generic names (*i.e.*, Rebate 1, Rebate 2, and Rebate 3), and there was no way to discern which field corresponded to each rebate program. Bridgestone also stated that its U.S. customers benefited from other discounts, including "{o}ther miscellaneous discounts not reflected on the line-item invoice price," which it reported in a field labeled OTHDISU. *Id.* at C-28. Bridgestone ignored Commerce's instructions and did not provide any details whatsoever regarding the nature of these "miscellaneous" discounts and why customers received them.

The USW submitted comments regarding Bridgestone's deficient initial questionnaire response. *See generally* USW Deficiency Comments (Feb. 26, 2024) (C.R. 274; P.R. 141). The

comments addressed the completeness and accuracy of the reported price adjustments. For example, Bridgestone's sales documents showed that certain customers qualified as "B-Network" dealers that [                                    ]. *Id.* at 25 (citing Bridgestone Section A at Exhibit A-9 and Exhibit A-28c). However, Bridgestone did not mention this [                        ] or otherwise explain how [            ] was accounted for in its U.S. sales reporting.

## B.    SUPPLEMENTAL QUESTIONNAIRES AND BRIDGESTONE'S RESPONSES

In February 2024, Commerce issued the first of many supplemental questionnaires to Bridgestone. Section A Suppl. Questionnaire (Feb. 1, 2024) (C.R. 176; P.R. 124). Commerce asked whether sales to GCR stores were reported as affiliated sales, unaffiliated sales, or a mix of affiliated and unaffiliated sales. *Id.* at Question 19. Bridgestone responded that it "treated sales to all GCR locations as affiliated sales" and "reported consolidated customer code [        ], [                                        ], for sales to all GCR locations." Suppl. Section A Resp. at 11 (Feb. 20, 2024) (C.R. 244; P.R. 139). This was not in accordance with Commerce's instructions. Bridgestone retained ownership of some but not all GCR stores during the POI, and only sales to Bridgestone-owned GCR stores should have been treated as affiliated sales. However, Bridgestone did not fix the misreported GCR sales in its revised U.S. market sales database, which [                    ]. Suppl. Section C Resp. at Exhibit SC-1a (Apr. 22, 2024) (C.R. 390; P.R. 188). On top of its erroneous reporting of all GCR sales as affiliated sales, Bridgestone continued to fail to include the missing downstream sales from the affiliated GCR stores to unaffiliated customers. *Id.*

PUBLIC VERSION

Commerce also identified problems with Bridgestone's reported price adjustments. Section C Suppl. Questionnaire at 7–10 (Mar. 28, 2024) (C.R. 330; P.R. 150). In response to these questions, Bridgestone disclosed for the first time that [

                                    ] the customer may be entitled to "on-invoice" discounts that are [                               ], such as the B-Network dealer discount (DEALERDISU) and the quantity discount (TRUCKU), and the customer may also be entitled to "off-invoice" discounts, such as the national account customer discount (OTHDISU) and the early payment discount (EARLYPYU). Suppl. Section C Resp. at 9–11 and 13–14 (C.R. 387; P.R. 188). Using one invoice as an example, Bridgestone showed how the "on-invoice" discounts alone [

                        ]. *Id.* at 15–17. The customer in this example [


                    ]. *Id.* at Exhibit SC-1a and Exhibit SC-17b (C.R. 388 and 390; P.R. 188).

In addition, Commerce asked Bridgestone to confirm which field in its U.S. sales database corresponded to each rebate program, provide more details on each rebate program, and explain how the reported rebate amounts were calculated. *Id.* at Question 20a. In responding to these questions, Bridgestone never indicated that U.S. customers benefited from any other rebate programs during the POI. Suppl. Section C Response at 17 (C.R. 387; P.R. 188).

## C.    THE PRELIMINARY DETERMINATION

On May 14, 2024, Commerce issued its affirmative preliminary determination. *Truck and Bus Tires from Thailand*, 89 Fed. Reg. 43,806 (Dep't Commerce May 20, 2024) (P.R. 233) and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 218). Commerce calculated a preliminary dumping margin of 2.35 percent based on Bridgestone's *unverified* questionnaire data. Given that Bridgestone's price adjustments [

], verifying the accuracy of these reported adjustments was of critical importance for the dumping analysis. Moreover, the preliminary calculations were incomplete as they did not include Bridgestone's sales to GCR stores because such sales "may have included sales to certain locations currently affiliated with Bridgestone rather than the first unaffiliated customer." PDM at 9.

### D.    POST-PRELIMINARY SUPPLEMENTAL QUESTIONNAIRE AND BRIDGESTONE'S RESPONSE

As mentioned, Commerce's preliminary determination excluded Bridgestone's sales through GCR stores. *Id.* However, because Commerce must include *all* U.S. sales in the margin calculations, Commerce stated it would "collect additional information regarding these sales for consideration in the final determination." *Id.* In fact, one day before the preliminary determination, Commerce issued the sixth and final supplemental questionnaire to Bridgestone. Post-Prelim Suppl. Questionnaire (May 13, 2024) (C.R. 443; P.R. 213). Like each of the previous questionnaires, the cover of this supplemental questionnaire cautioned Bridgestone that failing to provide the requested information may result in the application of facts available or AFA. *Id.* at 2. Among other things, the supplemental questionnaire instructed Bridgestone to identify which GCR stores were affiliated with Bridgestone during the POI and to report the downstream sales made through affiliated stores so that all reported sales are to the first unaffiliated U.S. customer. *Id.* at Question 1.

Once again, Bridgestone did not revise its U.S. sales database as instructed but instead continued to report BATO's sales to affiliated GCR stores. Post-Preliminary Suppl. Questionnaire Resp. at 2 and Exhibit 3SC-1A (May 22, 2024) (C.R. 475; P.R. 235–236). Bridgestone submitted a separate Excel file that purportedly reported the downstream sales made by affiliated GCR stores. *Id.* at 2 and Exhibit 3SC-1B (C.R. 476; P.R. 235–236). But there were

critical problems with the data. First, while Bridgestone used BATO's ship-to location codes as customer codes for specific GCR stores, the list of ship-to location codes included [

]. *Id.* at Exhibit 3SC-3 (C.R. 478; P.R. 236). Second, Bridgestone did not provide Commerce with a list identifying the customer associated with each customer code in the GCR database, leaving no way to confirm that Bridgestone reported sales to *unaffiliated* customers. And third, the separate GCR database was not limited to sales of subject merchandise because the GCR stores [                                    ] and, as a result, Bridgestone had to estimate in the database the quantities of Thai-origin tires sold by GCR stores. *Id.* at 2 and Exhibit 3SC-1B (C.R. 476; P.R. 235–236).

## IV.     VERIFICATION UNCOVERED WIDESPREAD AND SERIOUS PROBLEMS WITH BRIDGESTONE'S REPORTED SALES DATA

In June 2024, Commerce conducted on-site verification of Bridgestone's sales data. *See generally* Sales Verification Report (Sept. 9, 2024) (C.R. 558; P.R. 266). Commerce's verification revealed significant and pervasive problems with Bridgestone's reported sales data. Bridgestone also failed to comply with Commerce's requests for certain information and documentation at verification. Below is a summary of Commerce's observations during verification that are relevant to this appeal:

-   *Unverifiable Downstream U.S. Sales Through Affiliated GCR Stores*: Commerce requested that Bridgestone "provide a reconciliation of its accounts receivable for sales made to affiliated locations that Bridgestone officials explained were either sold during the POI or currently affiliated with Bridgestone." *Id.* at 17. Bridgestone provided a reconciliation that "did not include sales to all of the [   ] requested affiliated GCR customers" and, ultimately, Commerce was unable to "identify the {constructed export price ('CEP')} sales in Bridgestone's U.S. sales database that were made to its affiliate GCR locations," "reconcile these sales to BATO's accounting system," and "examine if information regarding a price to an unaffiliated customer was available for reporting purposes." *Id.*

-   *Misreporting of U.S. Rebates*: Commerce uncovered several issues with Bridgestone's reporting of U.S. rebates. *First*, Bridgestone's "per-unit expenses for the annual volume, smart resource, and exceptional growth rebates were not reported in the U.S. sales

database." *Id.* at 24. The expenses Bridgestone reported in the three rebate fields related to the [                    ], an entirely different rebate program that Bridgestone had never disclosed. *Id. Second*, Bridgestone failed to comply with requests for: (1) documentation relating to [                         ] in an account related to volume rebates; and (2) a breakdown of the largest and smallest total amounts received by BATO's customers for each type of rebate. *Id.* at 24–25. *Third*, the rebate amounts in Bridgestone's [        ] system did not reconcile to the amounts recorded in its [        ] system. *Id.* at 25.

- *Undisclosed, Unreconcilable, and Unverifiable Other U.S. Discounts*: Commerce examined a sample credit memo and noted that it [

                    ]. *Id.* at 22–23. Despite Commerce's request, Bridgestone failed to provide an itemized reconciliation for the amounts reported in the OTHDISU field with BATO's accounting system. *Id.* at 23.

- *Improperly Reported Destination Codes for CEP Sales*: In the DESTU field, Bridgestone reported the *billing* address as the destination for every sale to a particular customer, even if the tires were sold and delivered to different locations. *Id.* at 20. Commerce noted some examples, including one involving a customer with "a billing address in [
        ], which was reported as the destination of sale, but was shipped to [            ]." *Id.*

- *Unreported U.S. Warehousing Expenses*: Bridgestone misreported certain temporary warehousing expenses in response to the initial questionnaire and later claimed in a supplemental questionnaire response that it corrected the error by reporting the expenses in the DWAREHU field. *Id.* at 33 (citing Section C Suppl. Resp. at 30). However, Commerce was unable to verify these expenses because Bridgestone never updated its U.S. sales database to include the DWAREHU field. *Id.* Bridgestone also never provided a calculation of the per-unit amounts for these expenses. *Id.* at 33–34.

- *Other Errors and Inaccuracies*: Bridgestone misreported several other expenses in its sales databases. *First*, the total and per-unit expenses for cost reduction discounts (OTHDISH) were incorrect with respect to [        ], *i.e.*, one of two home market customers that received this discount. *Id.* at 22–23. *Second*, Bridgestone's warehousing expenses (USWAREH1U/USWAREH2U) contained "systemic errors" because one was calculated using an incorrect ratio and the other was calculated using an incorrect account in Bridgestone's [        ] system. *Id.* at 3 and 30–31. *Third*, with respect to packing expenses (PACKH), Commerce noted that the reported amounts erroneously included expenses for [                ] used to pack non-subject merchandise. *Id.* at 34–35. *Fourth*, with respect to certain movement expenses (DINLFTPU), Bridgestone recalculated the per-unit expenses to be specific to U.S. shipments in response to a supplemental questionnaire but failed to update the U.S. sales database with the recalculated per-unit amounts. *Id.* at 28–29. *Fifth*, and finally, with respect to indirect selling expenses (INDIRSU), the per-unit expenses were inaccurate because "the total expenses in the numerator included certain expenses that Bridgestone also reported as

rebates" and "the denominator … did not include BATO's sales for the first quarter of the POI." *Id.* at 34.

## V.    THE APPLICATION OF TOTAL AFA IN THE FINAL DETERMINATION

On October 9, 2024, after considering interested parties' case and rebuttal briefs, Commerce issued the *Final Determination*. Commerce found Bridgestone's reported data to be unverifiable and unreliable:

> …during our verification of Bridgestone's questionnaire responses, we found numerous discrepancies, including significant, unresolved errors with respect to Bridgestone's reporting of U.S. market rebate expenses, U.S. market destination, and certain missing or unverifiable sales expenses. We further found a number of issues with the reporting of other sales expenses, which called into question the overall accuracy and appropriateness of Bridgestone's application of the selling expense values found in its trial balances to its HM and U.S. sales. We find that these errors undermine the reliability of Bridgestone's sales databases, as well as Commerce's ability to calculate accurate sale-specific NV and U.S. prices and conduct an accurate differential pricing analysis for the purposes of calculating a dumping margin for Bridgestone.

IDM at 7–8. Commerce dedicated over *twenty* pages of its final decision memorandum to explain the multitude of problems that plagued Bridgestone's sales data and the numerous instances in which Bridgestone withheld information that had been requested, failed to timely provide information in the form and manner requested, significantly impeded the investigation, and provided data that could not be verified. *Id.* at 7–10 and 15–37. Because of the significant and widespread problems discovered during verification, Commerce found that Bridgestone's sales data could not be used to calculate a dumping margin with reliable accuracy and without undue difficulty. *Id.* Pursuant to 19 U.S.C. § 1677e(a) and (b), Commerce concluded that the factual circumstances of this case warranted the application of total AFA and assigned Bridgestone the petition rate of 48.39 percent. *Id.* at 8–10. Bridgestone subsequently filed this action.

## SUMMARY OF ARGUMENT

For the reasons stated below, Commerce lawfully applied total AFA in determining Bridgestone's final dumping margin. The Court should therefore hold that the *Final Determination* is supported by substantial evidence and in accordance with law.

*First*, the statute required Commerce to resort to facts otherwise available in this case. After Bridgestone submitted its responses to the individual sections of the initial questionnaire, Commerce issued a total of *six* supplemental questionnaires, including one that allowed Bridgestone to submit missing sales data after the preliminary determination when the factual record is typically closed. Bridgestone had ample time and multiple opportunities to provide complete and accurate sales data. At verification, however, Commerce discovered significant and pervasive reporting problems affecting sales information that is at the core of the dumping analysis. As detailed above, the problems included missing sales of subject merchandise, total misreporting of rebates, inaccurate reporting of discounts, unreported and systemic errors with respect to warehousing expenses, improper reporting of customer destinations, erroneous reporting of movement expenses and packing expenses, and the incorrect calculation of per-unit indirect selling expenses. Critically, while Bridgestone's moving brief attacks some of Commerce's findings with respect to the company's reporting problems, it fails to address numerous other fundamental problems that the agency identified with Bridgestone's submitted data that created a gap in the record. Thus, contrary to Bridgestone's contentions, substantial evidence supports Commerce's conclusions regarding Bridgestone's sales data and the decision to resort to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and (a)(2)(A)– (a)(2)(D).

*Second*, Commerce correctly exercised its discretion under 19 U.S.C. § 1677e(b) and applied total AFA to Bridgestone. As explained in *Nippon Steel Corp. v. United States*, 337 F.3d

1373 (Fed. Cir. 2003), the "best of its ability" standard requires a respondent to do the maximum it is able to do. Bridgestone came nowhere close to satisfying this standard of cooperation. Commerce's verification revealed a multitude of problems that undermined any confidence in the accuracy and reliability of Bridgestone's reported sales data. An attentive respondent would not have been so careless with its reporting and would not have submitted data riddled with all the errors that came to light. While the statute recognizes that mistakes sometimes occur, the "best of its ability" standard does not condone inattentiveness or carelessness. Commerce could not address Bridgestone's lack of cooperation by applying partial AFA and cobbling together the remaining pieces of Bridgestone's sales data. The extent of the errors made it unduly difficult for Commerce to make the statutorily prescribed adjustments to achieve a fair comparison between normal value and U.S. price. Taken together, these problems rendered Bridgestone's reported sales data wholly unreliable and unusable. Commerce's application of total AFA was an appropriate exercise of discretion under the statute and consistent with administrative precedent. While Bridgestone disagrees with the result, it fails to demonstrate that Commerce's decision to apply total AFA is unsupported by substantial evidence or otherwise not in accordance with law.

*Finally*, the Court should reject Bridgestone's arguments that the 48.39-percent petition rate could not be applied as the total AFA rate. As an initial matter, Bridgestone waived these arguments by failing to raise them in its rebuttal brief when it had an opportunity to do so. Regardless, the statute specifically recognizes the petition rate as a valid basis for total AFA, and Commerce correctly corroborated this rate when it compared it to Prinx's transaction-specific dumping margins.

## ARGUMENT

### I.     STANDARD OF REVIEW

The standard of review requires that the Court sustain any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). The substantial evidence standard requires the Court to assess whether the administrative determination under review is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)).

### II.    COMMERCE'S DECISION TO RESORT TO FACTS OTHERWISE AVAILABLE SHOULD BE SUSTAINED

#### A.     LEGAL FRAMEWORK FOR COMMERCE'S AUTHORITY TO USE FACTS OTHERWISE AVAILABLE

Commerce issues questionnaires to elicit sales and cost information that it needs to conduct a dumping analysis, and the respondent bears the burden to respond with all the requested information and create an adequate record. *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018) (citing *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016); *QVD Food Corp. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Ideally, Commerce makes its determination using the respondent's sales and cost data. However,

the statute directs Commerce to use facts otherwise available if "necessary information is not available on the record," or when a respondent "withholds information that has been requested," "fails to provide such information by the deadlines … or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(1) and (a)(2)(A)–(D).

In reaching a final determination in an investigation, Commerce is required to verify the information provided by the respondent before it relies on that information. 19 U.S.C. § 1677m(i)(1). "Verification is a spot check and is not intended to be an exhaustive examination of a respondent's business." *Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2015). This spot check is like an audit and involves close examination of a representative sample of the respondent's data, the purpose of which is to ensure that Commerce relies upon complete and accurate information in making a final determination. *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343–44 (Fed. Cir. 2021) (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396) (Fed. Cir. 1997)). Stated another way, "{v}erification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response." *Özdemir Boru San ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005)).

"Verification represents a point of no return." *Goodluck*, 11 F.4th at 1343–44. If at verification the respondent does not demonstrate the correctness of the information in its questionnaire responses, Commerce must disregard that information and instead rely on facts

otherwise available. *See* 19 U.S.C. §§ 1677e, 1677m(i); *see also Heveafil Sdn. Bhd. v. United States*, 25 C.I.T. 147, 149 (2001); *AK Steel Corp. v. United States*, 21 C.I.T. 1265, 1267 (1997).

## B.    COMMERCE LAWFULLY RESORTED TO FACTS OTHERWISE AVAILABLE

As detailed above, Commerce made multiple attempts to obtain the information it needed to calculate Bridgestone's dumping margin through its initial and supplemental questionnaires. Nevertheless, the investigation concluded with major gaps in the record that required the agency to resort to facts available.

Bridgestone's initial questionnaire response was woefully inadequate and did not comply with Commerce's instructions. Specifically, Bridgestone reported information on BATO's sales to GCR stores without distinguishing which of the sales were made to affiliated GCR stores and without providing information on the downstream sales made by affiliated GCR stores. Even worse, Bridgestone completely botched its reporting of various expenses that were incurred on virtually every sale of subject merchandise. These expenses were an essential part of Bridgestone's pricing structure and [            ] impacted the calculation of U.S. price. These deficiencies led to the issuance of *six* supplemental questionnaires with over 100 multi-part questions. Suppl. Questionnaires dated Feb. 1, 2024 (C.R. 176; P.R. 124), Feb. 27, 2024 (C.R. 306; P.R. 143), Mar. 21, 2024 (C.R. 329; P.R. 149), Mar. 28, 2024 (C.R. 330; P.R. 150), May 1, 2024 (P.R. 200), and May 13, 2024 (C.R. 443; P.R. 213). In May 2024, Commerce completed the information collection phase of the investigation and closed the factual record. Commerce then sent Bridgestone an agenda that described the agency's standard verification procedures, provided a non-exhaustive list of topics that would be covered at verification, and reminded Bridgestone that it must be fully prepared to comply with the verifiers' requests. Sales Verification Agenda (June 3, 2024) (C.R. 482; P.R. 241).

As Commerce explained in the *Final Determination*, verification revealed widespread problems with Bridgestone's sales data. IDM at 7–10 and 15–37. Commerce first noted that it "afforded Bridgestone multiple opportunities to provide complete and accurate information." *Id.* at 15. Bridgestone could have availed itself of these "opportunities prior to verification to identify and alert Commerce of any discrepancies or inaccuracies in its sales reporting," but ultimately chose not to do so. *Id.* at 16. Bridgestone had one final chance at the beginning of verification to submit minor corrections. *Id.* While Bridgestone disclosed at the start of verification that it misreported all its rebates on U.S. sales, Commerce found that the error would require extensive changes to Bridgestone's U.S. sales database and did not meet the criteria for a minor correction. *Id.* at 15 and 24–25.

Next, Commerce detailed the four instances in which Bridgestone failed to comply with Commerce's requests at verification. *Id.* at 16–23. *First*, before it could analyze Bridgestone's estimate of downstream sales made by affiliated GCR stores, Commerce verified whether Bridgestone "reported its sales to the first unaffiliated customer, through its affiliate GCR locations, accurately and to the best of its ability." *Id.* at 17–18. In an attempt to isolate Bridgestone's sales to affiliated GCR stores, Commerce used the GCR ship-to location codes that Bridgestone used as customer codes for sales to GCR stores. *Id.* at 18. However, Bridgestone submitted ship-to-location codes for [                    ] affiliated GCR stores. Post-Preliminary Suppl. Resp. at Exhibit 3SC-3. Then, Commerce "requested that BATO provide a reconciliation of its accounts receivable for sales made to affiliated GCR locations ...." IDM at 18. Bridgestone provided an accounts receivable report that did not include all [   ] affiliated GCR stores, which thwarted Commerce's efforts to use the company's records to identify which sales were made to affiliated GCR stores and to test whether Bridgestone's estimate of

downstream sales was accurate. *Id.* Further, BATO "was unable to locate the appropriate personnel able to amend the exhibit or answer Commerce's questions prior to the conclusion of … verification." *Id.* at 20. As a result, Commerce was "unable to verify that Bridgestone properly reported its U.S. sales to the first unaffiliated party" and necessary information with respect to GCR sales was missing from the record because Bridgestone failed to provide the requested information in the form and manner requested. *Id.* at 20–21.

*Second*, Commerce "conducted several exercises … to verify Bridgestone's U.S. rebate reporting to the extent possible." *Id.* at 21. Commerce asked Bridgestone for "a breakdown of the smallest and largest values received by BATO's customers for each type of rebate{.}" *Id.* Rather than provide the requested breakdown, Bridgestone provided two items generated from its internal rebate tracking system — (1) a worksheet containing "the sum total values of each type of rebate program" without "refer{ring} to any specific customer whatsoever"; and (2) a full report with a "list of total rebates by month and customer of the POI … that contains a list of rebate agreements, and the settled amount for each month of the POI." *Id.* Neither was responsive to Commerce's request for a customer-specific breakdown for each type of rebate. While it may have been possible to derive the requested information from the full report, Bridgestone did not provide the information in the form and manner requested. *Id.*

*Third*, Bridgestone failed to provide requested "documentation regarding a large credit balance in BATO's general ledger account for volume bonus rebates for January through September 2023." *Id.* Because this information was missing from the record, Commerce could not complete its verification of the volume rebate and determine whether the reported rebate amounts were correct and appropriate to deduct from U.S. price. *Id.* at 22. Commerce was

gravely concerned by Bridgestone's failure to provide rebate-related documentation, stating the following:

> BATO maintains a large number of rebate programs that are customer-specific and understanding both the correct amount of the rebates provided and the potential per-customer effects on the gross unit price of BATO's sales is crucial information, because rebates are a significant part of BATO's sales process and the value of certain examined rebates, to the extent Commerce was able to examine them, appeared to potentially have a large impact on Bridgestone's U.S. sales prices.

*Id.*

And *fourth*, to verify the "other" discounts that Bridgestone reported in the OTHDISU field, Commerce examined a sample credit memo and observed that it included undisclosed expense items — namely, [                                                    ]. *Id.* at 22–23. Following this discovery, Commerce asked for an itemized reconciliation "to allow the verifiers to examine the appropriateness of using the total value of the credit and debit notes as an expense adjustment." *Id.* at 23. But Bridgestone failed to provide the requested reconciliation, which Commerce needed to rule out the possibility that Bridgestone underreported these discounts on its U.S. sales. *Id.*

Bridgestone's failure to provide requested documentation during the verification process was just the tip of the iceberg. Commerce's verification process revealed numerous discrepancies and errors that undermined any confidence in the accuracy of Bridgestone's reported sales data. Because Bridgestone misreported its sales to GCR stores, Commerce could not identify the sale to use as the starting price for purposes of calculating U.S. price. IDM at 20. In addition, Bridgestone totally misreported rebates for its U.S. sales. *Id.* at 24–28. Bridgestone reported that U.S. customers benefited from three types of rebates during the POI and per-unit expenses associated with each rebate program were reported in a separate field in the U.S. sales database, *i.e.*, annual volume (REBAT1U), smart resource (REBAT2U), and exceptional growth

(REBAT3U). *Id.* at 24. During verification, Commerce learned that the expenses reported in the sales database were for the Milestone program, which was an entirely different rebate program that Bridgestone had never disclosed. *Id.* In other words, expenses for the annual volume, smart resource, and exceptional growth rebate programs were not reported at all in the sales database. *Id.* Commerce declined to accept new information to correct Bridgestone's rebate reporting because the error was "systemic in nature" and "affects every reported U.S. sale." *Id.* at 25. Commerce "discovered a number of other issues," including double-counting Milestone rebate expenses as rebates and indirect selling expenses, unreconcilable expenses recorded in Bridgestone's [      ] system and separate [       ] system, additional rebates issued pursuant to undisclosed rebate programs (*e.g.*, a [         ] rebate to [              ]), and an undisclosed large credit balance in the general ledger account offsetting expenses for the annual volume rebate program. *Id.* at 25–26; *see also* Sales Verification Report at 24–26 (C.R. 558; P.R. 266).

Bridgestone's reporting errors affected other fields in Bridgestone's U.S. sales database. Commerce could not successfully verify the "other" discounts reported in the OTHDISU field because "the credit notes contained multiple additional items beyond the commission expenses" that were reported in a separate field. IDM at 23. Bridgestone also misreported basic information in the DESTU field, which reflected the billing address rather than the delivery address for every sale to a particular customer, regardless of whether tires were delivered to different locations for that same customer. *Id.* at 28–29. This deprived Commerce of the information it needed "to accurately conduct a differential pricing analysis based on sale destination per Commerce's normal practice." *Id.* at 29. Additionally, Bridgestone never updated its U.S. sales database to include the temporary warehousing expenses that Bridgestone claimed to have reported in a

nonexistent DWAREHU field. *Id.* at 29–31. Commerce found more discrepancies and

inaccuracies with respect to Bridgestone's reporting of home market discounts in the OTHDISH

field, U.S. warehousing expenses in the USWAREH1U and USWAREH2U fields, home market

packing expenses in the PACKH field, U.S. movement expenses in the DINLFTPU field, and

U.S. indirect selling expenses in the INDIRSU field. *Id.* at 31–33. Moreover, the sheer number of

reporting issues left no time for Commerce to complete its verification of other items (*i.e.*, credit

expenses, inventory carrying costs, and plant tours). *Id.* at 16 n.62.

     In sum, the statute specifies several scenarios that call for the use of facts otherwise

available in determining a respondent's dumping margin. 19 U.S.C. § 1677e(a). Here, based on

the extensive problems with Bridgestone's sales reporting that came to light during verification,

Commerce lawfully resorted to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and

(a)(2)(A)–(D) because Bridgestone significantly impeded the investigation when it withheld and

failed to submit complete and accurate sales information that Commerce needed for its analysis.

## C.    BRIDGESTONE'S ARGUMENTS AGAINST COMMERCE'S USE OF FACTS OTHERWISE AVAILABLE ARE UNAVAILING

     Bridgestone takes no responsibility for submitting data rife with errors and attempts to

shift the blame to Commerce for every single reporting failure that was identified at verification.

The burden of creating an adequate record, and thus avoiding the need to apply facts otherwise

available, lies with the respondent. *Nan Ya*, 810 F.3d at 1337 (citing *QVD*, 658 F.3d at 1324).

Bridgestone, and Bridgestone alone, is at fault for its failure to build a complete and accurate

record. As discussed below, the record supports Commerce's decision to resort to facts otherwise

available. Bridgestone has utterly failed to demonstrate that Commerce's decision is unsupported by substantial evidence or otherwise not in accordance with law.

### 1.    *The Record Supports Commerce's Findings Regarding GCR Sales*

Bridgestone asserts that there is no gap in the record with respect to sales to GCR stores. Bridgestone Br. at 11–12. Nothing could be further from the truth. In its questionnaire responses, Bridgestone reported BATO's sales to GCR stores without distinguishing between sales to affiliated and unaffiliated GCR stores and without reporting the downstream sales made by affiliated GCR stores. These deficiencies in Bridgestone's reporting created a dilemma because, as Bridgestone itself admits, "Commerce does not include transactions to affiliated resellers in its margin calculations …." Bridgestone Br. at 11. Commerce explained that "{w}hether Bridgestone completely reported its sales of subject merchandise *from BATO* to BATO's immediate customers is not in question; rather, the issue at hand is whether Bridgestone reported its sales to the first unaffiliated customer, through its affiliated GCR locations, accurately and to the best of its ability." IDM at 17. It is undisputed the Bridgestone never reported the downstream sales made by affiliated GCR stores. These missing sales created a gap in the record.

Commerce was under no obligation to pursue the issue any further. However, because Bridgestone reported an estimate of its downstream sales, Commerce attempted "to verify Bridgestone's identification of its affiliated GCR locations and the reasonableness of its proposed allocation methodology of sales from GCR to the first unaffiliated customer." IDM at 18. The first step required isolating BATO's sales to affiliated GCR stores. This proved to be too difficult, if not impossible. Commerce examined whether it could correctly identify BATO's sales to affiliated GCR stores within Bridgestone's U.S. sales database by ship-to location codes that Bridgestone used as customer codes for specific GCR stores. The ship-to location codes could not resolve the issue because Bridgestone did not include this information for some affiliated

GCR stores. *Id.*; *see also* Post-Preliminary Suppl. Questionnaire Resp. at Exhibit 3SC-3 (customer code list with ship-to location codes for [                                        ]). Commerce then requested a reconciliation of BATO's accounts receivable for sales made to the [   ] affiliated GCR stores. IDM at 18. However, Bridgestone "did not provide a reconciliation with all of the requested affiliate locations prior to the conclusion of verification." *Id.* Despite the agency's efforts, Commerce was forced to rely on facts available. Reliance on facts available was required pursuant to 19 U.S.C. § 1677e(a)(1) because necessary downstream sales information was missing from the record. Facts available was also necessary under 19 U.S.C. § 1677e(a)(2)(B) and (D) because Bridgestone provided downstream sales information that could not be verified and was not in the form and manner requested.

Much of Bridgestone moving brief focuses its attack on Commerce's request at verification for BATO's accounts receivable report. As part of this attack, Bridgestone claims that Commerce asked for an accounts receivable *report* for the [   ] GCR stores in question but never asked for a *reconciliation*. Bridgestone Br. at 12–14. This is a distinction without a difference that does not identify a true flaw in Commerce's reasoning. Commerce plainly stated that verifiers requested the accounts receivable for GCR stores to test whether Bridgestone's estimated data on its downstream sales was accurate. IDM at 17–21. Reconciliation is the process of comparing two sets of records to ensure they are consistent. Thus, the purpose of Commerce asking for the accounts receivable report was to compare it to Bridgestone's reported data to ensure consistency. As Commerce explained, it "did not request that BATO tie its accounts receivable to its sales" and that the accounts receivable report was requested to "identify which invoices were included in Bridgestone's U.S. sales database." *Id.* at 20. The bottom line is that the accounts receivable report provided by Bridgestone did not include all [   ]

affiliated GCR stores, which prevented Commerce from performing the reconciliation exercise and thus completing its verification.

According to Bridgestone, Commerce abused its discretion when it found that the accounts receivable report was incomplete and excluded this material from the administrative record. Bridgestone Br. at 13–18 and 39–40. Bridgestone prefaces its argument by stating that the accounts receivable for all [    ] GCR stores were provided in two reports — one for the [    ] GCR stores that Bridgestone owned for the entire POI and another for the [    ] stores that were sold to Commercial Tire during the POI. *Id.* at 14–15. These reports are on the judicial record and, as Commerce found, do not include all [    ] GCR stores. ECF No. 60 at Attach. 1. Bridgestone acknowledges that the [    ] stores located in [                    ] were not included. *See* Bridgestone Br. at 39–40. It argues that these [    ] stores do not appear in the reports because "no sales were made to these locations" and "it makes sense that the A/R report does not display any unpaid balances for those stores." *Id.* at 40. The record says otherwise. In its Section A response, Bridgestone indicated that it sold subject merchandise to the [    ] stores located in [                  ]. Section A Resp. at A-11 (C.R. 28; P.R. 94). Bridgestone never stated in any subsequent questionnaire response that it did not sell subject merchandise to these GCR stores. Also, the reports on the judicial record display [

                ], including some [                    ]. If it were true that the reports only included GCR stores that purchased tires from BATO during the POI and that had unpaid balances, then [                        ] would be displayed in the reports. This begs the question of why [                  ] are nowhere to be found in the reports.

Bridgestone questions the relevance of BATO's accounts receivable report, stating that "it would be conceptually impossible to use Bridgestone's A/R reports to identify sales to affiliated customers." Bridgestone Br. at 16. This argument fails for at least three reasons. First, Commerce decides what information is relevant for its analysis and "the role of the respondent is to comply with such requests for information, regardless of the respondent's perception or substituted judgment." *SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2023); *see also Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) (explaining that the respondent may not "dictate to Commerce whether and when Commerce actually needs the requested information"); *Hung Vuong Corp. v. United States*, 483 F. Supp. 1321, 1336 n.10 (Ct. Int'l Trade 2020) ("Commerce has latitude in how it conducts verification …."). Second, Commerce was working with imperfect data and requested the accounts receivable report because, as far as Commerce was aware, it was the only information maintained in the ordinary course of business that could potentially be used for verification purposes. And third, in arguing that it would be impossible to use the accounts receivable report to identify sales to affiliated GCR stores, Bridgestone unwittingly admits that Commerce had no way of verifying the downstream sales.

Bridgestone also argues that Commerce failed to allocate sufficient time during verification to review the reconciliation and this misallocation of time denied Bridgestone the opportunity to participate in the verification process. *See* Bridgestone Br. at 17–18. This argument is being raised for the first time as it was not raised in Bridgestone's administrative briefs. *See* Bridgestone Case Br. at 25 (Sept. 16, 2024) (C.R. 561; P.R. 274); Bridgestone Rebuttal Br. at 10–18 (Sept. 24, 2024) (C.R. 567; P.R. 285). It is thus not properly before the Court. *See* 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies); 19 C.F.R.

§ 351.309(c) (requiring case briefs to present *all* arguments); *see also JBF RAK LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (noting this Court's "strict view" of the exhaustion requirement). This Court has explained that the "failure to raise a specific argument in a case brief, even if the general issue is addressed, constitutes a failure to exhaust administrative remedies." *Ad Hoc Shrimp Trade Action Committee v. United States*, 616 F. Supp. 2d 1354, 1366 (Ct. Int'l Trade 2009); *see also ABB Inc. v. United States*, 190 F. Supp. 3d 1159, 1181 (Ct. Int'l Trade 2016) ("{M}erely bringing up a general issue does not serve to exhaust all specific issues under that general umbrella").

Regardless, the unexhausted argument lacks merit. Commerce must meet strict statutory deadlines in an investigation, which limits the time for verification. Commerce told Bridgestone that "{i}f, due to time constraints, it is not possible to return to that item, {Commerce} may consider the item unverified …." Sales Verification Agenda at 2 (C.R. 482; P.R. 241). While Commerce allotted three days for the CEP sales verification, Commerce was forced to expend considerable time on the various reporting issues that first came to light during verification. Commerce covered as much ground as it could. Commerce's discretion on how it manages its time constraints in a particular case should not be disturbed. *NTSF Seafoods Joint Stock Co. v. United States*, Court No. 20-00104, 2022 WL 1375140, at *23 (Ct. Int'l Trade Apr. 25, 2022). Commerce's decision not to accept the incomplete accounts receivable report was a reasonable exercise of discretion because it did not include the [    ] GCR stores and the company official that prepared the report was not available to address the problem prior to the conclusion of verification.

2.    *The Record Supports Commerce's Findings Regarding U.S. Rebates*

With respect to U.S. rebates, Bridgestone argues that it provided the verifiers with the requested breakdown of the largest and smallest total amounts received by BATO's customers for

each type of rebate. Bridgestone Br. at 19. However, the worksheet that Bridgestone provided did not satisfy the request because it "contains the sum total values of each type of rebate program in Bridgestone's rebate tracking system, and does not refer to any specific customer whatsoever." IDM at 21. Bridgestone also provided Commerce with a report from its [          ] system, which was requested "to understand the total universe of rebates tracked by Bridgestone," but this report did not provide the requested breakdown because it "required organization and sorting by customer and rebate type …, collating the values using other data such as Bridgestone's customer codes and classification of rebates." *Id.* In short, Bridgestone failed to provide the information in the form and manner requested and, as a result, the rebates were unverified. *Id.* at 21–22.

Bridgestone claims that Commerce's explanation of the rebates breakdown is "directly contradicted by the documents now included as part of the judicial record." Bridgestone Br. at 19. However, these documents *support* Commerce's finding. The [          ] report is, as Commerce described, "a report generated from BATO's rebate tracking system that contains a list of rebate agreements, and the settled amount for each month of the POI." IDM at 21; *see also* ECF No. 60 at Attach. 2. This report was not broken down into summary form as requested. The other document now on the judicial record contains [

                                                                                    ]. ECF No. 60 at Attach. 3. But this

[

                                                                                    ] *Id.* There is no mention of [

                    ]. *Id.* Additionally, the [

]. *Id.* Bridgestone now asserts that "the customer codes identified for the smallest and largest values for the Exceptional Growth rebate program are [        ] and [        ] respectively," Bridgestone Br. at 38. This information is based on Bridgestone's analysis of the table, which is being presented for the first time during this challenge, and is not self-evident from the report itself. Bridgestone did not perform this type of analysis *during* verification and thus failed to provide Commerce with the requested information *during* verification.

Critically, as discussed above in Section II.B. of the Argument, the missing rebate breakdown was one small part of the larger gap in the record, because Bridgestone totally misreported its U.S. rebates. The expenses reported in the U.S. sales database were not associated with the three reported rebate programs and were, in fact, for an entirely different rebate program that Bridgestone never disclosed as being used by U.S. customers during the POI. IDM at 24–28. Commerce was therefore "unable to verify any portion of BATO's U.S. rebate programs beyond basic program descriptions and that total account values containing rebates that were placed on the record contained the correct amounts." *Id.* at 28. Contrary to Bridgestone's contentions, Commerce correctly refused to accept Bridgestone's belated attempt to fix its rebate reporting as a "minor correction." Bridgestone Br. at 20–22. Bridgestone's proposed changes would have affected multiple expense fields for virtually every reported sale in the U.S. sales database. IDM at 24–25. As Commerce explained, it "considers a failure to properly report three expense fields, an error that affects every reported U.S. sale, to be both systemic in nature and missing information that should be on the record{.}" *Id.* at 25. In fact, when considering the other undisclosed rebate program, the full scope of the error involved "undisclosed or incorrect expenses for five separate types of rebate calculations." *Id.* at 28.

Under similar circumstances, Commerce has refused to accept purported "minor corrections." *See, e.g.*, *Fine Denier Polyester Staple Fiber from the Republic of Korea*, 83 Fed. Reg. 24,743 (Dep't Commerce May 30, 2018) and accompanying Issues and Decision Memorandum at Comment 1(a). And the Court has upheld the agency's refusal to accept information at verification when it did not meet Commerce's criteria for a "minor" correction. *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 357 F. Supp. 3d 1325, 1336 (Ct. Int'l Trade 2018). Here, Bridgestone's requested changes were not remotely close to qualifying as a minor correction, and Commerce adhered to its longstanding, court-approved policy. Because it was too late to accept the new information from the full [      ] report as a correction to the previously reported data, Commerce retained sample pages as a verification exhibit for the limited purpose of showing the [      ] system's capabilities. ECF No. 53-1 at ¶8; ECF No. 53-2 at ¶9; *see also* IDM at 21.

Nonetheless, Bridgestone attempts to downplay the magnitude of the error by arguing that the correction relied on existing record evidence and would allocate the total rebate expenses across all U.S. sales. Bridgestone Br. at 20–22. In other words, Commerce should have accepted the correction because Bridgestone accurately reported the *total* amount of rebates paid out to all customers during the POI. Bridgestone's position has no merit. Bridgestone never reported per-unit expense amounts under each rebate program for each U.S. sale. Commerce explained that "a single account value from a trial balance is not the reporting equivalent of a twice-requested expense allocation." IDM at 25. Commerce also noted other case-specific nuances to the problem because Bridgestone's rebates were "not universally available to all customers" and the amounts under the same program varied from customer to customer, which meant that "{a}llocating an equivalent value or percentage of each of these programs across all sales does

not accurately provide an adjusted U.S. sales price based on expenses incurred …." *Id.* at 26. Under Commerce's policy, and as recognized by the Federal Circuit, a minor correction is one that fixes clerical errors. *Goodluck*, 11 F.4th at 1343. Bridgestone's request at the eleventh hour to devise a method for allocating its rebate expenses and calculating per-unit amounts for every reported U.S. sale was methodological in nature, involved widespread changes across its entire U.S. sales database, and did not meet the criteria for a minor correction.

      3.    *The Record Supports Commerce's Findings Regarding Other Errors*

Bridgestone also fails to demonstrate that Commerce's findings regarding the other reporting errors identified at verification are unsupported by substantial evidence. With respect to other discounts, Bridgestone claims there is no gap in the record because it provided the verifiers with the requested documents and there was no request for a more detailed itemized reconciliation. Bridgestone Br. at 23–26. However, the record shows otherwise. The sales verification report is a contemporaneous account of the verifiers' observations and states the following: "We requested an itemized reconciliation for the OTHDISU values reported in this schedule to BATO's accounting system, but did not receive this reconciliation prior to the conclusion of verification." Sales Verification Report at 23 (C.R. 558; P.R. 266). While Bridgestone is correct that "the *total* amount of credit and debit notes were reconciled to BATO's trial balance," the matter required a more detailed reconciliation because "the credit notes contained multiple additional items" that were not previously disclosed and this revelation raised questions regarding "the appropriateness of using the total value of the credit and debit notes as an expense adjustment." IDM at 23. Bridgestone insists that only the "tire-related" items on the credit note, not the "non-tire related" items, were used to calculate the other discount amounts. Bridgestone Br. at 25–26. But that is the crux of the problem that Commerce tried to address. Because "the credit and debit notes were not solely related to the reported discounts," the

nondisclosure of the unrelated items on the notes "could potentially result in the underreporting of the reported value of the discount." IDM at 23. An item-by-item reconciliation would have allowed Commerce to complete its verification exercise, but Bridgestone's failure to provide the requested reconciliation created a gap in the record, and the other discounts remained unverified.

With respect to temporary warehousing expenses, Bridgestone again incorrectly claims that there is no gap in the record because the expenses were reported in the questionnaire "narrative with detailed supporting information." Bridgestone Br. at 27. However, as Bridgestone acknowledges, "the Excel file for Bridgestone's U.S. sales was not properly updated to include {the DWAREHU} field." *Id.* Bridgestone did not provide the requested calculation worksheet in its questionnaire response and the per-unit warehousing expenses for each sale were not reported in the revised U.S. sales database, thereby creating a gap in the record. This was not disclosed prior to verification. Bridgestone is also wrong that Commerce did not first satisfy the requirements of 19 U.S.C. § 1677m(d) before using facts available. *Id.* at 29. Bridgestone initially reported these warehousing expenses as indirect selling expenses in the DINDIRSU field, and after Commerce questioned Bridgestone regarding the items that were reported as indirect selling expenses, Bridgestone claimed it reported the warehousing expenses in a new DWAREHU field. IDM at 29–30. One supplemental questionnaire was enough to satisfy Commerce's obligation under 19 U.S.C. § 1677m(d). *New Mexico Garlic Growers Coalition v. United States*, 352 F. Supp. 3d 1281, 1295 (Ct. Int'l Trade 2018) (citing *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)).

Bridgestone does not contest the use of facts available to fill gaps in the record created by certain reporting errors discovered at verification (*i.e.*, OTHDISH, PACKH, and DINLFTPU). IDM at 31–33. However, Bridgestone complains that the inaccuracies relating to warehousing

expenses (USWAREH1U/USWAREH2U) and indirect selling expenses (INDIRSU) were due to "clerical errors in expense calculation worksheets" and "{t}hese simple errors could be easily corrected." Bridgestone Br. at 28. Tellingly, Bridgestone does not dispute that it erred when reporting these expenses. Having failed to disclose these errors prior to verification or follow Commerce's established procedures for requesting minor corrections, Bridgestone is in no position to say that Commerce was *required* by law to fix Bridgestone's reporting. Commerce was correct to use facts available because "Bridgestone failed to provide necessary information on a timely basis and in the form and manner requested, and it provided misleading and inaccurate information, significantly impeding this proceeding." IDM at 34.

*          *          *

For all these reasons, Bridgestone has failed to demonstrate that Commerce's use of facts otherwise available is unsupported by substantial evidence or otherwise not in accordance with law.

## III.      COMMERCE'S DECISION TO APPLY TOTAL AFA SHOULD BE SUSTAINED

### A.      LEGAL FRAMEWORK FOR COMMERCE'S DISCRETIONARY AUTHORITY TO APPLY AFA

Commerce has the discretion to draw adverse inferences when selecting from among the facts otherwise available when it finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon*, 337 F.3d at 1382. The "best of its ability" standard requires that the respondent maintain full and complete records, is familiar with all its records, and has conducted a careful review of its records. *Id.* The standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* The

respondent's motivation or intent is not a relevant consideration. *Id.* at 1383 ("While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element.").

### B.    COMMERCE LAWFULLY APPLIED TOTAL AFA

As a mandatory respondent, Bridgestone "had an individual obligation to cooperate with Commerce's investigation." *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 103 (Fed. Cir. 2022). The initial questionnaire issued to Bridgestone requested all the information that Commerce needed to calculate a dumping margin.[4] After providing its initial questionnaire response, Bridgestone had additional opportunities to submit complete and accurate data, with Commerce issuing a total of six supplemental questionnaires. IDM at 15–16. Each questionnaire warned Bridgestone that failing to provide the requested information may result in the application of AFA and that Bridgestone's questionnaire responses would be subject to verification. Bridgestone's questionnaire responses included signed certifications that the company was aware of the agency's verification requirement. Despite these warnings, verification revealed that Bridgestone did not uphold its duty as a mandatory respondent because it failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information, both during the information collection phase and at verification. *Id.* at 7–8 and 34–37.

Bridgestone did not put forth its maximum effort at verification when it failed to comply with the verifiers' requests for documentation to support the submitted questionnaire response

---

[4] Bridgestone and its affiliates had familiarity with Commerce's reporting requirements and previously participated in other antidumping proceedings involving tire imports. *See, e.g.*, *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,893 (Dep't Commerce June 18, 2015) (assigning separate rate to Bridgestone producer/exporter combinations).

data with respect to GCR sales, U.S. rebates, and U.S. other discounts. *Id.* at 16–23. But Bridgestone's failures began long before the verification process. Commerce found that "Bridgestone did not cooperate to the best of its ability to respond to Commerce's requests for information in this investigation because it … reported information that contained pervasive errors." *Id.* at 37. Specifically, Commerce's verification uncovered "numerous discrepancies, including significant, unresolved errors with respect to Bridgestone's reporting of U.S. market rebate expenses, U.S. market destination, and certain missing or unverifiable sales expenses." *Id.* at 7–8. This was inexcusable because "Bridgestone had the information within its possession and its failure to provide it demonstrated that Bridgestone did not participate to the best of its ability." *Id.* at 37. The Federal Circuit has clarified that the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate recordkeeping." *Nippon*, 337 F.3d at 1382. An attentive respondent would not have been so careless with its reporting and would not have submitted data riddled with all the errors that came to light here. Because Bridgestone's conduct did not meet the "best of its ability" standard, the statute authorized the application of AFA in determining Bridgestone's final dumping margin.

In fact, the circumstances warranted the application of total AFA because "Bridgestone's responses contained numerous fundamental reporting deficiencies and errors … that call into question the overall reliability of Bridgestone's reporting, particularly regarding its sales expenses." IDM at 37. Commerce further explained that the serious and widespread errors "undermine{d} the reliability of Bridgestone's sales databases, as well as Commerce's ability to calculate accurate sale-specific {normal value} and U.S. prices and conduct an accurate differential pricing analysis for the purposes of calculating a dumping margin for Bridgestone." *Id.* at 8. The issues "were so pervasive that calculation of a dumping margin would require

construction of an entirely new U.S. sales database with respect to Bridgestone's U.S. selling expenses." *Id.* at 36. Taken together, total AFA was appropriate because "the level of inattentiveness and inaccuracy of Bridgestone's reporting throughout the proceeding undermines the reliability of the company's responses as a whole." *Id.* at 37. As total AFA, Commerce followed the approach it has taken in similar cases and "appl{ied} the highest dumping margin alleged in the Petition and published in the *Initiation Notice* (*i.e.*, 48.39 percent) to Bridgestone." *Id.* at 10.

As the Federal Circuit has held, "{u}se of partial {adverse} facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." *Mukand Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014). Total AFA is applied "when none of the reported data is reliable or usable because, for example, the data contains pervasive and persistent deficiencies that cut across the entire record." *Id.* at 1305. The totality of the issues that Commerce encountered at verification rendered Bridgestone's reported sales data wholly unreliable. Commerce has applied total AFA to a noncooperative respondent in this type of scenario in the past. *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from France*, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) and accompanying Issues and Decision Memorandum at Comment 2 (applying total AFA after discovering pervasive misreporting at verification). Therefore, Commerce's application of total AFA was an appropriate exercise of discretion afforded to the agency under 19 U.S.C. § 1677e(b) and consistent with administrative and judicial precedent.

### C.    BRIDGESTONE FAILS TO DEMONSTRATE THAT COMMERCE'S DECISION TO APPLY TOTAL AFA IS UNLAWFUL

As demonstrated below, each of Bridgestone's challenges to Commerce's decision to apply total AFA is meritless and should be rejected.

### 1.    The Record Supports Commerce's Finding that Bridgestone Failed to Cooperate to the Best of its Ability

Bridgestone claims that it "cooperated to the best of its ability, timely responded to all of Commerce's requests, provided fulsome responses to the points included in the verification outline, and was ready on site to address the Department's questions during verification." Bridgestone Br. at 7. To the contrary, Bridgestone "reported information that contained pervasive errors" that were never disclosed prior to verification. IDM at 37. Bridgestone does not deny the presence of errors. "Where the relevant information was available to the respondent, its failure to use the information and accurately report the data requested by Commerce is evidence of its failure to meet the standard." *Acciai Speciali Terni S.P.A. v. United States*, 142 F. Supp. 2d 969, 989 (Ct. Int'l Trade 2001). Bridgestone also failed to satisfy *four* requests for supporting documents at verification. IDM at 16–23. In other words, Bridgestone's conduct reflected a pattern of noncooperation and serious inattention to its obligations as a mandatory respondent. The record evidence in this case unquestionably supports Commerce's finding that Bridgestone failed to put forth its maximum effort and cooperate to the best of its ability.

Bridgestone, however, asserts that "{t}here is no evidence of *intentional* withholding, refusal to provide information, or any other conduct that would justify the application of adverse inference under Section 1677e(b)." Bridgestone Br. at 13 (emphasis added). Bridgestone also states "{t}he record does not indicate that Bridgestone *attempted* to impede the investigation." *Id.* at 30. The respondent's motivation or intent is not a relevant consideration. In *Nippon*, the Federal Circuit explained that "{w}hile intentional conduct, such as deliberate concealment or

inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element" and "there is no *mens rea* component to the section 1677e(b) inquiry." 337 F.3d at 1383. The Federal Circuit's interpretation of the statute in this regard has not changed over the years. *See, e.g.*, *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295–96 (Fed. Cir. 2021). Commerce was not required to identify evidence that Bridgestone's series of missteps and failures were the result of intentional conduct.

Bridgestone argues that its noncompliance with the GCR-related requests at verification does not support the application of AFA because "no reasonable respondent could have guessed that Commerce would have desired to see a GCR-specific reconciliation." Bridgestone Br. at 7. But Bridgestone's incomplete reporting with respect to GCR sales and the missing downstream sales made by affiliated stores was a key issue in the post-preliminary supplemental questionnaire. Moreover, Bridgestone "signed company certifications for every response certifying that they were 'aware that the information contained in this submission may be subject to verification or corroboration (as appropriate).'" IDM at 19. Bridgestone cannot justify its failure to provide the requested GCR documentation. Indeed, given the importance of this issue, as emphasized by Commerce in its preliminary determination and post-preliminary supplemental questionnaire, it would be unreasonable for an experienced respondent like Bridgestone *not* to expect Commerce to focus on the GCR sales during verification.

### 2.    *The Record Supports the Application of Total AFA*

Bridgestone contends that Commerce abused its discretion because "{t}he law does not permit transforming a handful of immaterial clerical issues into grounds for total AFA— particularly in the compressed context of an original investigation where estimated accuracy, not flawless perfection, is the statutory standard." Bridgestone Br. at 34. However, as the Federal Circuit has explained, "{a}n overriding purpose of Commerce's administration of antidumping

laws is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts &*
*Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). There is nothing in the law that
condones inaccurate margin calculations in an investigation as opposed to a subsequent
administrative review. While Bridgestone is correct that the investigation establishes an
estimated weighted-average dumping margin, this merely reflects the retrospective nature of the
U.S. antidumping law. Any dumping margin used for cash deposit purposes, whether calculated
in an investigation or an administrative review, is an estimate of final duty liability and could
potentially be used as the basis for assessment. 19 C.F.R. § 351.212(c). Moreover, the calculation
of a dumping margin in an original investigation dictates whether Commerce will actually issue
an antidumping duty order. There is simply no basis for Bridgestone to assert that its duty to
cooperate was lessened because this proceeding was an original investigation.

Furthermore, Bridgestone grossly mischaracterizes the facts when it states that
Commerce applied total AFA due to "a handful of immaterial clerical issues." The problems here
are not minor inaccuracies that can be brushed off as excusable errors. Commerce "identified
widespread inaccuracies in the reported data at verification" and "found numerous discrepancies,
including significant, unresolved errors with respect to Bridgestone's reporting of U.S. market
rebate expenses, U.S. market destination, and certain missing or unverifiable sales expenses."
IDM at 7–8. Commerce further explained that "the errors reported by Bridgestone were so
pervasive that calculation of a dumping margin would require construction of an entirely new
U.S. sales database with respect to Bridgestone's U.S. selling expenses." *Id.* at 36. The Federal
Circuit has approved the application of total AFA where such core information is wholly
unreliable. *Mukand*, 767 F.3d at 1305 and 1308. Bridgestone also references provisions in the
law that allow Commerce to disregard adjustments that are insignificant in relation to U.S. price.

Bridgestone Br. at 30–31 (citing 19 U.S.C. § 1677f-1(a)(2) and 19 C.F.R. § 351.413). Putting aside the fact that this argument was not exhausted at the administrative level, Bridgestone has not demonstrated that the expenses at issue here qualify for such treatment. It cannot make any such showing because, for example, Bridgestone's rebates alone are significant and potentially had a large impact on U.S. price. IDM at 22.

Next, Bridgestone asserts that the misreported destination codes in the DESTU field were inconsequential and do not justify the application of AFA. Bridgestone Br. at 31–33. According to Bridgestone, the destination codes are only used in the differential pricing analysis and the preliminary results of the analysis recommended the average-to-transaction comparison methodology, regardless of whether or not the Cohen's *d* test is conducted by region. *Id.* Again, Bridgestone has raised an argument that it failed to include in its administrative briefs. While Bridgestone's rebuttal brief includes a discussion regarding the misreported destination codes, nothing in that discussion preserved any claim concerning the use of destination codes in Commerce's differential pricing analysis or Cohen's *d* test. Bridgestone Rebuttal Br. at 31–33 (C.R. 567; P.R. 285).[5] The unexhausted argument should therefore be rejected. Regardless, Bridgestone's argument lacks merit because "preliminary determinations are 'preliminary' precisely because they are subject to change." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). Indeed, Commerce often receives revised data after the preliminary determination that affect the final results of the differential pricing analysis. That is exactly what

---

[5] On a related note, Bridgestone falsely states that the Federal Circuit has declared unlawful Commerce's use of the average-to-transaction comparison methodology with zeroing. Bridgestone Br. at 3. Elsewhere, Bridgestone mischaracterizes zeroing as a "discredited practice." *Id.* at 35. Although the USW strongly disagrees, Bridgestone forfeited any claim by not raising the issue at the administrative level or in its complaint. Thus, Commerce's differential pricing analysis and its use of the average-to-transaction comparison methodology with zeroing are not within the scope of this litigation.

occurred here. Bridgestone submitted entirely new sales databases following the preliminary determination. Bridgestone does not dispute this fact. Bridgestone Br. at 21 (stating that revised rebate expenses were reported after the preliminary determination). It was not a foregone conclusion that Commerce would apply the average-to-transaction comparison methodology in the final determination. The misreported destination codes hampered Commerce's ability "to accurately conduct a differential pricing analysis based on a sale destination per Commerce's normal practice." IDM at 29.

Bridgestone also singles out its failure to provide documentation relating to an undisclosed credit balance, arguing that this documentation had no relevance because the specific account "was used exclusively for rebates to the affiliated customer, GCR," and the credit balance is negligible compared to the total volume bonus for all U.S. sales. Bridgestone Br. at 22–23. A similar explanation was provided at verification. Sales Verification Report at 24 (C.R. 558; P.R. 266). By not providing supporting documentation, Bridgestone deprived Commerce of the information it needed to complete the verification exercise and decide for itself whether the credit balance was relevant or not. Moreover, the issues identified at verification should be viewed together and not in isolation. IDM at 33–34. Bridgestone's failure to comply with this document request was consistent with a pattern of behavior that "call{ed} into question whether Bridgestone fully examined its own accounts in order to determine how to correctly report its selling expenses, and even if it did, whether those expenses would be accurately calculated in the manner and form requested by Commerce, or even as reported in Bridgestone's own responses." *Id.* at 34.

### 3. *Bridgestone's Arguments On Corroboration Should Be Rejected*

Commerce's practice in selecting a total AFA rate in an investigation is to select "the higher of: (a) the highest dumping margin alleged in the petition; or (b) the highest calculated

rate of any respondent in the investigation." *Id.* at 8. Here, Commerce assigned Bridgestone the

48.39-percent petition rate as total AFA. *Id.* at 8–10. Commerce corroborated this rate because it

is "within range of the highest individually calculated margins for Prinx." *Id.* at 10. This was a

reasonable exercise of Commerce's discretion under 19 U.S.C. § 1677e(b) and achieves the

legislative purpose of applying AFA in a manner that will induce future cooperation and not

reward Bridgestone for its noncooperation.

Bridgestone asserts that Commerce did not satisfy the statute's corroboration requirement

under 19 U.S.C. § 1677e(c)(1). Bridgestone Br. at 34–35. However, Bridgestone failed to

exhaust its administrative remedies by not raising this argument in its briefs at the administrative

level. Generally, the Court takes a "strict view" of the exhaustion requirement in cases that

challenge Commerce's antidumping determinations. *Corus Staal BV v. United States*, 502 F.3d

1370, 1379 (Fed. Cir. 2007). The USW argued in its case brief that "Commerce should assign

Bridgestone the petition rate of 48.39 percent as total AFA" and that the record evidence

corroborated the petition rate. USW Case Br. at 13 (Sept. 16, 2024) (C.R. 563; P.R. 277). In fact,

the USW argued that Commerce should use the transaction-specific margins for Prinx to

corroborate the petition rate. *Id.* at 13 n.71. At that point, Bridgestone was on notice that

Commerce would be considering the petition rate as total AFA. Bridgestone cannot claim that it

had no opportunity to raise its arguments below. But Bridgestone's rebuttal brief did not address

the issue. *See generally* Bridgestone Rebuttal Br.

The Federal Circuit addressed this exact scenario in *Boomerang Tube LLC v. United*

*States*, 856 F.3d 908 (Fed. Cir. 2017), holding that the failure to rebut an argument raised in

another party's case brief constitutes a failure to exhaust administrative remedies. There, the

respondents proposed in their case briefs using the mandatory respondent's own third-country

sales as a basis for constructed value profit. *Id.* at 910–11. The domestic party raised only one objection to this proposal, which Commerce adopted in the final determination. *Id.* at 911. On appeal, the domestic party raised additional arguments against Commerce's decision that were not raised in its rebuttal brief. *Id.* at 911–12. The Federal Circuit held that the domestic party pursued arguments on appeal that were not exhausted, because it had failed to raise those arguments in its rebuttal brief. *Id.* at 912–13. Like the domestic party in *Boomerang*, Bridgestone could have included arguments against the petition rate in its rebuttal brief, but it failed to do so. These arguments were not exhausted and, therefore, should not be considered by the Court.

Regardless, even if the Court considers the merits of Bridgestone's unexhausted argument, Commerce satisfied the corroboration requirement. Commerce may rely on information contained in a petition in an AFA scenario. 19 U.S.C. § 1677e(b)(2)(A). The statute does not demand perfection — Commerce is simply required to corroborate "to the extent practicable." *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1354 (Fed. Cir. 2021). The Federal Circuit has also cautioned that "{t}he relevant inquiry focuses on the nature of the information, not on whether the source of the information was referenced in or included with the petition." *KYD, Inc. v. United States*, 607 F.3d 760, 765 (Fed. Cir. 2010). Here, while the petition is the source of the AFA rate, the dumping margin alleged in the petition was based on independent sources (*i.e.*, official import statistics) and other evidence with probative value (*i.e.*, price quotes and third-party company affidavits). *See supra* Section II within the Background and Procedural History. The reliability of this information did not change merely because it was submitted as part of the petition. *Id.* It is also worth noting that the petition relied on price quotes obtained from one of Bridgestone's Thai affiliates, Thai Bridgestone Co.,

Ltd., and used that same affiliate's production facility as the point of origin to calculate movement-related expenses.

Despite the probative value of the information derived from the petition, Bridgestone claims that the petition rate is "implausib{le}" and "untethered to the record" based on a comparison to Bridgestone's lower preliminary dumping margin. Bridgestone Br. at 35. This preliminary dumping margin is not an appropriate comparison, however, because it was based on unverified questionnaire responses, relied on data that was subsequently revised in a supplemental questionnaire response, and as later came to light, was riddled with errors that made the data unreliable. Furthermore, Commerce is not required to consider what the "dumping margin would have been if the interested party … had cooperated," and has no obligation to demonstrate that the selected dumping margin "reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3). "Commerce need not select, as the AFA rate, a rate that represents the typical dumping margin for the industry in question." *KYD*, 607 F.3d at 765–66. In any event, Prinx's transaction-specific margins show that the petition rate "does not lie outside the realm of actual selling practices." *Id.* at 766.

The Court should reject Bridgestone's argument that Commerce's corroboration method does not comply with the statute because the agency calculated the transaction-specific margins for Prinx using partial AFA. Bridgestone Br. at 34–35. Commerce routinely satisfies the corroboration requirement by referencing transaction-specific margins which were calculated using partial AFA. *See, e.g.*, *Certain Carbon and Alloy Cut-to-Length Plate from Belgium*, 82 Fed. Reg. 16,378 (Dep't Commerce Apr. 4, 2017) and accompanying Issues and Decision Memorandum at 5–6; *Certain Quartz Surface Products from the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) and accompanying Issues and Decision

Memorandum at 7. The statute contemplates such an approach when it permits using partial AFA rates to determine dumping margins for *cooperative* respondents that are not selected for individual examination. 19 U.S.C. § 1673d(c)(5)(A) (instructing Commerce to determine all-others rate using rates that are not zero, *de minimis*, or based *entirely* on facts available). It logically follows that, absent any statutory language indicating otherwise, Commerce may use partial AFA rates to corroborate an AFA rate for a *noncooperative* respondent. Commerce corroborated the petition rate "to the extent practicable" and used information "reasonably at {its} disposal," as required by the statute. The Court should decline to "impose conditions not present in or suggested by the statute's text." *Nan Ya*, 810 F.3d at 1347.

## CONCLUSION

For the foregoing reasons, the USW respectfully requests that the Court deny Bridgestone's motion for judgment on the agency record and sustain Commerce's final determination as supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/  Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

Date: January 16, 2026

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

### CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 13,999 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Standard Chambers Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated: January 16, 2026                                    /s/ Luke A. Meisner
                                                           Luke A. Meisner

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Administrative Order 25-01 and the Rules of this Court, I hereby

certify that the confidential version of the foregoing brief was served on the following parties via

secure file transfer protocol on January 16, 2026.

**<u>Counsel for Plaintiff Bridgestone Americas Tire Operations, LLC</u>**
Daniel J. Cannistra, Esq.
**Crowell & Moring, LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
dcannistra@crowell.com

**<u>Counsel for Defendant United States</u>**
Sosun Bae, Esq.
**U.S. Department of Justice**
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
sosun.bae@usdoj.gov

**<u>Of Counsel for Defendant United States</u>**
Ayat Mujais, Esq.
David W. Richardson, Esq.
**U.S. Department of Commerce**
Office of the Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite/Room 3614 and 3622
Washington, DC 20230
ayat.mujais@trade.gov
david.richardson@trade.gov

/s/ Luke A. Meisner
Luke A. Meisner

# UNITED STATES COURT OF INTERNATIONAL TRADE
### Before: The Honorable Gary S. Katzmann, Judge

BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,                                                    Court No. 24-00263

and

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC,

*Defendant-Intervenor*.

## ORDER

Upon consideration of the motion for judgment on the agency record filed by the plaintiff, the responses thereto filed by the defendant and the defendant-intervenor, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the plaintiff's motion for judgment on the agency record is **DENIED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the antidumping duty investigation of truck and bus tires from Thailand is sustained; it is further

**ORDERED** that judgment is entered in favor of the United States; and it is further

**ORDERED** that the subject entries shall be liquidated in accordance with the final court decision, including all appeals, as provided for in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

**SO ORDERED**.


Dated: _____, 2026
     New York, New York                     Honorable Gary S. Katzmann, Judge
                                          U.S. Court of International Trade