**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00263 |
| | ) | |
| UNITED STATES, | ) | PUBLIC DOCUMENT |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| United Steel, Paper and Forestry, Rubber, Manufacturing, | ) | |
| Energy, Allied Industrial and Service Workers | ) | |
| International Union, AFL-CIO, CLC | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO QUESTIONS FOR ORAL ARGUMENT**

I.    *Question for all parties*

1.    *Please clearly and concisely list all the errors that Commerce identified with Bridgestone's information and indicate for each (1) whether Bridgestone disputed the existence of the error, (2) whether Commerce later conceded that there was no error, (3) whether Bridgestone remedied the error in a subsequent response, and (4) whether the error would have been material to Commerce's calculation of a dumping margin. Please include citations to all relevant questionnaires and responses.*

**ANSWER:** See Exhibit I attached to this response, as well as the Exhibits attached to

Bridgestone's brief in support of its 56.2 motion, and its reply brief in support.

II.    *Questions for Plaintiff Bridgestone Americas Tire Operations, LLC ("Bridgestone")*

2.    *In your reply you provide a table of alleged errors and your rebuttal to Commerce's identification of each error. See Pl.'s Reply in Supp. of Pl.'s Mot. for J. on the Agency R. at Ex. 1, Feb. 27, 2026, ECF No. 77 ("Pl.'s Reply"). For most of the alleged errors, you argue that Bridgestone provided the requested data, and that, for*

1

> *example, "[t]he issue concerns allocation/classification."[1]Id. Assuming, arguendo,*
> *that Bridgestone provided all necessary information on the record, was it provided*
> *"in the form and manner requested"? 19 U.S.C. § 1677e(a)(2)(B). At what point is*
> *"the information . . . so incomplete that it cannot serve as a reliable basis for*
> *reaching the applicable determination"? Id. § 1677m(e)(3).*

**ANSWER:** Assuming arguendo that Bridgestone provided all necessary information on the record, the information was provided in the "form and manner requested" within the meaning of 19 U.S.C. § 1677e(a)(2)(B), and, in any event, satisfied the statutory standard set forth in 19 U.S.C. § 1677m(e).

First, the record demonstrates that Bridgestone responded to Commerce's questionnaires, produced the requested documentation, and made that information available for review at verification. See Verification Report at 2, 17–25. With respect to the two principal issues identified by Commerce—GCR accounts receivable and rebate reporting—the completed judicial record confirms that the documents Commerce claimed were not provided were, in fact, requested, presented, and examined at verification. See ECF No. 60. Where the agency receives and reviews the requested information, the "form and manner" requirement of § 1677e(a)(2)(B) is satisfied. Commerce may not retroactively redefine its request after verification or reject responsive documents based on unstated preferences.

Second, even if Commerce believed that certain submissions did not conform to a preferred format, § 1677m(e) prohibits the agency from disregarding information that is otherwise usable. The statute requires Commerce to use information if: (1) it is submitted by the deadline; (2) it can be verified; (3) it is not so incomplete that it cannot serve as a reliable basis for the determination; (4) the respondent acted to the best of its ability; and (5) the information can be used without undue difficulties. 19 U.S.C. § 1677m(e).

---

[1] 1 See also Pl.'s Reply at Ex. 1 (providing similar arguments for other alleged errors that "[t]he issue concerns reporting methodology," "[t]he issue concerns field placement," "the issue concerns database labeling and placement," "this was a minor classification adjustment," "[t]he issue reflects a calculation update placement," and "this was a correctable ministerial issue").

Those criteria are satisfied here. Commerce verified total quantity and value of U.S. sales and found no discrepancies in 36 separate tests. Verification Report at 2. The agency also verified rebate totals and used the underlying rebate data to select sample transactions. Verification Report at 25; Exhibit CEP-VE-10. The underlying accounting data, sales database, and supporting documentation were all available and verified. Under these circumstances, the information cannot be considered "so incomplete" as to preclude its use under § 1677m(e)(3).

Third, Commerce's position conflates disagreements over format, allocation, or presentation with the statutory concept of "missing" information. The statute does not authorize Commerce to disregard usable, verified information simply because it does not facilitate a preferred analytical approach. See Nat'l Nail Corp. v. United States, 390 F. Supp. 3d 1356, 1381 (Ct. Int'l Trade 2019) (rejecting use of facts available where information deemed "missing" was on the record); Celik Halat Ve Tel Sanayi A.S. v. United States, 557 F. Supp. 3d 1363, 1375–76 (Ct. Int'l Trade 2022).

Here, the alleged deficiencies concern allocation methodologies, labeling conventions, or the perceived utility of certain documents—not the absence of underlying data. Because the record contained the information necessary to calculate a dumping margin, Commerce was required to use that information under § 1677m(e).

> a. *In Mukand, Ltd. v. United States, the U.S. Court of Appeals for the Federal Circuit stated that "Commerce applies total [adverse facts available] when none of the reported data is reliable or usable because, for example, the data contains pervasive and persistent deficiencies that cut across the entire record." 767 F.3d 1300, 1305 (Fed. Cir. 2014). You state that "Commerce based its decision to apply total [adverse facts available] in part on the cumulative effects of . . . clerical errors" including "incorrect cell references in Excel formulas or calculation mistakes due to misaligned numbers." Mot. for Pl. for J. on the Agency R. at 27–28, Sep. 5, 2025, ECF No. 63 ("Pl.'s Br."). You state that "[t]hese simple errors could be easily corrected." Id. at*

> 28. Please explain why these errors, even if "simple" and "easily corrected," id., are not "pervasive and persistent deficiencies that cut across the entire record," Mukand, 767 F.3d at 1305.

**ANSWER:**

The clerical and formula issues identified by Commerce do not constitute "pervasive and persistent deficiencies that cut across the entire record" within the meaning of Mukand, 767 F.3d at 1305. This case arises from an investigation in which Bridgestone submitted more than 720 indvidual answers over a four-month period. In that context, minor clerical or formula errors in iterative submissions are not indicative of record-wide unreliability, but rather, the type of discrete, correctable issues that routinely arise in large, data-intensive proceedings. Moreover,the formulas at issue were not newly identified at verification, and Commerce did not previously raise concerns regarding the underlying methodologies.

Mukand and similar cases reserve total adverse facts available for circumstances in which the record is fundamentally unreliable—i.e., where core data are missing, fabricated, or unverifiable, such that Commerce cannot calculate a margin using the respondent's information. See Mukand, 767 F.3d at 1305; Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

That is not the case here.

The record demonstrates that Commerce successfully verified the core components of Bridgestone's data, including total sales quantity and value, completeness of U.S. sales, and key expense categories. Verification Report at 2, 17–25. Commerce also used that data to calculate a margin at the preliminary stage. See Preliminary Margin Memo at PDF 5. A dataset that has been verified and used to calculate a margin cannot reasonably be deemed unusable in its entirety.

The issues identified by Commerce—such as incorrect cell references, labeling inversions, or minor allocation discrepancies—are discrete, mechanical errors that do not affect the existence, accuracy, or completeness of the underlying data. In several instances, these issues either had no effect on the margin or operated to increase it. See Final Decision Memo at 29–34. Such errors are routinely addressed through minor corrections or adjustments and do not render a dataset unreliable.

Critically, Commerce did not identify any missing transactions, fabricated data, or inability to perform the margin calculation. Nor did it identify any aspect of the sales database that could not be used. Instead, it aggregated isolated clerical issues and characterized them as "pervasive" without demonstrating that they affected the reliability of the dataset as a whole.

The statute does not permit Commerce to transform correctable, non-core issues into a basis for total AFA. See Zhejiang Dunan, 652 F.3d at 1348 (requiring deficiencies that "cut across all aspects of the data"); Foshan Shunde Yongjian Housewares & Hardware Co. v. United States, 35 C.I.T. 1398, 1416 (2011) (deficiencies must pertain to "core, not tangential" information).  This is particularly so in the context of an investigation, where the resulting rate serves only as a provisional cash deposit – rather than a review in which Commerce assesses final liability, further underscore the unreasonableness of applying total AFA based on non-core, correctable issues.

Because the verified record data were complete, usable, and sufficient to calculate a margin, the identified clerical issues do not meet the standard articulated in Mukand and cannot support the application of total adverse facts available.

5

> 3. *Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") asserts that "[i]t is undisputed [that] Bridgestone never reported the downstream sales made by affiliated GCR stores" and that Bridgestone "admits that Commerce had no way of verifying the downstream sales." Def.-Inter.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 24, 27, Jan. 16, 2026, ECF No. 73 ("Def.-Inter.'s Br."). Did Bridgestone report the downstream sales made by affiliated GCR stores? If yes, was that information verifiable?*

**ANSWER:** USW is incorrect. Bridgestone reported both its sales to affiliated GCR stores and the downstream sales made by those stores.

With respect to downstream sales, Bridgestone reported GCR store sales using a reasonable allocations methodology. Because GCR stores do not track tire origin, Bridgestone reported total TBR sales by GCR and adjusted quantities based on the percentage of Thai-origin tires sold by Bridestone to GCR.   . See 2nd Supp B-C Response, at 2, Ex. 3SC-1b & Ex. 3SC-4.. Commerce verified Bridgestone's reported sales to GCR, as reflected in the verification report. Commerce did not, however, seek to verify downstream GCR sales, nor did it provide notice in the verification outline that such verification would occur. Had Commerce wished to examine downstream sales, it could have requested the necessary information and conducted verification accordingly.

Bridgestone did not admit that Commerce had no way of verifying the downstream sales. Bridgestone only asserted that the A/R reports at issue could not reasonably be used to verify whether a GCR store was affiliated or not during the POR. Such "verification" could only be conducted by examining the sales contracts for the GCR locations – an approach which Commerce itself employed. See CEP-VE-2B. If Commerce wanted to verify the GCR stores' downstream sales, Commerce easily do so, but Commerce has never requested to verify the downstream sales.

4.  *You state that the omissions in the accounts receivable reports for the GCR stores "reflect only locations where no sales occurred." Pl.'s Br. at 39. Please respond to USW's argument that Bridgestone previously indicated that it sold subject merchandise to locations that were omitted from the accounts receivable reports. Def.-Inter.'s Br. at 26.*

**ANSWER:**  Defendant-Intervenor's argument is premised on a misreading of the record and does not identify any evidence that Bridgestone made sales to the specific GCR locations at issue during the period of investigation.

The statement on which Defendant-Intervenor relies—drawn from Bridgestone's Section A response—describes Bridgestone's general sales channels and the existence of affiliated GCR locations in certain states. It does not establish that subject merchandise was sold to each individual store location identified by Defendant-Intervenor, nor does it purport to identify transaction-specific sales during the period of investigation.

The relevant record for determining whether sales occurred to particular locations is the U.S. sales database (Section C), which reflects Bridgestone's reported sales of subject merchandise during the period of investigation. As Bridgestone explained, the locations omitted from the accounts receivable ("AR") reports likewise do not appear in the U.S. sales database because no sales were made to those locations during the relevant period.

Defendant-Intervenor does not cite any record evidence—such as a transaction in the U.S. sales database—showing that sales occurred to the specific Montana and Washington locations it identifies. Instead, it attempts to infer such sales from general narrative statements, which do not support that conclusion.

7

Moreover, to the extent Defendant-Intervenor now attempts to construct an alleged inconsistency between narrative descriptions in Section A and transaction-specific data in Section C, that theory was not raised before Commerce and is unsupported by the administrative record. It cannot serve as a basis to challenge Commerce's determination, which was based on the sales data and verification findings on the record.

Accordingly, there is no inconsistency between Bridgestone's statements and the AR reports. Because no sales were made to those locations, there were no corresponding receivables to report. The absence of those locations from the AR reports is therefore fully consistent with the record and does not indicate any omission of sales.

> 5. *You state that "[accounts receivable] reports only reflect outstanding amounts owed, not the nature of the relationship between the seller and the buyer." Pl.'s Br. at 16. You also state that the reports "track unpaid balances owed by specific customer accounts." Id. Please explain why "it would be conceptually impossible to use Bridgestone's [accounts receivable] reports to identify sales to affiliated customers." Id.*

**ANSWER:** Accounts receivable ("AR") reports, by their nature, cannot reliably be used to identify sales to affiliated customers because they do not reflect the full universe of sales transactions and are not designed to capture the information necessary to make that determination.

As a matter of basic accounting, AR represents a snapshot of amounts owed by customers as of a particular point in time. It reflects outstanding balances arising from prior transactions, not a comprehensive record of all sales. *See*, e.g., Financial Accounting Standards Board, Concepts Statement No. 6 (defining receivables as claims to cash arising from past transactions). Accordingly, AR reports:

- include only transactions for which payment remains outstanding as of the reporting date;
- exclude sales that were fully paid prior to that date;
- may include balances arising from transactions outside the period of investigation; and
- are typically organized by customer account, not by individual transaction or product.

Because of these characteristics, AR reports do not provide a complete or transaction-specific record of sales activity. For example, sales made during the period of investigation may not appear in AR reports if they were paid before the reporting date, while older transactions unrelated to the period may remain reflected as outstanding balances.

In addition, AR reports do not reliably identify the nature of the underlying transaction or the relationship between the parties. AR balances may arise from a variety of transactions, not limited to sales of subject merchandise. Thus, the presence or absence of an AR balance for a particular account or location does not establish whether subject merchandise was sold to that entity during the period of investigation.

For these reasons, AR reports cannot be used as a substitute for a sales ledger or U.S. sales database, which are designed to capture transaction-level information regarding sales, including customer identity, product, and timing.

Accordingly, it is not conceptually sound to use AR reports to identify sales to affiliated customers, because AR reflects only outstanding payment obligations at a point in time, not the existence, scope, or characteristics of underlying sales transactions.

6. *The Government's argues that Commerce made it clear prior to verification that "it was Bridgestone's responsibility to be fully prepared to . . . make personnel available to Commerce to answer questions or explain the information it purports to submit." Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. at 33, Jan. 16, 2026, ECF No. 71*

*("Gov't Br."). Please explain why Commerce was not within its discretion to reject the reports when Bridgestone did "not hav[e] the appropriate personnel available when the verifiers had questions that needed answers before proceeding further." Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand at 14 (Dep't Com. Oct. 9, 2024), P.R. 290 ("IDM"); see also Pl.'s Br. at 13 n.2 ("Commerce's reason for rejecting the documentation was the unavailability of the person who prepared the accounts receivable reports specifically . . . .").*

**ANSWER:**   Commerce's general expectation that a respondent be prepared to explain its reported information does not justify the rejection of Bridgestone's accounts receivable ("AR") reports under the circumstances presented here.

Bridgestone made personnel available throughout verification and responded to Commerce's requests during the course of the proceeding. Commerce, in turn, conducted multiple verification procedures, including tests of the completeness of the U.S. sales database, and did not identify deficiencies in those exercises. See generally, Verification Report.

Although the AR reports were identified during verification, the record reflects that Commerce did not substantively engage with those reports until the very end of the final day of verification. At that point—after completing its other verification procedures—Commerce raised questions regarding the reports and requested to speak with the individual who generated them, when that individual was no longer available. See ECF No. 55.

Critically, Commerce did not indicate earlier in the verification that the AR reports were deficient, did not request clarification regarding their content or structure, and did not provide Bridgestone a meaningful opportunity to address any concerns before concluding the verification. Nor did Commerce identify any specific inaccuracy in the AR reports themselves.

10

Under these circumstances, Commerce's decision to reject the AR reports was not a reasonable exercise of its discretion. Verification is intended to test and clarify record information, and where questions arise, Commerce ordinarily seeks explanation or additional support. Here, however, Commerce did not pursue such clarification, but instead relied on the unavailability of a specific employee at the close of verification as a basis to disregard the information.

That approach is particularly unwarranted where the information at issue consists of standard accounting reports and where other knowledgeable personnel were available to provide explanation. Nothing in the record indicates that the requested individual possessed unique information that could not have been obtained through follow-up questions or additional documentation.

In these circumstances, Commerce's rejection of the AR reports does not reflect a reasonable exercise of its verification discretion and cannot support its broader conclusions regarding the completeness of Bridgestone's reporting.

> 7. In *Dalian Meisen Woodworking Co. v. United States*, the court stated that "if [Commerce] need not accept corrective substantive information at verification as to deficiencies in a respondent's original submissions, it need not seek corrective substantive information when verification responses are deficient." 47 CIT __, __, 2023 WL 3058783, at *4 (Apr. 24, 2023) (emphasis omitted). If Commerce need not seek corrective information when verification responses are deficient, does 19 U.S.C. § 1677m(d)—requiring that Commerce provide notice and an opportunity to remedy any deficiency in a response to a request for information—apply to deficiencies discovered at the verification stage?

**ANSWER:**  The principle articulated in Dalian addresses the scope of Commerce's obligation to accept or solicit new substantive information at verification. It does not eliminate Commerce's separate statutory obligation under 19 U.S.C. § 1677m(d) to provide notice of deficiencies in a respondent's submissions and an opportunity to remedy or explain them.

As this Court recognized in Dalian, if Commerce is not required to accept major corrective substantive information at verification, it likewise is not required to solicit such information in order to cure deficiencies in a respondent's prior submissions. That principle reflects the limited purpose of verification, which is to test the accuracy of information already on the record—not to create a new record through the submission of entirely new data.

However, that limitation is distinct from Commerce's obligation under § 1677m(d). Where Commerce determines—whether before or during verification—that record information does not serve its intended purpose or raises concerns regarding accuracy or completeness, it must, to the extent practicable, identify those concerns and provide the respondent an opportunity to respond. That response may take the form of explanation, clarification, or reference to existing record information; it does not require the submission of new substantive data.

Here, Commerce did not provide such notice. Instead, Commerce first articulated its concerns only in the verification report, after the conclusion of verification, depriving Bridgestone of any opportunity to address them.

This failure had concrete consequences. With respect to the accounts receivable ("AR") reports, had Commerce indicated during verification that it viewed the reports as incomplete or not responsive, Bridgestone could have explained—based on existing record information—that the absence of certain locations reflected the absence of outstanding receivables as of the reporting date selected by Commerce (the last day of the period of investigation), not the absence of sales or a reporting deficiency.

Similarly, with respect to rebate expenses, had Commerce articulated its concern during verification, Bridgestone could have clarified that the requested information had already been

provided and reviewed by another member of the verification team. No new information would have been required—only clarification of the existing record.

These examples underscore the distinction recognized in Dalian. Bridgestone does not contend that Commerce was required to accept new substantive information at verification. Rather, Commerce was required under § 1677m(d) to identify perceived deficiencies and afford Bridgestone an opportunity to explain or clarify the information already on the record. By failing to do so, and instead relying on concerns first raised in the verification report, Commerce deprived Bridgestone of that statutory opportunity.

Accordingly, Dalian does not excuse Commerce's failure to provide notice and an opportunity to respond to the alleged deficiencies identified at verification

8. *Please respond to USW's assertion that "expenses for the annual volume, smart resource, and exceptional growth rebate programs were not reported at all in the sales database." Def.-Inter.'s Br. at 2.*

**ANSWER**: Defendant-Intervenor's assertion that certain rebate program expenses were "not reported at all in the sales database" mischaracterizes the record and conflates clerical data population issues with the absence of information.

The record demonstrates that the total rebate expenses for the annual volume, smart resource, and exceptional growth programs were fully reported, supported, and verifiable. Bridgestone provided detailed rebate information in its questionnaire responses, including narrative explanations and underlying accounting data. See, e.g., Section C Questionnaire Response at C-28 to C30 & Exhibit C-18; Supplemental Section C Questionnaire Response at 17-19 & Exhibit SC-20b. Commerce reviewed this information at verification and used it to confirm total rebate

amounts and to select sample transactions for further testing. See Verification Report at 25; Exhibit CEP-VE-10; ECF No. 60.

The issue identified by Commerce—and now emphasized by Defendant-Intervenor—concerns how those verified totals were reflected within certain fields of the sales database. Specifically, due to clerical or transcription errors in transferring data from calculation worksheets into the database, certain rebate program amounts were not fully populated across all corresponding fields. These issues did not involve the absence of underlying data, but rather the allocation or placement of already-reported information.

Importantly, the total rebate amounts remained unchanged and were consistently reported across the record. Commerce was therefore in possession of the complete rebate information necessary to calculate the dumping margin. Indeed, Commerce relied on that information at verification to validate totals and conduct transaction testing. See Verification Report at 25.

Under these circumstances, the alleged issue is one of data presentation or allocation—not missing information within the meaning of 19 U.S.C. § 1677e(a). Nor does it render the information unusable under § 1677m(e), as the underlying data were on the record, could be verified, and were in fact verified.

Finally, any allocation differences among rebate categories do not materially affect the margin calculation. Commerce's margin program aggregates rebate expenses as adjustments to price, and the total amount—not the specific categorization among subfields—is what affects the calculation. Because the total rebate expenses were fully reported and verified, the clerical population of individual fields does not support the application of facts available, much less total adverse facts available.

In sum, the record reflects complete reporting of rebate expenses, with only minor clerical issues in how those amounts were distributed within the database. Those issues do not constitute missing information and do not support Defendant-Intervenor's characterization

9. *In its Issues and Decision Memorandum, Commerce stated that it requested "the breakdown of the largest and smallest total values received by [Bridgestone's] customers for each type of rebate." IDM at 21. You respond that "Commerce verified both the largest and smallest rebates by type and customer." Pl.'s Br. at 20. Please indicate where in the record "Commerce verified both the largest and smallest rebates by type and customer." Id.*

**ANSWER:** Commerce verified the largest and smallest rebates by type and customer at verification through its review of the rebate summary reports and supporting documentation used to select and test sample transactions. Specifically, Commerce examined rebate reports identifying rebate amounts by program and customer and used those reports to identify high- and low-value rebate transactions for testing.

Specifically, the breakdown chart identifies customer code 488054 as the largest recipient of the Exceptional Growth rebate. Commerce selected this customer for verification. See Verification Exhibit CEP-VE-10, at 28. The breakdown chart identifies customer code 78018 as the smallest recipient of the Exceptional Growth rebate. Commerce selected this customer for verification. See Verification Exhibit CEP-VE-10, at 34. The breakdown chart identifies customer code 175124 as the largest recipient of the Volume Bonus rebate. Commerce selected this customer for verification. See Verification Exhibit CEP-VE-10, at 40.

These materials reflect that Commerce requested, received, and relied upon rebate summaries that necessarily identify the largest and smallest rebate values by type and customer in order to perform its verification procedures.

10. *You state that Bridgestone "attempted to report certain revisions in its rebate expense fields as minor errors at the beginning of verification" and that "[t]he correction would not have affected the total amount of rebates reported by Bridgestone, but only the allocation of the rebates among transactions." Id. at 20–21. Would the allocation of the rebates among transactions affect Commerce's calculation of the constructed export price? Why or why not?*

**ANSWER**:  The allocation of rebates among transactions would not affect Commerce's calculation of constructed export price because the total rebate expense remains unchanged, and Commerce's calculations rely on the aggregate rebate amount rather than its allocation across individual transactions.

As Bridgestone explained, the reported revision involved only the allocation of rebates among transactions, not the total amount of rebates reported. Commerce verified the total rebate amounts and used those totals in its calculations. See Verification Report at 25.

Because rebate expenses are aggregated and applied as a total adjustment, any differences in allocation among individual transactions do not affect the overall price adjustment or the resulting margin.   That is true in any antidumping investigation where sales are compared on an average-to-average basis.   In Bridgestone's case, it is true for another reason, which is that the rebate adjustment has no material impact on the margin calculation in any event.   This is confirmed by the fact that even Commerce's full disallowance of the rebate adjustment in the home market—while continuing to apply it to U.S. price—did not result in a dumping margin for Bridgestone when average-to-average comparisons were used (i.e., absent zeroing) as required by law.

16

Accordingly, for reasons of both methodology and materiality, any allocation differences have no meaningful impact on Commerce's calculation of constructed export price and the margin for Bridgestone.

11. *You argue that "Bridgestone did not claim [a] credit balance [in its general ledger account associated with Volume Bonus rebates] as a deduction to its reported rebates. Since Commerce was not required to adjust for deductions that Bridgestone did not claim, no inquiry regarding the [general ledger] account was []necessary." Id. at 23. What is your basis for stating that Commerce is not required to adjust for deductions that Bridgestone did not claim.*

     a. *You further argue that the balance in the general ledger account "was a credit, meaning that if Bridgestone had claimed it as a deduction to its reported rebate expenses, it would have reduced the total amount of rebates . . . result[ing] in a higher U.S. price, which in turn would lower the dumping margin." Id. Even if the balance would lower the dumping margin, wouldn't Commerce still need that balance to accurately calculate the dumping margin?*

**ANSWER**: Commerce does not need to incorporate that balance to accurately calculate the dumping margin because the margin calculation is based on the rebate expenses actually reported, tested, and verified on the record.

As Bridgestone explained, the general ledger balance at issue was a credit that, if applied, would have reduced total rebate expenses and increased U.S. price, thereby lowering the dumping margin. Bridgestone did not claim that balance as a deduction and instead reported rebate expenses conservatively. Commerce verified the total rebate amounts as reported and relied on those amounts in its calculations. See Verification Report at 25.

Accordingly, the issue does not reflect missing or understated data, but the opposite: Bridgestone's reported rebate expenses were, if anything, overstated. Commerce's calculation therefore already reflects a conservative dataset.

Commerce's obligation is to calculate an accurate margin based on the verified record, not to identify and apply unclaimed adjustments that could further reduce the margin. However, to the extent Commerce or the Court believes the credit balance should be incorporated, doing so would only decrease total rebate expenses and further increase U.S. price.[2]

Accordingly, the unclaimed general ledger balance was not necessary to accurately calculate the dumping margin and, if anything, confirms that the reported data did not understate the margin by which any tires were sold in the U.S. market at less than fair value.

12. Commerce must corroborate secondary information by "examin[ing] whether [it] has probative value," 19 C.F.R. § 351.308(d), meaning the information is "both reliable and relevant," Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1354 (Fed. Cir. 2015). You assert that Commerce unlawfully corroborated adverse facts available rate by referencing Prinx's transaction-specific margin. Pl.'s Br. at 34; see also IDM at 10 ("We corroborated the highest Petition margin by comparing it to the individually calculated margins for Prinx . . . ."); Mem. from J. Schueler to The File, re: Final Corroboration of Margin Based on Adverse Facts Available (Dep't Com. Oct. 9, 2024), P.R. 292, C.R. 568–69. Why are Prinx's transaction-specific margins derived from Prinx's data—even if based on partial adverse facts available— not reliable and relevant?

**ANSWER:** Commerce's reliance on Prinx's transaction-specific margins does not satisfy the corroboration requirement because those margins are not independent, reliable benchmarks against which to test the probative value of the selected adverse facts available rate.

Although Commerce may consider other record information in assessing corroboration, the statute and regulation require that secondary information be tested for reliability and relevance.

---

[2] As a practical matter, is not uncommon for a respondent in an antidumping investigation to decide not to break out a modest but potentially favorable informational detail, in favor of efficiency. Antidumping investigations, unlike administrative reviews, proceed on a very tight timeline, with a maximum fully extended period of roughly one year for the investigation, and mere months to compile and respond to detailed antidumping questionnaires. This at times leads to the company not claiming a favorable adjustment, which is considered "conservative reporting" in the antidumping context. It is an ordinary and common practice for respondents to do this in antidumping investigations, and Commerce has never interpreted its obligation to calculate margins "as accurately as possible to equal calculating margins as favorably as possible.

19 C.F.R. § 351.308(d); Ad Hoc Shrimp, 802 F.3d at 1354. That requirement is not met where the purported corroborating data are themselves derived, in part, from the application of facts available.

Here, the transaction-specific margins for Prinx were calculated using data that Commerce acknowledges incorporated partial facts available. As a result, those margins are not fully independent of the same type of assumptions and adjustments that underlie the selected AFA rate. Using such data to corroborate another adverse inference risks circularity, rather than providing an objective check on the rate's probative value.  It is particularly notable here, where Prinx's preliminary margin using its own data reflected no margin of dumping whatsoever.  Essentially, what the court has before it is a company, Bridgestone, that at the prelim had not margin of dumping unless zeroing were applied, and Prinx, who likewise had no margin of dumping on an average-to-average basis.  It may be worthwhile for the Court to step back and observe that this case involves an antidumping order on a non-dumped product, to protect a non-existent[3] U.S. industry from import competition.

   *13. What cases and authorities best support your argument?*

**ANSWER**:  The following authorities support Bridgestone's argument that Commerce must rely on reliable and relevant information to corroborate secondary information and may not rely on non-independent or non-representative benchmarks:

- Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1354 (Fed. Cir. 2015) (corroboration requires that secondary information be "reliable and relevant")

---

[3] There is no tire producer appearing as a petitioner in this case.  Only the labor union has filed for trade protection here.

19

- F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (AFA rates must be a reasonably accurate estimate of actual dumping with a deterrent effect, not punitive)

- Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323–24 (Fed. Cir. 2010)(Commerce may not apply unreasonably high or punitive margins under AFA)

- Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1338–39 (Fed. Cir. 2002) (corroboration requires an evidentiary basis linking the selected rate to commercial reality)

- BMW of North America LLC v. United States, 926 F.3d 1291, 1301–02 (Fed. Cir. 2019)(Commerce must ensure AFA rates are grounded in record evidence and reflective of commercial reality)

These authorities establish that corroboration requires a meaningful assessment of whether the selected rate has probative value and reflects commercial reality, and not merely comparison to other margins derived from partially adverse or non-independent data

> 14. *Are there any recent or pending Federal Circuit or the United States Court of International Trade ("USCIT") cases that may affect the court's analysis?*

**ANSWER**: Recent decisions by the Federal Circuit continue to emphasize that Commerce's use of facts available must be supported by substantial evidence and must reflect commercial reality rather than punitive outcomes. See, e.g., Oman Fasteners, LLC v. United States, 125 F.4th 1068, 1085 (Fed. Cir. 2025).

Respectfully Submitted,

/s/ Daniel J. Cannistra

Daniel J. Cannistra
Pierce Lee
Valerie Ellis
CROWELL & MORING LLP
1001 Pennsylvania Ave, NW
Washington, D.C. 20004
Tel: (202) 624-2500
Email: dcannistra@crowell.com

*Counsel for Plaintiff*

20

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's March 19, 2026 order and questions, Plaintiff's counsel certifies that these responses to the Court's questions compy with the Court's type-volume limitation. According to the word count calculated by the Microsoft Word processing system, I certify that these responses (excluding the italic type repeating the Court's questions) contain 4256 words.

/s/ Daniel J. Cannistra

Daniel J. Cannistra

EXHIBIT I

Response to Question 1 (Table)

| Alleged Error | Disputed by Bridgestone | Conceded by Commerce | Remedied | Material to Margin |
|---|---|---|---|---|
| **GCR Accounts Receivable (A/R)** – Commerce initially asserted that Bridgestone failed to provide requested A/R documentation for affiliated GCR locations, and later reframed the issue as failure to provide a "complete reconciliation." (Verification Report at 17–18; Final Decision Memo at 20) | Yes. Bridgestone demonstrated that it provided the requested A/R reports at verification and that Commerce reviewed them. Bridgestone further explained that A/R reports reflect outstanding balances by customer and cannot be used to reconcile or establish completeness of sales. (Compl. ¶¶ 33–34, 43; ECF No. 60) | Not expressly conceded, but Commerce's position shifted from denial of receipt, to denial of review, to reframing the request as a "reconciliation," without record support | **Yes.** The Court ordered the A/R documents onto the judicial record, confirming they were requested, provided, and reviewed at verification. (ECF No. 59-1; ECF No. 60) | No. Commerce identified no unreported sales, and verification found no discrepancies in completeness testing, including sales to GCR, which represented less than 0.5% of total U.S. sales.  This was the fourteenth completeness exercise conducted by Commerce at verification, not a reconciliation exercise. . A/R reports cannot establish missing sales; thus no impact on margin. (Verification Report at 2, 17–18) |
| **Rebate Reporting** – Commerce asserted that Bridgestone failed to provide necessary rebate documentation at verification and therefore information was missing. (Final Decision Memo at 22–24) | Yes. Bridgestone demonstrated that Commerce requested, received, and used rebate reports and supporting data to verify totals and select sample transactions. (Verification Report at 25; CEP-VE-10; Compl. ¶¶ 61–72; ECF No. 60) | Not expressly conceded, but contradicted by the verification record and later Government admissions that the documents were requested, received, and reviewed | **Yes.** The Court ordered the rebate documentation onto the judicial record, confirming the information was provided and examined at verification. (ECF No. 59-1; ECF No. 60) | No. Commerce verified total rebate amounts and used the data. Any issue concerned allocation only and had no material impact on the margin. (Verification Report at 25; Preliminary Margin Memo at PDF 5, 439). Commerce's assertion was that the highest and lowest rebate amounts were not available, which has been disproven. |
| **OTHDISU (National Account Discounts)** – Commerce initially asserted Bridgestone failed to provide an itemized reconciliation, but later acknowledged the reconciliation tying credit/debit notes to the trial balance was provided. (Verification Report at 23; Final Decision Memo at 23) | Yes. Bridgestone demonstrated that the requested reconciliation was provided and included in verification exhibits. (Verification Report Ex. CEP-VE-5A, CEP-VE-8; Admin Case Br. at 17–19) | **Yes.** Commerce expressly acknowledged that the amounts were reconciled to the trial balance. (Final Decision Memo at 23) | Not applicable. The requested information was already on the record and verified | No. Underlying data were reconciled and verified; no impact on price or margin calculation.  Moreover, Commerce's acceptance and reconciliation of the other discounts verification exhibit to the financial statements confirms that the information was provided in the form and manner requested, undermining |

| Alleged Error | Disputed by Bridgestone | Conceded by Commerce | Remedied | Material to Margin |
|---|---|---|---|---|
| | | | | any contrary argument with respect to GCR. |
| **ZIP Code Reporting** – Commerce asserted that Bridgestone reported ZIP codes based on billing rather than shipping addresses. (Final Decision Memo at 28–29) | Yes. Bridgestone explained its reporting methodology and the limited purpose of the ZIP code field. (Final Decision Memo at 28; Preliminary Margin Memo at 233) | No | Not applicable | No. ZIP codes are used only in Cohen's d regional analysis. Bridgestone's sales already failed the test on other independent criteria, so this field could not affect the margin. (Preliminary Margin Memo at 233, 439) |
| **DWAREHU (Warehousing Expense Field)** – Commerce asserted Bridgestone failed to report a warehousing expense in the U.S. sales database. (Final Decision Memo at 30) | Yes. Bridgestone explained that the expense was fully and correctly disclosed in narrative responses, including amount, account, and supporting documentation, and that the issue was a clerical omission in the data field. (Supplemental Section C QR at 30; 2SSBCQR Ex. 2SB-7). | No | Not formally. Commerce did not raise the issue in supplemental questionnaires or provide an opportunity to remedy as required by statute | No. The underlying data were on the record and verifiable; the issue was a clerical presentation matter, not missing information. Additionally, the record shows that these expenses were incurred prior to the POI and should not be included in the margin calculation.  See 2nd Supplemental Sections B and C Questionnaire Response (May 22, 2024) ("2SSBCQR"), at Exhibit 2SB-7 (Identifying the expenses as a balance from the previous period). |
| **Miscellaneous Clerical / Expense Issues (Freight, Warehousing, Indirect Selling, Packing)** – Commerce identified labeling inversions, formula errors, and classification issues in expense calculations. (Final Decision Memo at 29–34) | Yes. Bridgestone explained that these were clerical or formula issues and that all underlying data were reported and verified. (Verification Report at 34; CEP-VE-18; CEP-VE-20; CEP-VE-13) | No | Not applicable. Issues were correctable using existing record data | No. These issues did not affect the reliability of the dataset and, in some cases, overstated expenses and increased the margin. They do not render the data unusable As demonstrated in Bridgestone's reply brief, the issue for both warehousing and ISE was simply a failure to copy over one segment of the POI denominator. All of the correct data are in the worksheet, and no party to the underlying administrative proceeding notice the error or |

| Alleged Error | Disputed by Bridgestone | Conceded by Commerce | Remedied | Material to Margin |
|---|---|---|---|---|
| | | | | bothered to comment on it, because the impact is immaterial. Likewise, the alleged packing error was the inclusion of a small strap not used for tires in the calculation of HM packing, which had no material impact ($0.007 USD per unit) on the margin.  The inland freight "error" is likewise on the record correctly, although the correct amount did not end up in the database. This is one line of programing in the Commerce Department's margin program, for an immaterial adjustment that Commerce declined to make. |

See also, Plaintiffs Exhibits to Motion for Leave to File Reply to Declarations, ECF No. 55, Motion for Judgment on the Agency Record ECF. 63, and Reply in Support of Motion ECF 77.